# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BANCO PANAMERICANO, INC., a South Dakota Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 07 C 15 |
| CONSORTIUM SERVICE MANAGEMENT GROUP, INC., also known as CONSORTIUM MANAGEMENT GROUP, INC., a Texas Corp., and CSMG GASTECH, LLC, a Texas LLC, | ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |
| CONSORTIUM SERVICE MANAGEMENT GROUP, INC., also known as CONSORTIUM MANAGEMENT GROUP, INC., a Texas Corp., and CSMG GASTECH, LLC, a Texas LLC, | ) ) ) ) ) | |
| Counter-Plaintiffs, | ) ) | |
| v. | ) ) | |
| BANCO PANAMERICANO, INC., a South Dakota Corporation, | ) ) ) | |
| Counter-Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Banco Panamericano, Inc. ("Banco") filed this breach of contract action against Defendants Consortium Service Management Group, Inc. ("CSMG") and CSMG Gastech, LLC ("Gastech") (together, the "Defendants"). In total, Banco calculates that it is entitled to recover $1,043,123.85. Because more than $75,000 is at stake and, as explained below, the parties are diverse in citizenship, the court's jurisdiction is secure.

This case arises from a February 15, 2002 Consolidated, Amended and Restated Loan, Guaranty and Security Agreement (the "Loan Agreement") and Promissory Note (the "Note"). Pursuant to these instruments, Banco loaned CSMG and Gastech $203,800 for work they would

perform pursuant to a contract with a company called Resource Technology Corporation ("RTC"). Banco contends that Banco advanced principal under the instruments, but Defendants failed to repay those advances. According to CSMG and Gastech, Banco's owner, Leon Greenblatt, used RTC, which he partially owns, to defraud Defendants and induce them to enter into the agreements with Banco and a separate contract with RTC. Based on this purported conduct, Defendants have filed several affirmative defenses as well as counterclaims for fraud, conspiracy, and breach of contract. Banco now moves for summary judgment on its breach of contract claims against CSMG and Gastech, on CSMG's and Gastech's affirmative defenses, and on CSMG's and Gastech's counterclaims. For the reasons explained below, the court grants Banco's motion for summary judgment on the Defendants' liability only. As genuine issues of material fact remain, the amount of damages to be awarded is reserved pending further proceedings.

## FACTUAL BACKGROUND

The facts presented here are drawn from the parties' Local Rule 56.1 Statements: Banco's amended Rule 56.1(a) statement ("Pl.'s 56.1"); CSMG's and Gastech's Rule 56.1(a) response to Plaintiff's Rule 56.1(a) statement ("Defs.' 56.1 Resp."); CSMG's and Gastech's Rule 56.1(b) statement of additional facts ("Defs.' 56.1"); and Banco's response to Defendants' statement of additional facts ("Pl.'s 56.1 Resp."). Unless noted otherwise, the facts are undisputed.

### I. Parties

Banco is incorporated in South Dakota corporation and has its principal place of business in Chicago, Illinois. (Pl.'s 56.1 ¶ 2; Notice of Removal ¶ 3, 05 C 1429 Docket Entry No. 1.) CSMG is a Texas corporation with its principal place of business in Corpus Christi, Texas. (Pl.'s 56.1 ¶ 3; Notice of Removal ¶ 4.) Gastech was a Texas limited liability company, until the State of Texas dissolved it on February 14, 2003. (Pl.'s 56.1 ¶ 4.) Gastech is a subsidiary of CSMG. (Notice of Removal ¶ 5.) None of Gastech's members is an Illinois citizen. (*Id.*)

Aside from the three parties, one other entity plays a significant role in this litigation: RTC.

RTC is an Illinois corporation that was engaged in the business of constructing and operating landfill gas collection and conversion systems between January 1999 and July 2003. (Pl.'s 56.1 ¶ 1.) Involuntary bankruptcy proceedings were initiated against RTC on November 15, 1999 and converted to Chapter 11 bankruptcy proceedings on January 18, 2000. (Id. ¶ 10.) In many ways, Banco and RTC are intertwined. As just one example, both entities are connected to Greenblatt: one of Greenblatt's family trusts owns Banco, and RTC is the wholly-owned subsidiary of a company of which Greenblatt is the 50% owner. (Defs.' 56.1 ¶¶ 1-2.) The relationship between these entities is significant and will be set forth in greater detail below, because Defendants contend that Greenblatt (and thus Banco) manipulated RTC and its employees to defraud them in connection with the Note.

## II.    Landfill Gas Projects

### A.    Corpus Christi

Since 1999, CSMG has been engaged in a business relationship with RTC in which CSMG has worked to develop a method of purifying gases emanating from RTC's landfills, by separating carbon dioxide from methane to produce a commercially saleable methane gas. In 1999, CSMG's President and Chairman, Donald S. Robbins, and RTC employee Kevin Werner discussed the possibility that CSMG might sell the proposed technology to operators of natural gas pipelines. (Pl.'s 56.1 ¶ 11.) In 2000, Robbins, Werner, and another RTC employee—George Calvert—had further conversations, specifically discussing the equipment needed to remove carbon dioxide from the landfill gases. (Defs.' 56.2 ¶ 9.) During one such conversation, Calvert and Robbins discussed RTC's interest in using the CSMG technology to purify gas at the J.C. Eliot Landfill in Corpus Christi, Texas (the "Corpus Christi Landfill"). (Id.) Calvert did not believe that CSMG's machine could in fact separate the carbon dioxide in landfill gas from the methane or that RTC could produce commercially saleable methane gas from landfill gas. (Id. ¶ 10; Calvert Dep. 114:7-16, Ex. 2 to Defs.' 56.1.) Calvert testified that he told CSMG (and, thus, its subsidiary, Gastech) "from the

beginning" that a machine could not separate carbon dioxide from methane. (*Id.* at 109:5-14.) Calvert also told Greenblatt he was skeptical about the project. (*Id.* at 122:21-123:17.) Greenblatt replied that he had been told (the record does not make clear who told him this) that the machine had worked in Ukraine and replied to Calvert: "Give it a try." (*Id.* at 123:21-124:10.) Calvert claims, however, that Greenblatt never directed RTC to do, or not to do, any particular business activity. (*Id.* at 95:13-21.)

Whatever Calvert's reservations may have been, it is undisputed that on approximately June 14, 2001, CSMG and RTC entered into an Operating Agreement related to the Corpus Christi Landfill. (Pl.'s 56.1 ¶ 8.) Pursuant to that Agreement, RTC granted CSMG the right to use a portion of the Corpus Christi Landfill to evaluate, collect, explore, test, treat, process, develop, and utilize gases produced there. (*Id.*; Operating Agreement dated 6/14/01 §§ 1.5, 1.8, 2, Ex. H to Pl.'s 56.1.) CSMG agreed to provide a methane separator plant (or scrubber) at the Landfill. (*Id.* § 4b.) In exchange, RTC agreed to provide, among other things, landfill gases and the equipment necessary to transport those gases to the plant; RTC also agreed to compensate CSMG monthly for providing the scrubber. (*Id.* §§ 4a, 5.) Specifically, RTC agreed to provide "at least 1750 CFM [cubic feet per minute] of Landfill Gas." (*Id.* § 4a.) RTC agreed, further, that it would make its "[b]est efforts to provide Landfill Gas with less than One Percent (1%) of air by volume." (*Id.*) There is no indication in the record that Banco or Greenblatt had any additional involvement in the Corpus Christi project at that point.

Ultimately, the Corpus Christi landfill project was not a success. Calvert testified that RTC abandoned the operation once it became clear that the City of Corpus Christi was creating "roadblocks" for RTC in an effort to steer the gas processing project to a local operator. (Calvert Dep. 137:24-138:5.) The parties agree that RTC was unable to fulfill its contract at the Corpus Christi Landfill, and that RTC and CSMG did not complete the gas scrubbing operation. (Pl.'s 56.1 ¶ 12; Defs.' Resp. to Pl.'s 56.1 ¶ 12.) Calvert testified that at some unspecified point, he and

Greenblatt discussed the decision to abandon the Corpus Christi Landfill. (Calvert Dep. 154:17-155:2.) After Calvert told Greenblatt that the issues at the site would never be straightened out, Greenblatt replied that they should "scrap" the project. (*Id.*)

## B. Chastang

RTC employee Kevin Werner was responsible for RTC's operations at the Chastang Landfill in Mobile, Alabama (the "Chastang Landfill") from January 1999 to July 2002. According to Robbins, Werner told Robbins in late 2001 that RTC had decided to move the carbon dioxide separator (or scrubber) from Corpus Christi to the Chastang Landfill, where RTC had negotiated a contract for the sale of processed gas. (Defs.' Resp. to Pl.'s 56.1 ¶ 13; Aff. of Kevin Werner dated 12/7/04 ¶ 2, Ex. O to Pl.'s 56.1 ("Werner Aff.").)[1] Robbins responded by telling Werner that CSMG would need to finance the cost of moving its scrubber to the Chastang Landfill and asked RTC to suggest a funding source. (Pl.'s 56.1 ¶ 14.) It is unclear why CSMG was required to bear the cost of moving its scrubber on RTC's behalf, but an unspecified individual from RTC suggested Banco as a funding source. (*Id.*) As described in greater detail below, Banco agreed to loan CSMG and Gastech $203,800. (*Id.* ¶ 16.) In total, CSMG's budget for installing the scrubber at the Chastang Landfill totaled $1,440,000; the loan at issue in this litigation was intended to partially fund this venture. (*Id.*)

On approximately February 14, 2002, CSMG and RTC executed another Operating Agreement, this one related to the Chastang Landfill project. (Pl.'s 56.1 ¶ 9.) In the 2002 Operating Agreement, CSMG agreed to provide an operational methane separation plant. (Operating Agreement dated 2/14/01[2] § 4, Ex. I to Pl.'s 56.1.) To facilitate this, RTC granted CSMG the right

---

[1] Although Banco suggests that CSMG made this decision to move the scrubber together with RTC, the deposition testimony Banco cites does not support its construction.

[2] Despite the date on the Operating Agreement, the parties agree that it was, in fact, entered into in 2002. In the signature block, representatives from RTC and CSMG dated the

(continued...)

to use a portion of the Chastang Landfill, without cost, for a period of five years "for the evaluation, testing and exploration program, and the construction, operation and maintenance" of gas processing facilities and related equipment, pipes, and utility lines. (Pl.'s 56.1 ¶ 9; 2/14/01 Operating Agreement §§ 1.4, 1.5, 2, 3.) According to the 2002 Operating Agreement, these facilities were to be used for evaluating, exploring, testing, treating, processing, and utilizing landfill gas and constituent products. (*Id.* § 1.4.) RTC agreed to provide at least 1750 CFM of landfill gas, and assured CSMG that the gas would be less than 1% oxygen by volume. (*Id.* § 4.) In exchange, CSMG agreed to provide a methane separator plant and the equipment necessary for the landfill gas purification effort. (*Id.*) CSMG also agreed to provide methane gas to "the end user," at a specified quality level. (*Id.*) Pursuant to the 2002 Operating Agreement, RTC agreed to compensate CSMG, based on a delineated formula. (*Id.* § 5.)

Just prior to execution of the 2002 Operating Agreement, in January 2002, RTC and the owners of the Chastang Landfill–TransAmerican Waste Industries, Inc.—amended their agreement to provide that RTC would complete installation of the CSMG scrubber by September 1, 2002 and undertake to commence delivery and sale of landfill gas to a named customer—Mobile Solid Waste Authority ("Mobile")–by that date. (Defs.' 56.1 ¶ 33; Amendment to December 23, 1996 Agreement, Ex. 10 to Defs.' 56.1 (at Dep. Ex. 6).)[3] Between February 2002 and May 2003, RTC and CSMG installed the scrubber at the Chastang Landfill. (Pl.'s 56.1 ¶ 15.) RTC spent more than $800,000 on the project; its work on the Chastang Landfill project included constructing foundations and infrastructure as well as purchasing components for the scrubber. (*Id.* ¶ 47.) Nevertheless, by

_____

[2](...continued)
agreement February 2002.

[3]    The Amendment, dated January 24, 2002 and signed by John Connolly on behalf of RTC but not signed by TransAmerican Waste Industries, Inc., is available in the record (Amendment to December 23, 1996 Agreement), but the December 23, 1996 Agreement is not. The parties apparently entered into the Amendment due to RTC's pending bankruptcy proceedings.

March 2003, RTC was still unable to deliver processed gas meeting Mobile's requirements, as the gas's oxygen level exceeded that required by the customers. (Defs.' 56.1 ¶ 36.) In July 2003, the landfill owner evicted RTC from the site, claiming that RTC had failed to timely complete the project at the Landfill. (Pl.'s 56.1 ¶ 48.) CSMG challenges the notion that its equipment was to blame for the failure. Robbins testified that the volume of gas generated at the Chastang Landfill never reached the 1750 CFM and that the oxygen content of the gas provided to the carbon dioxide separator was never below 1%, as specified in the 2002 Operating Agreement. (Defs.' 56.1 ¶ 38.) According to Robbins, this prevented the parties' successful delivery of processed gas to Mobile. (*Id.*)

Subsequently, on December 17, 2004, RTC's Chapter 11 trustee, CSMG, and various other entities reached a settlement agreement relating to the Chastang Landfill. (Pl.'s 56.1 ¶ 49.) When the Bankruptcy Court approved that agreement, RTC's gas rights at the Chastang Landfill were terminated, and "RTC's equipment at the Chastang landfill" was sold free and clear of Banco's lien. (*Id.*) The gas rights, the Chastang project, and the other equipment RTC had at the Chastang Landfill had all been collateral for Banco's DIP loan to RTC. (*Id.* ¶ 51.)

## III. The Loan

The parties agree that Plaintiff, as lender, and Defendants, as borrowers, entered into the Note and Loan Agreement contemporaneous with the 2002 Operating Agreement. Robbins executed the Note and the Loan Agreement on behalf of both CSMG and Gastech. (Pl.'s 56.1 ¶ 5; Note, Ex. D to Pl.'s 56.1; Loan Agreement, Ex. E to Pl.'s 56.1.) The Note is for the principal amount of $203,800 at an interest rate of 12%. (Pl.'s 56.1 ¶ 18.) By its terms, the "Note evidences a straight line of credit," and permits advances on either oral or written request. (Note.) The Note also provides that, "[o]nce the total amount of principal has been advanced, Borrowers is to [sic]

entitled to further loan advances." (*Id.*)[4]  That same clause specifies that Banco is under no obligation to advance funds under enumerated conditions, including if the borrowers are on default under the terms of the Note.  (*Id.*)

In the Note, CSMG and Gastech agreed to repay the loan in twenty payments of $5,000 each, beginning on June 1, 2002, and to make monthly payments of accrued, unpaid interest on each payment date.  (Pl.'s 56.1 ¶ 18; Note.)  The Note contains a maturity date of June 1, 2004, at which time all remaining principal and accrued interest was due.  (Defs.' 56.1 ¶ 24; Note.)  Defendants contend, however, that it had no obligation to make monthly payments "unless funds had been advanced by Banco under the line of credit provided in the Note."  (Defs.' Resp. to Pl.'s 56.1 ¶ 18.)  In his deposition, Greenblatt acknowledged that CSMG was required to make repayments under the Note only if Banco had advanced funds "under the straight line of credit," but he testified that funds were in fact advanced pursuant to the Note prior to June 1, 2002.  (Deposition of Leon Greenblatt of 8/27/07 37:4-16, Ex. 1 to Defs.' 56.1.)

Simultaneously with the Note, CSMG and Gastech as borrowers and Banco as lender entered into the Loan Agreement.  (Loan Agreement.)  The Loan Agreement states that the Promissory Note evidences a demand loan.  (*Id.* at Preliminary Statements.)  In the Loan Agreement, CSMG acknowledges that it is indebted to Banco in the principal amount of $203,800.  (*Id.*)  Banco acknowledges agreeing to provide unspecified amounts of "requested additional credit" to CSMG pursuant to the terms and conditions in the Note and Loan Agreement.  (*Id.*)

### A.    Advances Made Under the Note

There is no genuine issue of material fact as to whether the principal amount of $203,800 was advanced under the Note; CSMG and Gastech admit this.  They do not admit that it was Banco who advanced the funds, but as they have not identified any other lender for the funds they

---

[4]       No argument has been made that this clause is ambiguous.

admittedly received, the court deems admitted Banco's assertion that it advanced the money. (Pl.'s 56.1 ¶ 20.) Confirming this, in a November 2007 SEC filing, CSMG stated: "The Company is in default on a note with an initial balance of $203,800 to Banco Pamamericano [sic] that became due April 1, 2002. On February 10, 2005, Banco Panamericano filed suit in the Circuit Court of Cook County, Illinois for $514,920 (balance accrued as of September 30, 2007 including interest at 12% is $368,685)." (CSMG Form 10-QSB dated 11/13/07 at 29, Ex. N to Pl.'s 56.1.) As explained below, the parties dispute whether additional sums were advanced as well, but Plaintiff has effectively withdrawn its claim for any such additional sums. (Reply at 3 ("Banco is willing to accept summary judgment for $203,800 plus interest and late charges.").)

Banco asserts that it advanced funds in excess of $203,800: in the Complaint, filed initially in February 2005, Banco asserted that it advanced $211,205.61 on behalf of Defendants, under the terms of the Note and the Loan Agreement. (Compl. ¶ 17, Ex. B to Pl.'s 56.1.) Defendants denied this assertion. (Ans. ¶ 17, Ex. C to Pl.'s 56.1.) Now, Banco asserts–again over Defendants' objection–that it advanced $223,197.26 under the Note between March and December 2002. (Pl.'s 56.1 ¶ 19.) To support this, Banco points to a series of checks in its Local Rule 56.1 Statement. (Banco Panamericano Inc. Checks, Ex. J to Pl.'s 56.1) These checks reflect payments of:

- $5,000 to Hydraulic Crane Specialists, Inc. (6/12/02; with "Partial payment Crane Rental - Mobile Project" on the memo line)
- $500 to Thrifty Car Rental (6/28/02, with "CSMG" on the memo line)
- $17,835 to Silvertrans Inc. (5/10/02; with "CSMG" on the memo line)
- $8,600 to Alamo Transformer Co. (5/10/02; with "CSMG" on the memo line)
- $2,380 to Cat Rental Store (6/28/02; with "1881645 CSMG L9203001" on the memo line)
- $6,557.50 to Hydraulic Crane Specialists (7/8/02)
- $2,000 to Towne Place Suites (7/8/02)
- $2,296.26 to Diversified Employment (7/8/02)
- $2,500 to J&C Diversified (7/8/02)
- $750 to Thrifty Car Rental (7/8/02)

- $2,500 to Clark Geer Latham (7/8/02)

- $1,124.02 to Thrifty Car Rental (7/24/02; with "CSMG A/C" on the memo line)

- $1,391.04 to Porter Capital (7/29/02; with what appears to be "#CG 1600" on the memo line)

- $8,600 to Alamo Transformer Co. (10/28/02; with "CSMG" on the memo line)

- $6,611 to Boh Bros. Construction Co. (12/3/02)

- $5,000 to Clark Geer Latham (12/3/02)

- $23,559.07 to Bagby & Russell Electric Co. (11/29/02; with "CSMG/RTC Chastang Landfill" on the memo line)

- $38,936.50 to Bagby & Russell Electric Co. (12/10/02; with "CSMG/RTC Chastang Landfill" on the memo line)

- $2,491.65 to Thrifty Car Rental (12/10/02)

- $40,169.22 to Diversified Employment Services (12/12/02; with "CSMG/RTC Chastang Landfill Project" on the memo line)

(*Id.*) Greenblatt—as Banco's President, sole officer, and director—attests that the documents "are true and correct copies of checks and wire transfers by Banco in satisfaction of invoices submitted by CSMG." (Aff. of Leon Greenblatt, undated, ¶¶ 2, 23 ("Greenblatt Decl."), Ex. K to Pl.'s 56.1.) In addition, Greenblatt states that "Banco paid invoices submitted by CSMG for payment, making payments in the total amount of $223,197.26." (*Id.* ¶ 23.) The checks in Exhibit J, however, total just under $179,000–well short of the sum Greenblatt identifies. Nor does Exhibit J contain any evidence of wire transfers.

Based on these inconsistencies, Defendants challenge Banco's evidentiary support for the advances it claims to have made pursuant to the Note. Banco replies that it "mistakenly omitted certain documents showing wire transfer advances" from Exhibit J; to remedy this, Plaintiff purports to attach those documents to its Reply. (Reply at 2.) The documents attached to the Reply include:

- Redacted Bank Statement issued by CIB Bank to Banco Panamericano Inc. (10/31/02 with the entry: 10/18 OUT WIRES ALL OUT WIRES 28,343.97)

- Letter from P. Comella to E. Sharp of RTC of 9/20/02 (re: RTC v. Trans America Waste Industries, Inc.; Waste Management, Inc. requests that RTC satisfy a lien on the "Chastang Landfill")

- Letter from V. Drinkard, Jr. to Waste Management Inc. of 9/19/02 (stating that Reliable Staffing, Inc. has claimed a lien as a result of CSMG's failure

to pay work and labor costs)

- Verification for and Verified Statement of Lien (for lien on the "Chastang Landfill" claimed by Reliable Staffing, Inc.)

- Reliable Staffing Inc. invoice to CSMG dated 9/10/02 for $896.80; sold and assigned to Porter Capital[5]

- Reliable Staffing Inc. invoice to CSMG dated 9/3/02 for $4,458.97; sold and assigned to Porter Capital

- Reliable Staffing Inc. invoice to CSMG dated 8/27/02 for $6,177.37 (description specifies that work is on the "Chastang Land Fill"); sold and assigned to Porter Capital

- Unidentified invoice to CSMG dated 8/19/02 for $4,890.57

- Reliable Staffing Inc. invoice to CSMG dated 8/11/02 for $4,593.77 (description specifies that work is on the "Chastang Land Fill"); sold and assigned to Porter Capital

- Diversified Employment Services, Inc. - MECO invoice to CSMG dated 8/6/02 for $6,768.31

- Domestic Money Transfer from M. May to Porter Capital dated 9/6/02 for $4,944.03

- Letter from A. Smith (Reliable Staffing Inc.) to D. Robbins (CSMG) dated 7/16/02 (re: invoicing; stating that invoice payments should be made directly to Porter Capital)

- Reliable Staffing Inc. invoice to CSMG dated 7/29/02 for $2,741.55 (description specifies that work is on the "Chastang Land Fill"); sold and assigned to Porter Capital

- Reliable Staffing Inc. invoice to CSMG dated 7/23/02 for $2,202.48 (description specifies that work is on the "Chastang Land Fill"); sold and assigned to Porter Capital

- Voided check from Banco Panamericano Inc. to Porter Capital dated 8/14/02 for $4,944.03

- Redacted Bank Statement issued by CIB Bank to Banco Panamericano Inc. (8/30/02 with the entry: 8/09 OUT WIRES ALL OUT WIRES 1,608.00)

- GE Capital Modular Space invoice to Robbins dated 6/25/02 for $1,608.00

- Redacted Bank Statement issued by CIB Bank to Banco Panamericano Inc. (10/31/02 with the entry: 10/9 OUT WIRES ALL OUT WIRES 4,500.00)

- Boh Bros. Construction Co., LLC Request for Change Order to CSMG dated 9/23/02 on the "Chastang Compressor Station " project; change in cost will add $6,611.00

(Ex. A to Reply.) According to Banco, the documents contained in Exhibit A, when considered

---

[5] The significance of this sale and assignment is not apparent from the record.

alongside the documents in Exhibit J described above, show that Banco advanced a total of $223,197.26. (Reply at 2.) Banco also submits a revised affidavit from Greenblatt, attesting that Exhibit J contains "true and correct copies of checks by Banco in satisfaction of invoices submitted by CSMG" and that Exhibit A to Banco's Reply contains "[c]opies of documents evidencing those wire transfers" made by Banco as advances. (Revised Aff. of Leon Greenblatt dated 2/8/08 ("Rev. Greenblatt Aff.") ¶ 23, Ex. B to Reply.)

CSMG and Gastech contend that it is not clear that the checks and wire transfers relate to work at the Chastang Landfill, or to the Note and Loan Agreement. Defendants note, further, significant inconsistencies between these documents and other evidence in the record. For example, Defendants point out that RTC employee Werner sent Robbins an accounting of "[d]ates and payments" by e-mail on January 14, 2003. (Deposition of Kevin M. Werner of 10/17/07, Ex. 9 to Defs.' 56.1 (at Dep. Ex. 16); Werner Dep. 166:3-20.) The document attached to that email was entitled "BancoChastang Exp." (*Id.*) The attached chart bears Banco's name and address at the top, and catalogs twenty payments made, which total $204,328.61. (*Id.*) Defendants note that Werner's calculations are inconsistent with Greenblatt's, and they contend that discrepancies create a genuine dispute covering the amount of indebtedess. (Opp. at 8.)

## B. Defendants' Performance

CSMG and Gastech never made any repayments to Banco under the Note. (Pl.'s 56.1 ¶ 21.) Banco therefore claims to have sent CSMG and Gastech a notice of default on December 18, 2002. (*Id.* ¶ 22.) In it, Banco notified Defendants that they were in default due to their failure to make principal and interest payments. (*Id.*) Defendants claim they never received this letter of default. (Defs.' Resp. to Pl.'s 56.1 ¶ 22; Defs.' 56.1 ¶ 31.) The parties agree, however, that Banco sent Defendants a notice of default more than two years later, on January 26, 2005. (Pl.'s 56.1 ¶ 22.) In that letter, Banco stated that unless Defendant paid $288,703.60 within five days, Banco would "declare default due to non-payment of the Banco Indebtedness, and increase

12

the interest rate" as permitted by the parties' agreements. (Defs.' 56.1 ¶ 32.) Thereafter, as noted, in its November 2007 SEC filing, CSMG acknowledged being in default on the Note. (Pl.'s 56.1 ¶ 23.)

## IV.    Litigation

In February 2005, Banco filed a Verified Complaint against CSMG and Gastech in the Circuit Court of Cook County, Case No. 2005 L 1614. On the basis of diversity jurisdiction, CSMG and Gastech removed the action to this court on March 10, 2005, Case No. 05 C 1429. In their Answer, filed in this court on April 8, 2005, Defendants asserted thirteen affirmative defenses. (Ans.) Defendants also filed counterclaims against Banco, alleging fraud, conspiracy to defraud, and breach of contract. (*Id.*)

On June 28, 2005, CSMG and Gastech requested that the court refer this action to the Bankruptcy Court, which had since 1999 been adjudicating RTC's bankruptcy proceedings. (05 C 429 Docket Entry No. 18.) Defendants pointed out that they had asserted the defenses of substantive consolidation and alter ego, based on their contention that Banco and RTC had "a unity of interests and interlocking and overlapping ownership." (05 C 1429 Docket Entry No. 18 at 4.) Defendants' substantive consolidation defense rested on an assertion that RTC released Defendants from their obligations under the Note via a settlement agreement that also binds Banco, in light of the substantial identity between Banco and RTC.[6] Their alter ego defense consisted of an assertion that RTC's settlement agreement binds Banco because RTC was an instrumentality of Banco. (Ans. at 10.) The court agreed to refer the parties' dispute to the Bankruptcy Court, which considered these affirmative defenses. (05 C 1429 Docket Entry No. 34.) Ultimately, the Bankruptcy Court ruled that Defendants' substantive consolidation and alter ego claims lack merit,

---

[6]     Substantive consolidation occurs where the assets and liabilities of different legal entities are "dealt with as if the assets were held by and the liabilities were owed by a single legal entity." 2 *Collier on Bankruptcy* § 105.09[1][a] (15th ed.).

prompting Banco to move to withdraw the reference to the bankruptcy court on January 3, 2007. (Docket Entry No. 1.) No appeal has been taken from this ruling and, thus, Defendants cannot argue here that Banco and RTC and indistinguishable entities.

Banco now moves for summary judgment on its breach of contract claims against CSMG and Gastech, as well as on Defendants' counterclaims. (Docket Entry No. 61.)

## DISCUSSION

### I.    Legal Standard for Summary Judgment

Summary judgment is appropriate for Banco if the record shows that Banco is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Although the moving party [Banco] bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the nonmoving part[ies, CSMG and Gastech,] 'retain[] the burden of producing enough evidence to support a reasonable jury verdict in [their] favor.'" *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 651 (7th Cir. 2007) (quoting *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005)). When deciding whether summary judgment is appropriate, the court must view the facts and all legitimate inferences from those facts in the light most favorable to the Defendants, as the non-moving parties. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

### II.    Plaintiff's Breach of Contract Claims/Defendants' Breach of Contract Counterclaim

Because this is a diversity action, the court applies the substantive law of Illinois to the breach of contract claims, as it believes the Supreme Court of Illinois would apply that law. *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007). "Under Illinois law, the elements of a breach of contract cause of action are (1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Id.* (internal quotation marks and citation omitted). As discussed above, there is no dispute that the parties had a valid contract, and therefore Banco has proven the first three

elements of its breach of contract claims. The dispute centers on the remaining three elements of Banco's breach of contract claims and CSMG's and Gastech's breach of contract counterclaim: Banco's performance, Defendants' breach, and Banco's damages.

### A.    Banco's Damages

According to Defendants, Banco is not entitled to summary judgment on its case in chief because "genuine and significant issues of fact surround the actual amount Banco may be entitled to [recover] under the Note." (Opp. at 9.)  The court agrees that the amount of Banco's damages is a matter of genuine dispute.  First, Banco's documentary evidence of the amount of principal advanced pursuant to the Note and Loan Agreement is incomplete.  It is not apparent that each check in Exhibit J to Plaintiff's Local Rule 56.1 Statement reflects a payment related to the Chastang landfill project.  Moreover, even assuming each of the checks is accurate and relevant to the Note, the checks in Exhibit J do not total advances in the amount of $223,197.26.  Banco tried to remedy this second deficiency by providing evidence of wire transfers it made, evidence Banco claims was inadvertently omitted from Exhibit J.  But the documents in Exhibit A to Plaintiff's Reply—which purport to evidence those wire transfers—are insufficient for the purpose.  It is unclear how the collection of letters, bank statements, invoices, and other documents in Exhibit A should be interpreted.  For example, the bank statements indicate that some wire transfers were made—but it is not always clear to whom they were made, or for what purpose.  In addition, although the letters in Exhibit A discuss wire transfers, they do not explicitly reflect such transfers. It is therefore not apparent to the court how Banco intends for the documents to fit together, or what each individual document should demonstrate.

In other words, Banco has not sufficiently explained the raw evidence it provides to the court in Exhibits A and J.  Banco's only attempt to do so can be found in Greenblatt's Declaration and Revised Affidavit.  (Ex. K to Pl.'s 56.1; Ex. B to Reply. )  With respect to the documents, Greenblatt states that Exhibit J contains "true and correct copies of checks by Banco in satisfaction of invoices

submitted by CSMG," and that Exhibit A contains "documents evidencing. . . wire transfers." (Rev. Greenblatt Aff. ¶ 23.) He provides no additional detail, beyond stating the conclusion that "Banco fully funded its obligations under the Note. Banco paid invoices submitted by CSMG for payment, making payments in the total amount of $223,197.26." (*Id.*) Without further explanation of the documents in Exhibit A and Exhibit J, however, these conclusory statements in Greenblatt's affidavit are not useful. *Toro Co. v. Krouse, Kern & Co.*, 827 F.2d 155, 163 (7th Cir. 1987) ("Conclusory statements [contained in an affidavit] are . . . unacceptable."); *see also Fenje v. Feld*, 301 F. Supp. 2d 781, 814 (N.D. Ill. 2003) ("A summary judgment affidavit may include inferences . . . as long as they are based on underlying facts of which the affiant has personal knowledge.").

Without an evidentiary basis for determining the precise amount of principal advanced, the court is not able to calculate Banco's damages. Indeed, Banco's own exhibits demonstrate as much. Banco has submitted two charts that purportedly summarize its damages. According to Exhibit R to Plaintiff's Local Rule 56.1 Statement, the principal due is $223,197.26; the contract interest due (accruing as of the first loan payment on March 4, 2002) is $248,066.28; the default interest due (accruing as of January 1, 2003) is $495,697.77;[7] and the late fees due are $46,686.76.[8] Taken together, these sums total $1,013,648.07, as of December 3, 2007. Exhibit D to Plaintiff's Reply sets forth different totals. First, updating the sum in Exhibit R to reflect the additional interest and late fees accrued during briefing, Banco claims in Exhibit D that its damages total $1,043,123.85. This calculation, which Greenblatt claims he personally performed (Rev. Greenblatt Aff. ¶¶ 28-30), purportedly includes all payments made to vendors under the Note, which comprise the principal on which contract and default interest was due. (*Id.*) Alternatively, the chart

---

[7] The Note provides that upon CSMG's and Gastech's default, Banco may "increase the interest rate on this Note to 36.5 percent" without notice to the borrowers. (Note.)

[8] The Note provides that if a payment is at least ten days late, CSMG and Banco "will be charged 5.000% of the unpaid portion of the regularly scheduled payment." (Note.)

adds together a principal amount of $203,800 (the amount Defendants admit was advanced), the contract and default interest due on that amount ($709,960.03), and late fees ($45,537.11). In total, Exhibit D calculates Plaintiff's damages, assuming that a principal amount of $203,800 was advanced, at $959,297.14. There is clearly a dispute of fact as to the amount of principal Banco advanced.

As note earlier, Plaintiff has agreed to withdraw its claim for any principal beyond the admitted indebtedness of $203,800, plus interest and late charges due on that principal. (Reply at 3.) Still, Defendants point to a remaining dispute of fact in Banco's calculation of interest. CSMG and Gastech urge that it is improper to calculate default interest as of January 2003. In Greenblatt's January 26, 2005 notice of default letter, he states that "Banco will declare default due to non-payment of the Banco Indebtedness, and increase the interest rate by 36.5 percentage points, if payment in the amount of $288,703.60 is not received within 5 days." (Defs.' 56.1 ¶ 32.) In other words, Greenblatt's letter effectively acknowledges that, as of January 2005, Banco had not increased the interest rate on Defendants' obligation to the default rate of 36.5%. Although the Note permits Banco to increase the interest rate to 36.5% without providing notice to CSMG and Gastech, Defendants urge that it may not do so retroactively. (Opp. at 9.)[9] The court concludes that there is a genuine issue of material fact as to the proper calculation of Banco's damages under the Note. Consequently, summary judgment on the amount of damages owed would be improper.

## B.    Defendants' Liability

This does not end the inquiry, as "[a]n interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages." FED. R. CIV. P. 56(d)(2); *see also McGrath v. Am. Family Mut. Ins. Co.*, No. 07 C 1519, 2008 U.S. Dist. LEXIS 35725 (N.D. Ill. Apr. 29, 2008). As to Defendants' liability for breach of contract, summary judgment

---

[9]      Banco's only response is that it had the "right to charge default interest, without notice" (Reply at 3), which is irrelevant to the question of retroactivity.

for Banco on its case in chief and Defendant's third counterclaim is appropriate: Banco has proven that it has performed its contractual obligations, while CSMG and Gastech have not. It is undisputed that CSMG and Gastech have not fulfilled their contractual obligations. Defendants have made no payments to Banco under the Note. (Pl.'s 56.1 ¶ 21.) Defendants admit receiving a notice of default from Banco on January 26, 2005. (*Id.* ¶ 22.) Thereafter, in a November 13, 2007 SEC filing, CSMG acknowledged being in default on the Note. (Pl.'s 56.1 ¶ 23.)

Under Illinois law, CSMG's and Gastech's non-performance under the Note and Loan Agreement is only justified if Banco <u>materially</u> breached a contract provision. *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 714 (7th Cir. 1993). A breach is material if it "is of such a nature and of such importance that the contract would not have been made without it." *Id.* at 715 (citation omitted); *see also Virendra S. Bisla, M.D., Ltd. v. Parvaiz*, 379 Ill. App. 3d 567, 572-73, 884 N.E.2d 790, 795 (1st Dist. 2008) ("Whether a breach is material involves a determination of whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage consider[] such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.") (citation and internal quotation marks omitted).

To argue that Banco committed a material breach of contract, CSMG and Gastech have intimated in the Local Rule 56.1 Statements (though not in their Opposition) that Banco may have breached the parties' agreements in two ways–by making advances under the Note late, and by failing to pay certain vendors despite Robbins' request. (Defs.' Resp. to Pl.'s 56.1 ¶ 24.) These assertions are not sufficient to create a genuine issue of material fact for two reasons. First, there is no evidence that any of Banco's alleged failures constitutes a material breach. Defendants identify no contractual requirement regarding the timing of payments requested. Robbins stated in his declaration that CSMG experienced delays and damages as a result of late- or non-payments

18

by Banco, and points to letters he sent to Banco regarding these delays. (Robbins Decl. ¶ 11; *see also* Defs.' 56.1 ¶ 28.) Defendants make no mention of this in their Opposition brief, however, and have provided no analysis to show that Banco is responsible for the losses Robbins claims CSMG suffered. Banco was not obligated to pay all of CSMG's and Gastech's expenses related to the Chastang Landfill project. (Pl.'s Resp. to Defs.' 56.1 ¶ 28.) Thus, it is not clear that the unpaid vendors and resulting delays were Banco's responsibility, as opposed to that of other funding sources or of Defendants themselves. Thus, they provide no explanation for how Banco's late- or non-payments rise to the level of a material breach of contract. "It is not the court's responsibility to research the law and construct the parties' arguments for them." *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008). Instead, the parties must "allege facts and indicate their relevance under the correct legal standard." *Id.* (citation and internal quotation marks omitted). Having failed to explain how Banco's alleged late- and non-payments constitute a material breach of contract, CSMG and Gastech "must accept the consequences of that decision." *Id.* The evidence is not sufficient to defeat summary judgment.

In fact, Defendants' own admissions show that any late- or non-payments by Banco did not prejudice the Chastang Landfill project. Robbins testified that "[i]t wasn't the payment [by Banco] that was critical to the success or failure [of the project]." (Deposition of Donald Robbins of 8/28/07 101:24-102:11.) According to Robbins, "[w]hat was critical to the success of the project was getting the things that RTC was supposed to have done in the project. Had they done those and had Banco funded those for RTC, then we would have been in business today." (*Id.*) Robbins explained that Banco failed to fund RTC's work, which damaged RTC, and that CSMG suffered because RTC suffered. (*Id.* 102:12-17.) In effect, Robbins appears to assert that Banco had an obligation to loan funds to RTC if this would be necessary to ensure success of the CSMG project. However wise it might have been for Banco to extend additional loans to RTC, Defendants have not established that Banco's failure to do so constituted a breach of the agreement Banco had

under the CSMG/Gastech contract.  Indeed, CSMG and Gastech admit that they were "never advised that Banco would provide financing or capital to fund RTC's operations . . . at the Chastang Landfill." (Pl.'s 56.1 ¶ 30.)  Thus, even considering arguments made elsewhere in the record but never incorporated into the summary judgment briefing, Defendants have failed to set forth evidence from which a reasonable jury could conclude that Banco breached its contract with CSMG and Gastech.  As a result, Banco is entitled to summary judgment as to liability alone.  For the same reason, Banco is entitled to summary judgment on Defendants' third counterclaim, for breach of the Note and Loan Agreement.

### III.    Defendants' Defenses

Defendants have asserted thirteen affirmative defenses, and Banco moves for summary judgment on all of them.  As noted above, the Bankruptcy Court found no merit to the substantive consolidation (eleven) and alter ego (twelve) affirmative defenses, and therefore struck those defenses.  (Order dated 12/28/06, Ex. A to Docket Entry No. 1.)  As a thirteenth defense, Defendants also maintain a reservation of rights to assert other affirmative defenses.  This is not a proper affirmative defense and is therefore stricken.  In addition, Defendants assert as an affirmative defense set-off or recoupment (four).  The court may consider any such claims when assessing the proper calculation of damages, but they have no impact on Defendants' liability.

The remaining affirmative defenses are: failure to state a claim (one), Defendants not guilty (two), Banco's failure to perform (three), unclean hands (five), lack of consideration (six), estoppel (seven), fraud (eight), illegality (nine), and failure to perform conditions precedent (ten).[10]  Putting

---

[10]    In its discussion of CSMG's and Gastech's affirmative defenses, Banco devotes significant attention to the question of whether the parties orally agreed that CSMG and Gastech would only repay its obligations under the Loan and Note if RTC's operations at the Chastang Landfill generated revenue.  (*See* Pl.'s 56.1 ¶¶ 31-35.)  Defendants, however, make no such argument in their Opposition to Banco's Motion for Summary Judgment.  The court therefore assumes that Banco undertook this discussion out of an abundance of caution.  If Banco intended to assert a defense arising out of a purported oral agreement, it is waived.

aside the question of whether some of these allegations are properly considered affirmative defenses at all and/or are adequately pleaded, *see Reis Robotics USA, Inc. v. Concept Indus.*, 462 F. Supp. 2d 897, 905-06 (N.D. Ill. 2006), CSMG and Gastech have waived them. In response to Plaintiff's motion for summary judgment, Defendants made no arguments in support of any of their affirmative defenses. Failure to support these affirmative defenses in response to Banco's motion for summary judgment constitute a waiver. *See Ty, Inc. v. Publ'ns Int'l Ltd.*, 99 C 5565, 2000 WL 1499449, at *9 (N.D. Ill. Oct. 6, 2000), *rev'd on other grounds*, 292 F.3d 512 (7th Cir. 2002). And, to the extent that Defendants' alleged affirmative defense challenge Banco's proof, or overlap with Defendants' fraud and conspiracy counterclaims, the court's rulings on Banco's claims and on the counterclaim effectively dispose of these affirmative defenses, as well.

## IV.    Defendants' Counterclaims

In addition to their breach of contract counterclaim, Defendants have asserted two other causes of action: one for civil conspiracy and one for common law fraud. For the reasons explained below, Banco is entitled to summary judgment on both.

### A.    Conspiracy

The Seventh Circuit has set forth the elements of a civil conspiracy claim:

> To succeed in a claim of civil conspiracy under Illinois law, the plaintiffs must eventually establish: (1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the coconspirators in furtherance of the agreement that caused an injury to the plaintiff. The agreement is a necessary and important element of this cause of action.

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (quotation marks and internal citation omitted). A conspiracy may be proven by circumstantial evidence so long as that evidence is clear and convincing. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134, 720 N.E.2d 242, 258 (1999); *Baker v. Jewel Food Stores, Inc.*, 355 Ill. App. 3d 62, 69, 823 N.E.2d 93, 101 (1st Dist. 2005). This standard is defined as "the quantum of proof that leaves no

reasonable doubt in the mind of the fact finder as to the truth of the proposition in question, i.e., more than a preponderance while not quite approaching the degree of proof necessary for a criminal conviction." *Id.* at 69-70, 102 (citations omitted). Because it is such a high standard, it "is reserved for exceptional cases, such as where there is a special need for a greater burden of proof either due to contrary presumptions or the potential unreliability of the evidence in question." *Id.* at 69, 101-02 (citations and internal quotation marks omitted). In civil conspiracy cases where only circumstantial evidence is available, the clear and convincing standard is appropriate because that circumstantial evidence may be "as consistent with innocence as with guilt." *Id.* at 70, 102(citations omitted).

According to CSMG and Gastech, the civil conspiracy at issue involves the fraudulent schemes set forth in their fraud counterclaim. (Counterclaim ¶ 29.) In their Opposition to Banco's Motion for Summary Judgment, Defendants urge that Werner falsely represented that the quality and volume of gas available at the Chastang Landfill would make it possible to produce commercially saleable methane gas. (Opp. at 17.) Based on this representation, CSMG and Gastech allege, they spent more than $1.4 million on the Chastang Landfill project. (*Id.*) Because Werner's representations were untrue, CSMG and Gastech were injured. (*Id.*) Aside from the conduct described in the fraud counterclaim (which will be explored in greater depth below), Defendants do not identify any other aspects, elements, or participants to the conspiracy they allege. The conspiracy Defendants describe is therefore one to perpetrate the fraud alleged in the first counterclaim. Where a court dismisses a common law fraud claim, it must also dismiss a claim for conspiracy to commit the acts comprising that common law fraud claim. *Suburban 1, Inc. v. GHS Mortg., LLC*, 358 Ill. App. 3d 769, 774, 833 N.E.2d 18, 22 (2d Dist. 2005). The court turns to the merits of CSMG's and Gastech's fraud counterclaim.

**B.      Fraud**

Defendants allege that, through its agents, Banco made certain fraudulent

misrepresentations. (Counterclaim ¶ 13.) According to Defendants, these misrepresentations include that:

1.  RTC would provide "more than 1750 dm" of landfill gas (13(b));

2.  The quality of landfill gas "needed to be" 1% oxygen (13(c));

3.  RTC would install the equipment necessary to deliver landfill gas to the scrubber (13(d));

4.  There would be saleable gas at the Chastang Landfill if RTC complied with its contractual obligations (13(f));

5.  RTC could and would produce natural gas from the Chastang Landfill, which could be sold in the marketplace (13(g)); and

6.  RTC had gas rights to the entire Chastang Landfill (13(l)).

(Counterclaim ¶ 13.)[11] CSMG and Gastech allege that they relied on these representations when entering into the Operating Agreement with RTC as well as the Note and Loan Agreement with Banco. (*Id.* ¶ 14.) According to Defendants, these representations were part of a fraudulent scheme by which RTC and Banco sought to retain RTC's gas rights at the Chastang Landfill as security for RTC's debt to Banco, thus protecting Banco's financial interests. (Opp. at 13.) To do so, Defendants argue that Banco and RTC misrepresented the likely success of the Chastang

---

[11]    Defendants now acknowledge that they were "never advised that Banco would provide financing or capital to fund RTC's operations . . . at the Chastang Landfill." (Pl.'s 56.1 ¶ 30.) Certain misrepresentations alleged in the counterclaim are therefore no longer at issue. For example, CSMG and Gastech alleged that Banco represented that it would provide RTC with "adequate" funding, so that RTC could perform at the Chastang Landfill. (Counterclaim ¶ 13(e).) Similarly, CSMG and Gastech appear to have withdrawn the allegation that Banco fraudulently represented that it would finance RTC's efforts to comply with its contractual obligations at the Chastang Landfill. (*Id.* ¶ 13(h).)

Defendants also acknowledge that, while they were told that RTC had adequate revenue to perform its obligations at the Chastang Landfill, they could not identify who made this representation to them. (Pl.'s 56.1 ¶ 30.) Based on this admission, a third alleged misrepresentation identified in the counterclaim is also impossible to maintain: that RTC had adequate capital or financing to meet its obligations under the parties' agreements. (Counterclaim ¶ 13(a).) Because Defendants cannot identify the source of the alleged misrepresentation, they cannot hold Banco liable for it.

Landfill project.  (*Id.* at 12-13.)

The Seventh Circuit has set forth the elements of CSMG's and Gastech's fraud counterclaim:

> Under Illinois law, to establish actionable fraud, a [defendant] must prove that [a plaintiff], with the intent to induce [defendant] to act, made a false statement of material fact which [plaintiff] knew or believed to be false. [Defendants] must also show they justifiably relied on the statement and suffered damages resulting from that reliance. Most importantly, fraud must be proved by clear and convincing evidence.

*Ass'n Ben. Servs.*, 493 F.3d at 852 (citation omitted).  According to Banco, none of the statements Defendants point to can sustain a fraud claim, as a matter of law.  The court agrees, for the reasons explained below.

### A.     RTC Employees' Representations

CSMG and Gastech attribute the allegedly fraudulent statements at issue to Banco's owner, Leon Greenblatt, and RTC employees John Connolly and Kevin Werner.  (Counterclaim ¶ 13.)  To begin, the court therefore must ask whether it was Banco who made the allegedly false statements at issue.  *See Lewis v. Lead Indus. Ass'n*, 342 Ill. App. 3d 95, 104, 793 N.E.2d 869, 876 (1st Dist. 2003) (to state a claim for fraud, plaintiff must identify *specific* party who made allegedly false misrepresentations).  Defendants contend that Connolly, Werner, and another RTC employee— William Johnson—were acting as Banco's agents when they made misrepresentations to Robbins, CSMG, and Gastech.  Connolly, Johnson, and Werner were all RTC employees between January 1999 and July 2003.  More specifically, Connolly was RTC's Vice-President of Construction and Environmental Management until May 2001, when he became President of RTC.  (Pl.'s 56.1 ¶ 26.)  During that same time period, Werner and Johnson were also RTC employees, (Pl.'s 56.1 ¶ 27), though less information about their titles is available.  Banco urges that Connolly, Werner, and Johnson were not Banco's agents and, thus, that Banco is not accountable for their actions.

"Agency is a fiduciary relationship in which the agent has the power to act on the principal's

behalf." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004). The "words and conduct" of the principal establish the agency relationship; the alleged agent's words and conduct are not sufficient. *Id.* An agent may have either actual or apparent authority to act on behalf of the principal. *Id.* Actual authority exists if "the principal explicitly grants the agent the authority to perform a particular act." *Id.* (citation omitted). Here, there is no evidence that Banco and/or Greenblatt granted any RTC employee express authority to act on Banco's behalf. They were not Banco employees, officers, or directors. They were not empowered to sign documents on behalf of Banco. The relevant question, then, is whether Banco and/or Greenblatt afforded any RTC employee apparent authority to act on Banco's behalf. Apparent authority exists if

> (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority.

*Id.* at 673. Defendants, as the parties claiming that an agency relationship existed in this case, bear the burden of demonstrating the relationship by a preponderance of the evidence. *Id.* at 672. Here, CSMG and Gastech fail to identify evidence that Banco's words and conduct imbued Connolly, Johnson, and Werner with authority to exercise on its behalf.

In attempting to prove that Connolly, Johnson, and Werner were Banco's apparent agents, CSMG and Gastech begin by detailing the relationship between Banco and RTC. Greenblatt held an ownership interest in each entity: his family trust owns Banco, and from 1995 through July 2003, Greenblatt was the 50% owner of RTC's parent corporation. (Defs.' 56.1 ¶ 2.) In addition, Banco itself held a financial stake in RTC. In March 2000, RTC owed Greenblatt, Banco, and another entity affiliated with Greenblatt more than $23.5 million. (*Id.* ¶ 4.) Substantially all of RTC's assets were used to secure the debt. (*Id.*) It was in March of 2000 that Banco became RTC's DIP lender and obtained a security interest in RTC's assets. (Pl.'s 56.1 ¶ 25.)

Defendants also rely on George Calvert's testimony. Specifically, Calvert testified that

because of Banco's DIP lender status, Greenblatt reviewed all of the checks that were to be issued to RTC and decided when the checks would issue. (Defs.' 56.1 ¶ 5.) Banco notes that Calvert was not affiliated with RTC after October 2001 and, thus, that his testimony only applies to the pre-October 2001 timeframe. (Pl.'s Resp. to Defs.' 56.1 ¶ 5.) At least at that time, Calvert testified, RTC, Banco, and Greenblatt worked together. During Calvert's tenure at RTC, RTC's offices were adjacent to those of Banco and Greenblatt; the offices shared the same telephone system, facsimile number, printer, e-mail server, and receptionist. (Defs.' 56.1 ¶ 7.) After RTC was placed in bankruptcy in November 1999, Greenblatt and Calvert discussed RTC's business, operations, and finances almost every day. (Defs.' 56.1 ¶ 6.) In addition, as explained above, Calvert testified that Greenblatt advised him to give the Corpus Christi Landfill project a try in June 2001; later, when it appeared that the project would not succeed, Greenblatt approved Calvert's suggestion that they "scrap" the project.

The indebtedness that Banco seeks to collect in this lawsuit, however, relates to funding of the Chastang Landfill project in 2002, not Defendants' activities in Corpus Christi when Calvert was at RTC. The evidence of RTC's involvement in Banco's negotiations regarding Chastang is limited. It is undisputed that Robbins met with Greenblatt, Connolly, Johnson, and Werner in February 2002 to review and discuss the information Werner had sent Robbins regarding that project and, specifically, the gas quality requirements of the prospective processed gas purchaser. (Defs.' 56.1 ¶ 18.) Greenblatt instructed Connolly to sign the Chastang Landfill Operating Agreement on behalf of RTC, though he did not instruct Connolly to do anything else. (*Id.* ¶ 20; Pl.'s Resp. to Defs.' 56.1 ¶ 20.)[12] In other words, there is no evidence that he instructed Connolly to do anything on behalf

---

[12] In a declaration in support of Defendants' opposition to summary judgment, Robbins attests that Greenblatt instructed Connolly, Johnson, and Werner during the parties' meetings. (Decl. of Donald S. Robbins dated 1/25/08 ¶ 9, Ex. 4 to Defs.' 56.1.) He provides no further details about the instructions Greenblatt purportedly gave and, in particular, does not state that they were instructed to take any action on Banco's behalf. In addition, to the extent his Declaration
(continued...)

of <u>Banco</u>. During the meeting, Robbins testified, Werner went back to "his computer" and printed up the Banco loan agreements, which led Robbins to believe that "Greenblatt certainly had some control there." (Pl.'s 56.1 ¶ 20.)[13] At the end of these meetings, CSMG executed both the Operating Agreement with RTC for the Chastang Landfill and the Note for $203,8000 with Banco. (Defs.' 56.1 ¶ 22.)

None of this sheds light on the question of whether Connolly, Johnson, or Werner appeared to be Banco's agent. Viewed in the light most favorable to Defendants, the evidence suggests that Greenblatt exerted control over RTC's operations, and over RTC employees Connolly, Johnson, and Werner. Thus, Greenblatt exerted influence over Johnson, Werner, and Connolly. Simultaneously, Greenblatt, as President of Banco, controlled Banco's decision-making. Arguably, then, Greenblatt controlled both Banco and RTC.[14] This does not mean that all RTC employees were necessarily Banco's agents. Defendants attempt to conflate these two questions, arguing that Werner, for example, was "Banco's agent, under the control and direction of Greenblatt." (Opp. at 14.) But being Banco's agent requires having authority to act on Banco's behalf. *See Restatement (Third) of Agency* §1.01 cmt. c ("A relationship is not one of agency within the common-law definition unless the agent consents to act on behalf of the principal, <u>and</u> the principal has the right throughout the duration of the relationship to control the agent's acts.") (emphasis added). None

---

[12](...continued)
contradicts his deposition testimony that Greenblatt only instructed Connolly to sign the Operating Agreement, Defendants have provided no explanation for this contradiction and the court declines to consider the statements. *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005) ("Although at the summary judgment stage we must interpret the evidence in the light most favorable to [the non-moving party], that does not allow [the non-moving party] to contradict deposition testimony with later-filed contradictory affidavits.") (internal citation omitted).

[13]     According to Defendants, the documents Werner provided were attached as Exhibits to the Operating Agreement. (Defs.' 56.1 ¶ 21.) There is, however, no independent support in the record for this assertion.

[14]     As explained above, the Bankruptcy Court rejected any argument that Banco and RTC acted as alter egos of one another. Defendants do not raise this issue here.

of Defendants' evidence proves that Connolly, Johnson, or Werner had such authority. Defendants present no other evidence sufficient to create a dispute of material fact concerning Connolly's or Johnson's role as Banco's agents.

Defendants come closer with respect to Werner. Calvert testified that, at least until October 2001, Werner did not report to him–but rather reported directly to Greenblatt. (Defs.' 56.1 ¶ 8.) Calvert further testified that Werner's office was next to Greenblatt's, in an office space adjacent to RTC's. (*Id.* ¶ 30.) According to Robbins, Werner told Robbins that: (1) Banco–an affiliate of RTC–could arrange financing necessary to the Chastang Landfill project; and (2) RTC and Banco understood and agreed that the sale of gas from the Chastang Landfill would fund Defendants' repayment obligations under the Note. (*Id.* ¶¶ 17, 29.) Robbins also stated that Werner sent him an e-mail, which may have contained an attachment with an accounting of the Chastang Landfill advances, on Banco letterhead. (*Id.* ¶ 30.) Although Robbins could not remember whether the accounting was, in fact, attached to the e-mail Werner sent him (Pl.'s Resp. to Defs.' 56.1 ¶ 30), Werner testified that he sent the cover e-mail and attached the spreadsheet in question to it. (Werner Dep. 166:3-20.)[15] Although this evidence relates more closely to the issue, it still fails to demonstrate even a genuine question as to whether Werner was Banco's agent. As a matter of law, Werner's actions cannot establish his authority; only Banco's words and conduct can. *Sphere Drake*, 376 F.3d at 672; *see also Jones v. Beker*, 260 Ill. App. 3d 481, 485, 632 N.E.2d 273, 277 (1st Dist. 1994) ("an agent cannot confer power on himself, and his agency or authority cannot be established by showing what he said or did"). Here, there is no evidence that Banco or Greenblatt conferred authority on Werner, by words or deeds. As such, Banco cannot be liable for any

---

[15] In addition, according to CSMG and Gastech, Werner provided them with substantive information regarding the Chastang Landfill project, including the flow of gas at the landfill, analysis of that gas flow, and RTC's rights at the landfill. (Defs.' 56.1 ¶¶, 14, 19, 39.) Regardless of whether this is true, for the reasons explained above it cannot establish that Werner acted as Banco's agent.

representations Werner, Johnson, or Connolly made.

**B.      Justifiable Reliance on Banco's Representations**

What remains is the question of whether Defendants justifiably relied on statements made by Banco and Greenblatt.   Assuming that Banco and Greenblatt did make the representations Defendants identify (which is not entirely clear from the record), each relates to RTC and its work at the Chastang Landfill.   But Defendants admit that Banco has operated strictly as a lender at all times.   (Pl.'s 56.1 ¶ 38.)   Banco has never operated a landfill gas collection system.   (*Id.* ¶ 37.)   It has no experience with landfill gas collection systems, nor did it ever represent to Defendants that it had any such knowledge or experience.   (*Id.*)   Absent any evidence that Banco had the expertise to make representations regarding such operational issues, Defendant's reliance on such statements would be unreasonable, and therefore insufficient to sustain a common law fraud claim.   "Illinois law has long held that, <u>where the representation is made as to a fact actually or presumptively within the speaker's knowledge</u>, and contains nothing so improbable as to cause doubt of its truth, the hearer may rely upon it without investigation. . . ."   *Sims v. Tezak*, 296 Ill. App. 3d 503, 511, 694 N.E.2d 1015, 1020 (1st Dist. 1998) (emphasis added).   CSMG and Gastech counter that Greenblatt himself had knowledge about landfill gas collection systems.   But CSMG's and Gastech's only argument is that Greenblatt instructed the skeptical Calvert to try the Chastang Landfill project, and then, later, to "scrap" the project.   (Opp. at 11.)   On both occasions, Calvert made clear that Greenblatt was relying on others in making this assessment.   In other words, nothing in Calvert's testimony indicates that Greenblatt himself has any particular expertise in the landfill gas scrubbing business.

In fact, CSMG and Gastech admit that "[i]t was Werner that provided CSMG with the information upon which it relied in agreeing to install its carbon dioxide separator at the Chastang landfill."   (Opp. at 12.)   Likewise, they acknowledge that, when "entering into the Note and the Operating Agreement with respect to the Chastang landfill, CSMG relied upon the statements of

and documents provided by Werner and Johnson regarding the volume of gas that would be generated at the landfill, the oxygen content of that gas, and RTC's rights to all of the gas generated at the landfill." (Defs.' 56.1 ¶ 39.) For this proposition, Defendants rely on Robbins's testimony: "They were the experts. They [apparently Werner and Johnson] were supposed to be our partners. We trusted what they told us." (Robbins Dep. 111:17-112:2.) Robbins further testified that "we were clearly provided documents by RTC that showed an escalating amount of gas." (*Id.* 126:17-21.) In other words, Defendants admit that they relied on Werner rather than Greenblatt, and RTC rather than Banco, when deciding to embark on the Chastang Landfill project.

Significantly, the documentary evidence further undermines CSMG's and Gastech's claim of justifiable reliance. The parties' Loan Agreement contains the following clause:

> Relationship. . . . The Loan Parties will rely entirely upon their own judgment with respect to their business and any review, inspection, supervision or information supplied to the Loan Parties by the Lender is for the protection of the Lender and neither the Loan Parties nor any third party is entitled to rely on such information.

(Loan Agreement § 10.4.) Banco characterizes this as a non-reliance clause, which bars Defendants' fraud claim: "a written anti-reliance clause precludes any claim of deceit by prior representations." *Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000). According to Defendants, *Rissman* governs only stock purchase agreements, and not all contracts. The court is less certain; when construing an integration clause in a franchise agreement, the Seventh Circuit has approved a district court's finding that "it is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying." *Hardee's v. Hardee's Food Sys.*, 31 F.3d 573, 576 (7th Cir. 1994) (enforcing, under Indiana law, a clause providing that "no other representation having induced LICENSEE to execute this Agreement, and no representations, inducements, promises or agreements, oral or otherwise, not embodied herein or attached hereto (unless of subsequent date) were made by either party, and none shall be of any force or effect with respect to the Agreement or otherwise."); *see also Vigortone Ag Prods. v. AG Prods.*, 316 F.3d 641,

644 (7th Cir. 2002) ("parties to contracts who do want to head off the possibility of a fraud suit will sometimes insert a 'no-reliance' clause into their contract, stating that neither party has relied on any representations made by the other.").

The court need not decide whether the *Rissman* holding is limited to stock purchase agreements, however, because, at a minimum, the Loan Agreement's Non-Reliance Clause provides additional evidence that Defendants never relied on Banco's representations regarding the gas scrubbing operation when entering into the Note and Loan Agreement. This language, Banco's and Greenblatt's lack of expertise on the relevant subjects, and Defendants' admissions that they relied on Werner, defeat Defendants' effort to mount a showing—let alone clear and convincing evidence–that reliance on their representations was justifiable. Accordingly, Banco is entitled to summary judgment on the fraud counterclaim. *See Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004) ("to sustain an action for fraud under Illinois law, the [party] must prove by clear and convincing evidence that . . . the [party] reasonably believed the statements and justifiably acted in reliance on those statements").

## C. Promissory Fraud

Although the court need not reach the question, it is worth noting that "promissory fraud, involving a false statement of intent regarding future conduct, is generally not actionable under Illinois law unless the plaintiff also proves that the act was a part of a scheme to defraud." *Ass'n Ben. Servs.*, 493 F.3d at 853. Absent a showing that such a scheme existed, in order to prevail, Defendants would be required to prove that, at the time the allegedly false promise was made, Plaintiff had no intent to fulfill it. *Id.* It is not enough to prove that the Plaintiff later changed its mind and opted not to fulfill the promise. *Id.* The doctrine of promissory fraud renders several of the assertions identified in paragraph thirteen of Defendants' counterclaim non-actionable. For example, Defendants admit that they do "not contend that RTC never intended to provide wells, piping, etc, necessary to deliver the gas to the plant, only that RTC did not complete it." (Pl.'s 56.1

31

¶ 57.) Thus, any promise that RTC would provide equipment necessary to deliver gas to the plant (Counterclaim ¶ 13(d)), is not actionable. Likewise, Defendants acknowledge that CSMG "was not aware of any facts to indicate RTC did not intend to [produce gas and generate revenue from the Chastang Landfill]." (Pl.'s 56.1 ¶ 66.) As a result, RTC's statement of its intent to generate revenue from the Chastang Landfill is not actionable. (*See* Counterclaim ¶ 13(g).)

## VI.    Defendants' Motion to Strike

In connection with the summary judgment briefing, Defendants have filed a motion to strike certain exhibits filed by Banco. Specifically, CSMG and Gastech take issue with:

1.    Exhibit K to Banco's 56.1 (an undated, unsworn "affidavit" of Greenblatt)

2.    Exhibit B to Banco's Reply (Greenblatt's revised affidavit, which contains certain substantive changes and is signed, dated, and notarized)

3.    Exhibit J to Banco's 56.1 (a group exhibit consisting of checks; Banco alleges, through Greenblatt's "affidavit," that these checks demonstrate disbursement of money pursuant to the Note and Loan Agreement and thus contract performance by Banco)

4.    Exhibit A to Banco's Reply (a group exhibit consisting of bank statements, letters, a verified statement of lien, invoices billed to CSMG that appear related to the checks in Exhibit J, and a voided check; Banco asserts that, together with the checks in Exhibit J, these documents demonstrate disbursement of money pursuant to the Note and Loan Agreement and thus contract performance by Banco)

5.    Exhibit R to Banco's 56.1 (undated tables and spreadsheets purportedly summarizing disbursements Banco made pursuant to the Note and Loan Agreement; Greenblatt's "affidavit" attempts to authenticate these calculations)

6.    Exhibit D to Banco's Reply (undated spreadsheets purportedly summarizing disbursements Banco made pursuant to the Note and Loan Agreement; Greenblatt's "affidavit" attempts to authenticate these calculations)

Each of these exhibits relates to the proper calculation of damages in this case. Because the court concludes that a genuine issue of fact remains as to the proper calculation of damages in this case, the motion is denied as moot. The exhibits Banco has provided are insufficient to establish the measure of damages in this case.

In addition, with respect to Exhibits A, B, and D, CSMG and Gastech argue that the exhibits

were submitted in violation of Local Rule 56.1. "Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond." *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990). Here, Defendants have not requested an opportunity to respond. They will, however, have an opportunity to contest the admissibility of these exhibits in future proceedings relating to the proper calculation of breach of contract damages.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (61) is granted as to liability with respect to Plaintiff's breach of contract claims, and judgment is entered for Plaintiff in the amount of $203,800, plus interest and late fees. The court will require further briefing from the parties regarding the proper calculation of interest and late fees in this case before determining the precise sum of damages to which Banco is entitled. Plaintiff's Motion for Summary Judgment is also granted as to Defendants' affirmative defenses and counterclaims. Defendants' Motion to Strike (86) is denied as moot.

ENTER:

Dated: August 26, 2008

_____
REBECCA R. PALLMEYER
United States District Judge