IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BANCO PANAMERICANO, INC., a South Dakota Corp., | § § § | Case No. 07 C 00015 |
| Plaintiff and Counter-Defendant, | § § | |
| v. | § § | Hon. Rebecca R. Pallmeyer |
| CONSORTIUM SERVICE MANAGEMENT GROUP, INC., a/k/a CONSORTIUM MANAGEMENT GROUP, INC., a Texas Corp., and CSM GASTECH LLC, a Texas Corp., | § § § § § | |
| Defendants and Counter-Plaintiffs. | § § | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MEMORANDUM IN SUPPORT
OF ITS CLAIM FOR ADDITIONAL PRINCIPAL AND INTEREST**

## I.  INTRODUCTION

This matter is before the Court on Plaintiff's motion for summary judgment originally filed on December 4, 2007. On August 26, 2008, this Court issued its Memorandum Opinion and Order, granting partial summary judgment to Plaintiff on the issue of liability only. The Court concluded that genuine issues of material fact remained as to the claim for damages which were reserved for further proceedings. (Dkt. 106, p. 33). The Court concluded that there were genuine issues of material fact concerning principal advanced, the claimed "default," the application of the default interest rate of 36.5% and the retroactive accrual of that default interest rate. (Id., pp. 16-17).

On September 15, 2008, Plaintiff filed its Memorandum In Support Of Its Claim For Additional Principal And Interest. (Dkt. 114). Although Plaintiff previously limited its claim for principal to the amount of the note - $203,800 (Dkt. 106, p. 17), Plaintiff now asserts a claim for additional principal of $13,896.26. Plaintiff asserts a default interest claim of $3,697.31 based

on a default interest rate of 36.5% applied retroactively to the date of initial advance. Further, Plaintiff asserts a default interest claim of $464,053.09 based on a default interest rate of 36.5% applied retroactively to June 1, 2002. Finally, Plaintiff asserts a claim for "late fees" of $63,572.50 based on a rate of 5% applied to claimed advances again retroactive to June 1, 2002. Total damages now claimed are $749,019.96, exclusive of post-judgment interest and unspecified attorneys' fees.

Defendants submit that genuine issues of material fact continue to exist as to Plaintiff's damages claims precluding summary judgment. First of all, Plaintiff's calculation of "default" interest is contrary to the terms of the note itself. Plaintiff's claim for a default interest charge of 36.5% plus late fees of 5% results in an effective interest rate of 41.5% applied retroactively to the date of the first advance. There are genuine issues of material fact as to whether the default interest rate, particularly when coupled with a late fee, constitutes a penalty and is unenforceable under the circumstances. Finally, even if enforceable, genuine issues of material fact continue to exist as to the advances claimed, the accrual of interest, the date of any "default" and the retroactive application of a default interest rate of 36.5% and late fees of 5%. The Court must decide Plaintiff's damages claims in accordance with summary judgment standards, construing all facts and all legitimate inferences in the light most favorable to the Defendants. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). Because genuine issues exist, Plaintiff is not entitled to summary judgment on Plaintiff's damages claims.

In support of Defendants' Response, Defendants attach for the Court's convenience relevant portions of the depositions of Leon Greenblatt (D's Ex. 1), John Connolly (D's Ex. 2) and Donald Robbins (D's Ex. 3) and Exhibits 4 through 15. These exhibits were previously submitted in this case.

## II.     ARGUMENT

### A.     Significant Provisions Of The Promissory Note Are In Dispute.

Contrary to Plaintiff's view, the determination of unpaid principal and interest under the promissory note is not a simple mathematical calculation.  Plaintiff offers a "spreadsheet" reflecting Plaintiff's determination of the advance, date of advance, default date and interest and late fee calculations.  (P's Ex. B, Dkt. 114-2).  This "spreadsheet" was not prepared by any witness, but was prepared by Plaintiff's counsel.  (D's Ex. 16).  The "spreadsheet" itself is not admissible evidence and simply reflects calculations based on Plaintiffs' interpretation of the conflicting extrinsic evidence and the provisions of the promissory note which are in dispute.

Significantly, the promissory note is not a conventional term or demand note but rather a note evidencing a "straight line of credit."  Advances under the note varied over time.  No monies were ever advanced directly to Defendants.  Instead, funds were to be paid to third-party vendors at the Chastang landfill project on the joint authorization of Donald Robbins at CSMG and John Connolly at Resource Technologies Corporation ("RTC").  (P's Ex. A, Line of Credit, p. 3).  Accordingly, the only way to determine an unpaid principal balance under the note at any particular point in time is by extrinsic evidence.  Indeed, the note expressly provides:

> … The unpaid principal balance owing on the note at any time may be evidenced by endorsement on the Note or by Lender's internal records, including but not limited to daily, weekly or monthly computer print outs.  (P's Ex. A, Line of Credit, p. 3).

The evidence establishes, however, that Banco did not furnish to Defendants documentation establishing the advances made at any particular time, the date of the advance or the interest accrued.  (Greenblatt Depo., D's Ex. 1, TR. 51).  Indeed, as will be established, there was substantial conflicting evidence concerning vendor invoices and advances made under the line of credit provisions of the promissory note.

The promissory note provides the obligation to repay $203,800, or so much as may be outstanding, together with interest at 12% on the unpaid outstanding principal balance of each advance. Contrary to Plaintiff's position the actual payment obligation was not based on the advance, but on a fixed payment provision of twenty (20) payments of $5,000 plus accrued interest commencing June 1, 2002 with all remaining principal and interest due and payable on June 1, 2004, the "Maturity Date." The note provides:

> PAYMENT. Borrower will pay this loan in TWENTY payments of all five thousand dollars ($5,000.00) principal plus all accrued interest on the first day of each month, beginning June 1, 2002 with all subsequent principal payments to be due on the same day of each month after that "the payment date." In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning June 1, 2002, with all subsequent interest payments to be due on the same day of each month after that. In addition, all remaining principal together with all accrued interest will be due and payable on June 1, 2004 ("the Maturity Date"). (P's Ex. A, Payment, p. 1).

Further, while the note provides for a "late charge" if payment is 10 days or more late, the late charge of 5% only applies to the unpaid portion of the "regularly scheduled payment." (P's Ex. A, Late Charge, p. 2). Contrary to Plaintiff's view, the late charge is not applied retroactive to the date of each advance, is not applied to all unpaid balances, does not apply on a daily basis and does not apply to any balance except the unpaid portion of the regularly scheduled payment.

Finally, the note provides for an optional default interest rate of a maximum of 36.5% or a lower rate as Lender may deem at its sole discretion. The note provides:

> INTEREST AFTER DEFAULT. Upon default, including failure to pay upon final maturity, Lender at its option, may if permitted under applicable law, increase the interest rate on this Note to 36.5 percent or such lower rate as Lender may deem at its sole and absolute discretion. The interest rate will not exceed the maximum rate permitted by applicable Illinois law. Lender shall be under no obligation to give notice of interest rate increase upon default by borrowers. (emphasis added, P's Ex. A, Interest After Default, p. 2).

Although no notice is purportedly required of an increase in the default interest rate, the Lender, upon default, may declare the entire unpaid principal balance and accrued interest immediately due upon notice to Borrowers. The note provides:

> LENDER'S RIGHTS. Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued interest immediately due, then upon notice Borrowers will pay that amount. (P's Ex. A, Lender's Rights, p. 3).

Further, upon default, Borrowers would be entitled to notice of the unpaid principal and accrued unpaid interest due and payable. (P's Ex. A, Line of Credit, p. 3).

Accordingly, the default interest rate of 36.5% is not automatic but is optional, and is predicated upon notice of default and demand for unpaid principal and interest. The default interest rate is not to be applied retroactively and is not to be applied on a daily basis as is the initial interest rate of 12%. The default interest rate would only apply to the fixed payment in accordance with the payment terms of the note. Even if enforceable, the alleged "default," the date of any alleged "default," and the accrual of "default" interest of 36.5% must be established by extrinsic evidence which is in dispute.

## B. Genuine Issues Of Material Fact Exist As To Plaintiff's Claimed Advances.

In Plaintiff's spreadsheet, Plaintiff lists claimed advances by vendor, payment (amount funded), date "funded" and manner of payment, check or wire. The claimed advances now total $217,697.26, an excess of $13,897.26 over the principal amount of the note of $203,800. (P's Ex. B, Dkt. 114-2). While Defendants concede that Plaintiff did advance funds under the line of credit provisions of the note, certain of the claimed advances remain in dispute. Further, in the "spreadsheet," Plaintiff lists a date of each "advance" which is presumed to be the date of the Banco check or wire transfer. (P's Ex. B, Dkt. 114-2). The timing of each advance and the unpaid principal balance at any particular point in time is critical in calculating damages for

several reasons.  First of all, there was no obligation to make any payment until June 1, 2002 and

that monthly payment was limited to $5,000 each month for twenty (20) months.  The balance of

unpaid principal plus interest at 12% would not be due until June 1, 2004 (also referenced as the

"Maturity Date").  (P's Ex. A, Payment, p. 1).  Even more significant, Plaintiff now asserts

claims for default interest at 36.5% and late charges of 5% applied to unpaid balances on a per

diem basis retroactive to the date of advance.  Accordingly, the date of each particular "advance"

is critical to determining the unpaid principal balance as of any given date under the note as well

as the accrual of interest on such balance.  Any discrepancy will result in compounded errors

throughout the balance of the spreadsheet.

　　　The extrinsic evidence offered by Plaintiff to establish the advance and date of advance

as listed in the "spreadsheet" (P's Exs. 1-24) is no different than the evidence previously offered

by Plaintiff and determined by the Court to be incomplete and inconclusive.  (Dkt. 106, pp. 15-

17).  This extrinsic evidence is conflicting and in dispute.

　　　First of all, neither of Plaintiff's witnesses, Leon Greenblatt or John Connolly, actually

authenticates any claimed advance as an obligation of Defendants under the promissory note as

opposed to an obligation of RTC.  Banco was funding RTC liabilities at the Chastang landfill at

the same time it was advancing funds to pay third-party vendors under the line of credit

arrangements of the promissory note.  (Greenblatt Depo., D's Ex. 1, TR. 49).  Mr. Greenblatt, in

his affidavit, sponsors none of the exhibits (P's Exs. 1-24) purporting to document the claimed

advances.  (P's Ex. E).  John Connolly, President of RTC, merely testified that he caused a

search to be made of RTC's books and records and identified third-party invoices related to the

Chastang landfill project (P's Exs. 1-24).  Mr. Connolly does not authenticate the cancelled

Banco checks or wire transfer documents as payment to third-party vendors under the promissory note. (P's Ex. D).

Although Connolly was required to authorize each and every advance under the promissory note (P's Ex. A, Line of Credit, p. 3), Connolly testified in his deposition in this case that he never authorized any payment under the line of credit provisions of the promissory note. (Connolly Depo., D's Ex. 2, TR. 98-99, 101, 104-105). Mr. Connolly testified:

> Q. Do you recall ever authorizing a payment under the line of credit?
>
> A. No.
>
> Q. You never received an invoice that had been forwarded by CSMG for payment and sent that on to Mr. Greenblatt for payment?
>
> A. No. (Id., TR. 101-102).

Kevin Werner at RTC purported to prepare a listing of advances under the promissory note as of January 14, 2003. (Werner Depo. Ex. 16; D's Ex. 4). While this listing purports to reflect third-party advances, this list is inconsistent with the listing of advances in Plaintiff's spreadsheet. Connolly was presented with Werner Deposition Exhibit 16 at his deposition. Connolly could not recall ever authorizing any of the claimed advances. (Connolly Depo., D's Ex. 2, TR. 105).

Plaintiff contends that Donald Robbins admitted funding under the note and points to two letters from CSMG. (P's Memorandum, ¶ 17; Ps' Exs. 27 and 28). While Mr. Robbins does admit funding under the note, there is substantial dispute as to just what was funded and when. CSMG frequently complained that invoices were not being paid. (Greenblatt Depo., D's Ex. 1, TR. 49-55, 61). Since Banco never advanced funds directly to CSMG, there was continuing uncertainty as to what invoices were being paid. (Robbins Depo., D's Ex. 3, TR. 30, 35). Due to delays in payment, vendors were putting liens on the property, CSMG was forced to pay a

$35,000 judgment and CSMG was forced to pay certain vendors directly. (Id., TR. 36-37; Greenblatt Depo. Exs. 6-9, D's Exs. 8-11). By letter dated August 12, 2002, CSMG advised that although $60,000 had been advanced, some of the checks Banco sent to vendors were dishonored for non-sufficient funds. To keep the project moving, CSMG paid directly $3,148 in hotel bills, $10,863 to J&C Diversified, $10,000 to employment firms and $54,800 to Boh Brothers. (Greenblatt Depo. Ex. 10; D's Ex. 12). By letter dated October 20, 2002, CSMG advised that Banco had funded only $93,329.82 of the invoices tendered. CSMG advised that it paid directly $65,400 to Boh Brothers, $17,000 to Towne Place Suites, $10,000 to Diversified Employment, $6,500 to Cat Rental and $17,025 to J&C Diversified. (Greenblatt Depo. Ex. 11; D's Ex. 13).

The cancelled checks and invoices offered by Plaintiff (P's Exs. 1-14, 18-24) merely establish that Banco paid certain third-party invoices and do not establish that an advance was actually made under the promissory note. The checks might be self-authenticating, but only to the extent to prove some payment by Banco to a third-party. See Boim v. Quranic Literacy Institute, 340 F.Supp.2d 885, 916-917 (N.D. Ill. 2004). The balances are not properly authenticated as "advances" or that the balance shown is the "unpaid outstanding principal balance of each advance." There is nothing to establish that any particular "advance" was for the benefit of Defendants as oppose to RTC, consistent with the purpose of the note and in "… accordance with the instructions of an authorized person" as required by the terms of the note. (P's Ex. A, Line of Credit, p. 3). Some of the invoices do not match up to the amount paid by check. (Thrifty Car Rental Invoices; P's Exs. 9, 12 and 22). The wire transfers are partially redacted and are not self-authenticating. (P's Exs. 15, 16 and 17). Two claimed "advances" were actually payments to pay-off liens at the Chastang landfill. (P's Exs. 16, 17).

In sum, Plaintiff's evidence concerning the claimed advances is insufficient, inconsistent and inadmissible.  The evidence offered is incomplete and inconsistent with the depositions of the witnesses in material respects.  The evidence is entitled to no weight whatsoever.  Buttron v. Sheehan, 00C4451, 2003 WL 21801222 at *1, n. 1 (N.D. Ill., August 4, 2003) at p. 4, citing Beckel v. Wal-Mart Assocs., Inc., 301 F.3d 621, 623 (7th Cir. 2002); Colosi v. Electri-Flex Co., 965 F.2d 500, 503 (7th Cir. 1992); E.E.O.C. v. Yellow Freight System, Inc., 253 F.3d 943, 952 (7th Cir. 2001).  Many of the documents contained in Plaintiff's Exhibits 1-24 are not properly authenticated and constitute inadmissible hearsay evidence.  Buttron v. Sheehan, supra at pg. 4, citing Winskunas v. Burnbaum, 23 F.3d 1264, 1268 (7th Cir. 1994); Martz v. Union Labor Life Ins. Co., 757 F.2d 135, 138 (7th Cir. 1985).  Further, affidavits are subject to strict scrutiny to evaluate probative value.  Jones Truck Lines, Inc. v. Supreme Beauty Products, 93 C 3906, 1994 WL 142940 at *6 (N.D. Ill., April 15, 1994).  Affidavits which are inconsistent with prior sworn testimony are afforded no weight.  Buttron v. Sheehan, supra at p. 4, citing Beckel v. Wal-Mart Assocs., Inc., 301 F.3d 621, 623 (7th Cir. 2002).  If not stricken, the Court must, at least, conclude that there are genuine issues of material fact raised in the two affidavits and exhibits submitted by Plaintiff which preclude summary judgment.

## C. Genuine Issues Of Material Fact Exist As To The Claimed "Default" And Application Of The Claimed Default Interest Rate.

At the second page of Plaintiff's "spreadsheet," Plaintiff calculates a claimed default interest charge based on a default interest rate of 36.5% applied retroactive to the date of each claimed advance, that is all the way back to May 10, 2002.  Plaintiff calculates a default interest of $3,697.31 from the date of advance to date of payment default.  Plaintiff then groups the claimed advances into eight (8) "tranches" and applies a default interest rate of 36.5% on a per diem basis retroactive to the date of claimed "default" up to August 31, 2008 (.365/360 =

.0010139 x advance x # days). Plaintiff calculates a total default interest retroactive to June 1, 2002 of $464,053.09. (P's Ex. B, Dkt. 114-2).

There is no support under the terms of the note for Plaintiff's calculation of a default interest rate applied on a per diem basis retroactive to the date of the initial advancement. Plaintiff erroneously calculates default interest at 36.5% applied to the total advances each month between June 1, 2002 through January 1, 2003 (eight "tranches") even though the actual payment was limited to $5,000 per month for the first twenty (20) months, that is from June 1, 2002 through January, 2004. Plaintiff's grouping of advances into "tranches" is not authorized by the note. The term "tranche" is not employed in the note at all. No payments were due from February, 2004 until June 1, 2004 (the "Maturity Date") at which point all remaining unpaid principal and interest was due and payable. (P's Ex. A, Payment, p. 1). Furthermore, there is no basis for Plaintiff to calculate default interest on a per diem basis. The note provides for a 36.5% annual default interest rate. There is no suggestion in the note this penalty rate would apply on a daily basis. (P's Ex. A, Interest After Default, p. 2).

Moreover, pursuant to the note, default interest at 36.5% would not begin to accrue until a default is declared upon notice to the borrowers and accompanied by a demand and reconciliation of the unpaid principal and interest due. There is no evidence that Plaintiff gave proper notice of default and imposition of a 36.5% default interest rate until January 26, 2005. There is no basis for Plaintiff to claim accrued default interest retroactive to the date of the first advance, that is May 10, 2002 - well over two (2) years prior to the notice of default dated January 26, 2005.

Contrary to Plaintiff's view, default interest under the note is not automatic. Actually, the note provides for an optional default interest rate. (P's Ex. A, Interest After Default, p. 2).

Upon "default," the lender may declare the entire unpaid principal balance on the note and all accrued interest due and payable upon notice to borrowers. (P's Ex. A, Lender's Rights, p. 3). Further, upon default, borrowers would be entitled to notice of the unpaid principal and accrued interest due and payable. (P's Ex. A, Line of Credit, p. 3).

The evidence firmly establishes that Plaintiff did not elect to declare a default until January 26, 2005. (Ex. E, Dkt. 73-74; D's Ex. 15). By letter dated January 26, 2005, Banco stated:

> ... Banco will declare default due to non-payment on the Banco Indebtedness, and increase the interest rate by 36.5 percentage points, if payment in the amount of $288,703.60 is not received in five days.

As this Court previously concluded in its Memorandum Opinion and Order, Banco acknowledged in the January 26, 2005 letter that it had not previously increased the interest to the default rate of 36.5%, but would declare a default if payment were not made within five days. The Court concluded:

> In Greenblatt's January 26, 2005 notice of default letter, he states that "Banco will declare default due to non-payment of the Banco Indebtedness, and increase the interest rate by 36.5 percentage points, if payment in the amount of $288,703.60 is not received within 5 days." (Defs.' 56.1 ¶ 32). In other words, Greenblatt's letter effectively acknowledges that, as of January 2005, Banco had not increased the interest rate on Defendants' obligation to the default rate of 36.5%. (Dkt. 106, p. 17).

Further, Banco never submitted a demand for unpaid principal and accrued interest prior to January 26, 2005. (Greenblatt Depo., D's Ex. 1, TR. 51). There would be no way for Defendants to know the amount advanced and accrued interest until presented with a demand and documentation. Pursuant to the note, Defendants had the right to know the unpaid balance due upon default. (P's Ex. A, Line of Credit, p. 3).

At his deposition, Leon Greenblatt testified that Banco first elected default and provided notice by letter dated December 10, 2002. (Greenblatt Depo., D's Ex. 1, TR. 68; Greenblatt Depo., Ex. 12, D's Ex. 14). However, Donald Robbins testified that he did not receive the December 10, 2002 letter until late 2004. (Robbins Depo., D's Ex. 3, TR. 75). The letter was obviously improperly dated December 10, 2002 as the letter references a judgment in favor of Bagby and Russell Electric that was not entered until March, 2004. (Id., TR. 76, 80). When confronted with this discrepancy, Mr. Greenblatt admitted the date was inaccurate and instructed his counsel to correct the record. (Greenblatt Depo., D's Ex. 1, TR. 105-106).

Plaintiff now asserts that a "default" occurred on or about March 15, 2002 when there was a delay in tendering 150,000 shares of CSMG stock. (P's Ex. E, ¶¶ 6-8; P's Memorandum, ¶ 31). Contrary to his affidavit, Leon Greenblatt testified at his deposition that Banco received the certificate for the 150,000 shares of CSMG stock on or about March 19, 2002. (Greenblatt Depo., D's Ex. 1, TR. 42). Banco accepted the stock and later sold the stock on the open market. (Id., TR. 44). Mr. Greenblatt agreed that CSMG cured the default and transferred the certificate. (Id., TR. 46). (See also Defendant's Exhibits 5, 6 and 7). Donald Robbins also confirmed at this deposition that CSMG tendered the shares and Banco accepted the stock and registered the stock in its own name. (Robbins Depo., D's Ex. 3, TR. 45).

In sum, genuine issues of material fact exist as to the claimed "default," the date of any "default," the application of the claimed default interest rate of 36.5% and the retroactive accrual of that default interest rate. Application of a "default" interest rate is not automatic but is optional and is dependent on extrinsic evidence which is in dispute. Plaintiff is not entitled to summary judgment on its damages claim for default interest.

**D.**     **Genuine Issues Of Material Fact Exist As To The Claimed "Late Fees."**

Finally, at page 3 of the "spreadsheet," Plaintiff calculates a "late fee" of 5%, again applied per diem, retroactive to June 1, 2002. The total amount claimed is $63,572.30. (P's Ex. B, Dkt. 114-2).

The note provides for a late charge if payment is 10 days or more late. The charge is 5% of the unpaid portion of the regularly scheduled payment. There is no support for Plaintiff's charging a "late fee" on the entire amount of each advance retroactive to June 1, 2002 when the actual payment scheduled was twenty (20) payments of $5,000 rather than the amount of the advances. There is no further basis to apply the 5% fee on a daily basis.

**E.**     **Genuine Issues Of Material Fact Exist As To Whether The Default Interest Rate Is Enforceable.**

In this case, Plaintiff claims a 36.5% default interest rate applied retroactively to June 1, 2002 and calculated daily plus a "late fee" of 5% also applied on a per diem basis also retroactive to June 1, 2002 - an effective interest rate of 41.5%. This is on top of the 150,000 shares of CSMG stock Defendants had to tender as part of the cost of the loan. There are genuine issues of material fact as to whether the default interest rate, particularly when coupled with a late fee, is a penalty and is unenforceable under the circumstances.

While the Illinois statute, 815 ILCS 205/4 does not establish a maximum interest rate on a loan made to a corporation, Illinois courts have declined to enforce an interest provision that is not reasonably related to costs on default but can only be viewed under the circumstances as a penalty. See e.g., Hidden Grove Condominium Assn. v. Crooks, (2001) 318 Ill. App.3d 945, 744 N.E. 2d 305. Whether a default interest rate is reasonable depends on the circumstances. An enforceable "default" interest rate generally applies only from the date of default and does not apply retroactively. Baker v. Loves Park Sav. & Loan Assn. (1975), 61 Ill.2d 119, 333 N.E. 2d

1. Whether a late fee constitutes a penalty is a question of law. <u>Checkers Eight Ltd. Partnership v. Hawkins</u>, 241 F.3d 558, 562 (7th Cir. 2001). A late fee applied as a flat percentage to an unpaid balance not dependent on the length of delay is generally unenforceable as a "penalty." <u>AT&T Capital Leasing Servs. v. Brasch</u>, 912 F.Supp. 395, 396-97 (N.D. Ill. 1996); <u>Heath v. U.S. Mortgage, LLC</u>, 2006 WL 488642, at *5 (S.D. Ill., February 28, 2006).

### III.   CONCLUSION

Plaintiff's claim for default interest at 36.5% plus late fees of 5% results in an effective interest rate of 41.5% applied retroactively to the date of the first advance. Plaintiff's claims for interest are contrary to the terms of the note itself. There also exists genuine issues of material fact as to whether the default interest rate, particularly when coupled with a late fee, is a penalty and is unenforceable under the circumstances. Finally, even if enforceable, genuine issues of material fact continue to exist as to the advances claimed, the accrual of interest, the date of claimed "default" and the retroactive application of a default interest rate of 36.5% and late fees of 5%. Because genuine issues of material fact exist, Plaintiff is not entitled to summary judgment on the issue of damages.

Respectfully submitted,

*Jonathan P. Froemel*

BARNES & THORNBURG LLP
Jonathan P. Froemel
Suite 4400
One North Wacker Drive
Chicago, IL 60606
(312) 214-8315
(312) 759-5646 (Fax)

and

BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
William I. Kohn
Mark A. Phillips
200 Public Square, Suite 2300
Cleveland, OH 44114-2378
(216) 363-4500
(216) 363-4588 (Fax)

and

BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
Orla E. Collier
John F. Stock
41 South High Street, Suite 2600
Columbus, OH 43215
(614) 223-9300
(614) 223-9330 (Fax)

**Counsel for Defendants Consortium Service
Management Group, Inc. and CSM Gastech
LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2008, the foregoing Defendants'
Response To Plaintiff's Memorandum In Support Of Its Claim For Additional Principal And
Interest was filed electronically. Notice of this filing was sent to counsel via the Court's
electronic filing system. Access to this filing can be obtained via the Court's electronic filing
system.

/s/ Orla E. Collier
Orla E. Collier
Counsel for Plaintiff

# DEFENDANTS' EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BANCO PANAMERICANO, INC., a South )
Dakota Corp., )
    Plaintiff/Counter-Defendant, )
        -vs- ) No. 07 C 00015
CONSORTIUM SERVICE MANAGEMENT )
GROUP, INC., a/k/a CONSORTIUM )
MANAGEMENT GROUP, INC., a Texas )
Corp., and CSM GASTECH, LLC, a )
Texas Corp., )
    Defendants/Counter-Plaintiffs.)

The deposition of Leon Greenblatt, taken in the above-entitled cause before Susan Maul, CSR No. 84-2501, a notary public within and for the County of Will and State of Illinois, taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts, One North Wacker Drive, Chicago, Illinois, on the 27th of August, A.D., 2007, at the hour of 10:00 o'clock a.m.

INDEX

| WITNESS | EXAMINATION |
|---|---|
| LEON GREENBLATT | |
| By Mr. Phillips | 6 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| Greenblatt Deposition Exhibit | |
| No. 1 | 8 |
| No. 2 | 14 |
| No. 3 | 17 |
| No. 4 | 42 |
| No. 5 | 45 |
| No. 6 | 46 |
| No. 7 | 52 |
| No. 8 | 53 |
| No. 9 | 56 |
| No. 10 | 63 |
| No. 11 | 64 |
| No. 12 | 68 |
| No. 13 | 72 |
| No. 14 | 75 |
| No. 15 | 78 |
| No. 16 | 80 |
| No. 17 | 83 |
| No. 18 | 95 |
| No. 19 | 104 |
| No. 20 | 124 |
| No. 21 | 129 |
| No. 22 | 130 |

APPEARANCES:

POLSINELLI, SHALTON, FLANIGAN,
SUELTHAUS, PC
Two Prudential Plaza
180 North Stetson Avenue
Chicago, IL 60601
(312) 819-1900
BY: MR. GREGORY J. JORDAN
    On behalf of the Plaintiff and
    Counter-Defendant;

BENESCH, FRIEDLANDER, COPLAN &
ARONOFF, LLP
2300 BP Tower
200 Public Square
Cleveland, OH 44114-2378
(216) 363-4500
BY: MR. MARK A. PHILLIPS
    On behalf of the Defendant and
    Counter-Plaintiff.

1 (Pages 1 to 4

1    Q.  The loan evidenced by the note as alleged
2  by Banco in this litigation.
3    A.  I believe that CSMG required construction
4  financing.
5    Q.  And do you recall why CSMG came to Banco
6  to obtain such construction financing?
7    A.  Probably because CSMG believed it could
8  obtain the financing from Banco.
9    Q.  What fact or facts would have led CSMG to
10 that belief?
11   A.  You'll have to ask your own client that.
12   Q.  Are you aware of any facts?
13   A.  I'm not aware of what your client thinks.
14   Q.  So to the best of your recollection, CSMG
15 appeared out of the blue and asked Banco to advance
16 it 200,000 plus for a construction loan?
17   A.  I believe that's a ridiculous
18 mischaracterization of my testimony.
19   Q.  Well, do you recall how CSMG was
20 introduced to Banco?
21   A.  As I said, I don't recall.
22   Q.  What's the maturity date on the promissory
23 note, sir?
24   A.  June 1st, 2004.

29

1    Q.  Looking at the third entry on the top
2  line, is that April 1st, 2004?
3    A.  Why, yes, it is.
4    Q.  So this loan would have matured as of
5  April 1st, 2004, correct?
6    A.  Yes.
7    Q.  Turning to Page 3 of Exhibit 3, the last
8  paragraph on that page entitled line of credit, do
9  you see that, sir?
10   A.  Yes.
11   Q.  First sentence of that paragraph after the
12 heading is this note evidences a straight line of
13 credit. What is a straight line of credit, sir?
14   A.  I don't know. It's whatever the law says
15 it is.
16   Q.  Well, what is your understanding as the
17 lender in this situation as to what a straight line
18 of credit means?
19   A.  Under this situation, I believe the lender
20 advance funds in accordance with the terms of the
21 loan.
22   Q.  Had Banco previously provided any
23 borrowers with a straight line of credit?
24   A.  Yes.

30

1    Q.  And who would those borrowers have been?
2    A.  I don't recall, but the DIP loan was a
3  line of credit.
4    Q.  Did Banco ever provide a line of credit to
5  Health Risk Management?
6    A.  No.
7    Q.  Did it ever provide a loan of any sort to
8  Health Risk Management?
9    A.  No.
10   Q.  Banco at one time held stock in Health
11 Risk Management, correct?
12   A.  Yes.
13   Q.  Under this straight line of credit, am I
14 correct that Banco did not advance any funds
15 directly to CSMG?
16   A.  I don't recall, but it could be that we
17 refused to advance moneys to CSMG for fear that
18 they would not pay the contractors and; therefore,
19 we paid them directly.
20   Q.  Well, why would Banco be concerned as to
21 whether the contractors were paid?
22   A.  Because if the contractors were not paid
23 then they could put a mechanics lien on the
24 property.

31

1    Q.  Which property?
2    A.  The collateral for our loan.
3    Q.  And we will get into the collateral for
4  the loan in a few moments, but how then did CSMG
5  obtain advances on the straight line of credit?
6    A.  In accordance with the terms of the loan.
7    Q.  What is the -- what do the terms of the
8  loan say in that respect?
9    A.  If you have the security agreement, I'm
10 happy to -- actually line of credit, let's see.
11       All communications, instructions,
12 directions by telephone or otherwise to lender are
13 to be directed to lender's office shown above.
14       The following person is authorized to
15 request advances and authorized payments under the
16 line of credit until lender receives from borrowers
17 at lender's shown address above written notice of
18 revocation of his or her authority, and it required
19 the joint request of Don Robbins and John Connolly.
20   Q.  So Mr. Connolly as the president of RTC
21 had to approve of any request for advances under
22 the straight line of credit?
23   A.  No.
24   Q.  Well, didn't you just tell me that the

3

1 request had to come from both Mr. Robbins and
2 Mr. Connolly?
3    A. Yes. But you said that he had to request
4 it as president of RTC, and there's nothing in the
5 note that says that he had to be president of RTC
6 to request it.
7    Q. Okay. Was Mr. Connolly the president of
8 RTC at the time of this loan?
9    A. Yes. I believe so.
10    Q. What other basis would there have been for
11 Mr. Connolly's involvement in approving any
12 advances under the straight -- straight line of
13 credit?
14    A. I have no idea, but you mischaracterized
15 my testimony by saying that the note requires that
16 Mr. Connolly as president approved this, and it
17 doesn't.
18    Q. So how did this work, sir?
19    I mean, did Mr. Robbins send any requests
20 for advances directly to Banco?
21    A. He may have.
22    Q. You don't recall any advances being
23 requested by Mr. Robbins?
24    A. I don't recall what the particular

33

1 credit which you had me read and read to you, and
2 they had to do that in accordance with the terms
3 set forth therein.
4    And as I recall, it says Don Robbins and
5 John Connolly.
6    Q. And I'm asking, sir, did Banco make that a
7 requirement of this loan, that Mr. Connolly be part
8 of that authorization or request process?
9    A. It says that -- that Don Robbins and John
10 Connolly had to request advances and authorize
11 payments.
12    Q. Do you have any understanding as to why
13 Mr. Connolly would be part of this process?
14    A. Because I believe that Mr. Connolly was in
15 charge of RTC's supervision of building the plant
16 and that more or less he had control over the
17 disbursement of the funds for RTC under its DIP
18 line, and that he and Don Robbins would jointly
19 decide to request the amount of money made
20 available to CSMG for payment to their contractors.
21    Q. Do you have any understanding as to how
22 that became a term of this note?
23    A. It was written in the line of credit
24 portion of the note.

35

1 to Connolly for approval once or more than once.
2    Q. Was Mr. Connolly's approval a condition of
3    [1] requests were, but I do recall that I referred him
4 making the loan imposed by Banco?
5    A. That's not what the -- the note says. The
6 note didn't require Mr. Connolly's approval to be
7 made.
8    Q. I thought you said that the approvals
9 had -- the request had to come from Mr. Robbins and
10 Mr. Connolly.
11    A. Their request for disbursements had to
12 come from Mr. Robbins and Mr. Connolly, but the
13 note didn't have to come from Mr. Robbins and
14 Mr. Connolly.
15    Q. I'm not -- I don't believe I said the
16 note, sir.
17    A. Yes, you did. You can read back the
18 question.
19    Q. Let's clarify. Let's clarify. Did Banco
20 require as a term of this loan that Mr. Connolly
21 make requests for advances in conjunction with
22 Mr. Robbins?
23    A. The terms of the loan are set forth in the
24 line of credit under the section of the line of

34

1    Q. Understanding that physically it was
2 written in that paragraph, sir, do you
3 understand -- do you have any understanding as to
4 why that was placed as a term of this note in that
5 paragraph?
6    A. I believe it was to ensure that the
7 project financing would be used for the project as
8 I previously testified.
9    Q. Okay. Turning to the first page of this
10 exhibit, sir, the second paragraph entitled
11 payment, as I read this paragraph, and correct me
12 if I'm wrong, the first -- strike that.
13    Correct me if I'm wrong, but this
14 paragraph requires that the payments be -- that
15 this loan be paid in twenty installment payments
16 over a period of time, correct?
17    A. Yes.
18    Q. And the first installment would have been
19 due on June 1st, 2002; is that correct?
20    A. Are you asking me to read the payment
21 section to you?
22    Q. Well, I'm just asking whether that's
23 correct.
24    A. The payment section says that borrower

3

9 (Pages 33 to 3[

1  will pay this loan in twenty payments of all $5,000
2  principal plus accrued interest on the first day of
3  each month beginning June 1st, 2002.
4      Q. Was CSMG required to make installment
5  payments under this note even if no funds had been
6  advanced by Banco under the straight line of
7  credit?
8      A. No.
9      Q. So CSMG would have only been required to
10  make an installment payment pursuant to these terms
11  if funds had been advanced by Banco?
12      A. Which they had been.
13      Q. Do you believe that Banco advanced any
14  funds on the line of credit prior to June 1st of
15  2002?
16      A. Yes.
17      Q. How much?
18      A. I don't recall.
19      Q. Do you recall who that -- those funds were
20  advanced to?
21      A. No.
22      Q. With respect to interest on this loan, can
23  you tell me how such interest was to be calculated?
24      A. Interest rate is -- for this note is

37

1  computed on a 365 over 360 basis by applying the
2  ratio of the annual interest rate over a year of
3  360 days multiplied by the outstanding principal
4  balance multiplied by the actual number of days the
5  principal balance is outstanding.
6          Borrower will pay lender at lender's
7  address shown above or at such other places lender
8  may designate in writing.
9      Q. So the principal -- strike that.
10          Interest was to be calculated based upon
11  the principal outstanding, correct?
12      A. The interest was to be calculated in
13  accordance with the terms of the note.
14      Q. And I'm trying to understand Banco's
15  understanding of the terms of the note.
16      A. The terms -- Banco's under --
17      MR. JORDAN: Objection to relevance of that, I
18  don't think that there's -- you're asking him for
19  his understanding of a written document, I don't
20  think there's any point --
21      THE WITNESS: In any case, Banco's
22  understanding of the note is exactly the note as
23  it's written.
24

38

1  BY MR. PHILLIPS:
2      Q. Okay. Banco has claimed that interest is
3  due on this note, correct, sir?
4      A. Banco has claimed that it is due its
5  principal and interest and attorneys fees.
6      Q. And with respect to the interest
7  calculation, how did Banco go about calculating the
8  amount of interest due on this note?
9      A. It calculated the 12 percent interest rate
10  until what's their names were in default, and then
11  it calculated on the default interest rate.
12      Q. And would the calculation of the interest
13  prior to the date on which Banco says the loan was
14  in default, would that calculation have been based
15  upon the principal outstanding at any one time?
16      A. It would have been based on the manner
17  specified in the section payment.
18      Q. I'm trying to get to, sir, and I'm not
19  trying to be difficult about this, but is the
20  interest calculated based upon the amount that had
21  been advanced under the straight line of credit or
22  is it calculated based upon the principal -- the
23  total principal amount of the loan?
24      Are you unable to read the section that

39

1  says payment where it says multiplied where it says
2  the annual interest rate for this note is computed
3  on a 365 over 360 basis, that is by applying the
4  ratio of the annual interest rate over a year of
5  360 days multiplied by the outstanding principal
6  balance multiplied by the number of days the
7  principal balance is outstanding. Is that
8  difficult to understand? Maybe for attorneys.
9      Q. Has there been a calculation by Banco of
10  the interest due under this note?
11      A. Yes.
12      Q. Is that in writing anywhere?
13      A. Is the calculation in writing?
14      Q. Yes.
15      A. Yes.
16      Q. Okay. Did you prepare that calculation?
17      A. Probably not.
18      Q. Who would have prepared that calculation,
19  sir?
20      A. Whoever did the accounting for that
21  particular point in time.
22      Q. Was that Michael May?
23      A. It could have been.
24      Q. Did Michael May have check writing

10 (Pages 37 to 4

**Page 41**

1  authority with Banco?
2  A. I don't know.
3  Q. Michael May was not an employee of Banco,
4  correct?
5  A. No.
6  Q. He was not an officer of Banco?
7  A. Not other than for one day once.
8  Q. When was that one day, sir?
9  A. I was out, and I needed to have someone in
10  authority of Banco send a letter out, so we made
11  him a temporary vice president for one day.
12  Q. Who had check writing authority at Banco
13  in 2002?
14  A. I did.
15  Q. Anybody else?
16  A. I don't recall.
17  Q. Do you recall actually writing checks
18  representing advances on this loan?
19  A. Yes.
20  Q. You personally wrote those checks?
21  A. Yes.
22  Q. Have you seen recently the written
23  interest calculation that we were discussing a few
24  moments ago?

**Page 42**

1  A. What's recently?
2  Q. Within the past six months.
3  A. Yes.
4  Q. Is that a document that is at Banco's
5  offices?
6  A. It could be.
7  MR. PHILLIPS: Off the record.
8  (Discussion had off the record.)
9  (Short break.)
10  (Whereupon, Greenblatt
11  Deposition Exhibit No. 4 was
12  marked for identification.)
13  BY MR. PHILLIPS:
14  Q. Mr. Greenblatt, you've been handed by the
15  court reporter what has been marked as Exhibit 4
16  for your deposition. Do you recognize this
17  document?
18  A. Yes. This was the certificate issued to
19  me by CSMG in accordance with the first paragraph
20  of the loan agreement. I don't, however, believe
21  it was sent to me any time near the date on the
22  certificate.
23  Q. March 19?
24  A. Yes.

**Page 43**

1  Q. Well, we'll take a look at that on -- in a
2  few moments.
3  And I do apologize, but this -- this copy
4  is not two sided as you noted, but do you recall
5  the transfer legend on the reverse side?
6  A. Yes.
7  Q. This was restricted stock, correct?
8  A. Yes.
9  Q. What's commonly referred to as rural 144
10  stock?
11  A. It's stock and it's restricted.
12  Q. There were restrictions on Banco
13  Panamericano's ability to sell the stock, correct?
14  A. Yes.
15  Q. What was the purpose for the transfer of
16  this stock to Banco Panamericano?
17  A. It was additional consideration for making
18  the loan.
19  Q. At the time do you recall placing any
20  value on the transfer of the 150,000 shares in CSMG
21  to Banco?
22  A. Other than it was a hope instrument that
23  had some nebulous value, no.
24  Q. What do you mean by a hope instrument?

**Page 44**

1  A. Well, you get it and you hope it has some
2  value in the future.
3  Q. Do you recall why this became a term of
4  the note?
5  A. No. We wanted more money.
6  Q. Did Banco -- did Banco at any time after
7  receiving this certificate transfer or sell the
8  stock evidenced by the certificate?
9  A. Yes.
10  Q. Do you recall when that stock was
11  transferred?
12  A. I don't understand what you mean by
13  transfer.
14  Q. Well, it was sold to someone, correct?
15  A. We sold it in the open market.
16  Q. Did you sell all 150,000 shares at one
17  time?
18  A. No.
19  Q. Do you recall when the sales took place?
20  A. No.
21  Q. Do you recall what price Banco got for the
22  sale of the stock?
23  A. No.
24  Q. Do you recall what the total value of this

11 (Pages 41 to 4

1  consideration was in light of such sales?
2    A.  Actually, no.
3    Q.  You never did a calculation on that?
4    A.  No. I just don't recall.
5    Q.  Okay. At some point in time Banco did do
6  a calculation then?
7    A.  It's on our tax returns somewhere.
8          (Whereupon, Greenblatt
9          Deposition Exhibit No. 5 was
10         marked for identification.)
11  BY MR. PHILLIPS:
12    Q.  You've been handed what has been marked as
13  Exhibit 5 by the court reporter, and I'll say right
14  off the bat this is two separate documents but
15  wondering if you can first identify the first page
16  of this exhibit.
17    A.  The first page is a letter, notice of
18  default to CSMG for failure to deliver the stock.
19    Q.  At the time that you sent this letter,
20  Mr. Greenblatt, on March 18, 2002, had Banco made
21  any advances under the straight line of credit to
22  or on behalf of CSMG?
23    A.  I believe so.
24    Q.  Do you recall to whom any such advance had

                45

1  been made?
2    A.  No.
3    Q.  You urged Mr. Robbins to cure the default?
4    A.  Yes.
5    Q.  Did Mr. Robbins and CSMG cure the default?
6    A.  Yes.
7    Q.  With respect to the last two pages of the
8  exhibit, do you recall receiving that letter from
9  Mr. Robbins?
10    A.  I don't.
11    Q.  Do you recall receiving the certificate
12  via overnight?
13    A.  I don't actually recall receiving it, but
14  I did receive it.
15    Q.  Okay.
16          (Whereupon, Greenblatt
17          Deposition Exhibit No. 6 was
18         marked for identification.)
19  BY MR. PHILLIPS:
20    Q.  Mr. Greenblatt, the court reporter has
21  handed you what has been marked as Exhibit 6. Do
22  you recognize this document?
23    A.  Yes.
24    Q.  Is this a letter from Mr. Robbins to you

                46

1  dated June 19th, 2002, correct?
2    A.  Yes.
3    Q.  And do you recall receiving it on or about
4  June 19th of 2002?
5    A.  No.
6    Q.  Do you recognize the substance of the
7  letter?
8    A.  I recall the substance of the letter, and
9  I recall telling -- addressing them that they
10  should get Connolly to approve their disbursements.
11  This happened once or twice or three times.
12    Q.  Well, do you recall how you communicated
13  that to CSMG?
14    A.  No.
15    Q.  Did you send back a letter of any sort?
16    A.  I just said that I didn't recall.
17    Q.  Okay. So you don't recall whether it was
18  a telephone conversation or -- or an e-mail or any
19  form of correspondence?
20    A.  I don't recall. I'm sorry.
21    Q.  Let me understand the procedure that you
22  believed CSMG had to go through in order to get
23  advances under the loan.
24        Did Mr. Robbins first have to send any

                47

1  request for a payment to Mr. Connolly?
2    A.  Unless he wanted to not have anything
3  ignored, then he needed to submit a request in
4  accordance with the terms of the loan which
5  required Mr. Connolly's approval for payment.
6    Q.  Do you know whether Banco eventually
7  advanced funds in this amount to BOH Brothers?
8    A.  I don't recall as I sit here today the
9  exact advancements to any particular person,
10  however, we did advance over the full amount of the
11  loan and the project was completed before the
12  completion requirement date.
13    Q.  Well, what was the completion requirement
14  date?
15    A.  It was sometime in December.
16    Q.  Well, why was -- why was Banco concerned
17  about the completion requirement date?
18    A.  Banco was concerned that it -- its project
19  financing would be used in accordance with the
20  requirements of the project which was that it start
21  up by a particular day.
22    Q.  Why was Banco concerned in that respect?
23    A.  Because that was a term of the contract
24  which was the underlying collateral of Banco's

1 debtor in possession loan.
2 . Q. The debtor in possession loan to RTC?
3 A. Yes.
4 Q. The term of what underlying contract?
5 A. The Chastang contract and the order issued
6 by the Court with respect to the financing for the
7 Chastang project.
8 Q. And who was that contract between?
9 A. Which contract?
10 Q. The contract that you're now -- the
11 underlying contract that you're now referring to.
12 A. There is a contract between RTC and
13 Chastang for which there was an entered court order
14 with respect to the DIP financing and the payment
15 of moneys and the performance requirements of RTC
16 under the order.
17 Q. Was Banco during 2002 advancing funds to
18 RTC to complete the Chastang project?
19 A. RTC was advanced funds under the DIP loan,
20 whether they used those particular funds for
21 Chastang or funds from operations for Chastang I
22 can't tell you.
23 Q. Well, did Banco require before it would
24 advance funds to RTC for Chastang that it approve

49

1 status of the straight line of credit?
2 A. For whom?
3 Q. For -- for CSMG, excuse me.
4 A. Well, since John Connolly worked for RTC
5 and he was -- his signature was required or his
6 approval was required for advances, if he decided
7 to remember it or tell anybody then, yes, they did,
8 and if he decided to forget everything immediately
9 then, of course, they didn't.
10 Q. Well, would Banco advise RTC when it made
11 an advance on the CSMG line of credit?
12 A. Yes.
13 Q. And who would you advise that such an
14 advance had been made?
15 A. When I received a request that had been
16 forwarded to me by CSMG through John Connolly who
17 endorsed it, I would tell him that I would pay it.
18 Q. All right. And would you then tell
19 Mr. Connolly that, in fact, that had been paid,
20 that amount had been paid?
21 A. Actually I don't recall.
22 Q. Do you recall ever providing any sort of
23 spread sheet of payments to RTC on the CSM -- CSMG
24 line of credit?

51

1 of expenses, invoices submitted by RTC?
2 A. No. The RTC loan was a debtor in
3 possession financing. The CSMG loan was a project
4 financing.
5 Q. I'm just trying to clarify, sir.
6 A. I just answered your question.
7 Q. I understand that. Off the record.
8 (Discussion had off the record.)
9 BY MR. PHILLIPS:
10 Q. Was Banco involved in the negotiation of
11 the underlying contract between RTC and Chastang?
12 A. No.
13 Q. Have you ever visited the landfill at
14 Chastang, Alabama?
15 A. No.
16 Q. In 2002, were you reviewing reports as to
17 the status of the project at Chastang, Alabama?
18 A. I don't recall.
19 Q. Would you receive reports on the status of
20 the project at Chastang, Alabama?
21 A. I may have.
22 Q. Who would those reports have come from?
23 A. Resource Technology Corporation.
24 Q. Did Banco keep RTC advised as to the

50

1 A. No.
2 Q. You mentioned Mr. May previously. Was
3 Mr. May employed by Banco in 2002?
4 A. Mr. May was not an employee of Banco other
5 than for the one day one time that I specifically
6 told you.
7 Q. Did Banco contract with any other entity
8 for Mr. May's services?
9 A. I don't recall.
10 Q. Was Mr. May an employee of Loop Corp?
11 A. I don't recall.
12 (Whereupon, Greenblatt
13 Deposition Exhibit No. 7 was
14 marked for identification.)
15 BY MR. PHILLIPS:
16 Q. Mr. Greenblatt, the court reporter has
17 handed you what has been marked as Exhibit 7. Do
18 you recognize this document?
19 A. Yes.
20 Q. Is this a letter you received from Don
21 Robbins on or about July 3rd, 2002?
22 A. Yes.
23 Q. Do you recall responding to this letter on
24 behalf of Banco?

5

13 (Pages 49 to 5

1    A.  Yes.
2    Q.  Who did you respond to?
3    A.  I don't actually recall.  I recall telling
4  them that they needed to submit the invoices and
5  get the approval from John Connolly before we would
6  pay anything.
7    Q.  When Banco advanced funds on the line of
8  credit, did those funds go to the vendor for the
9  services or did they go to RTC for payment of the
10  vendor?
11    A.  No funds went to RTC.
12    Q.  So the funds went to the vendors?
13    A.  Yes.
14       (Whereupon, Greenblatt
15        Deposition Exhibit No. 8 was
16        marked for identification.)
17  BY MR. PHILLIPS:
18    Q.  The court reporter has handed you what has
19  been marked as Exhibit 8.
20       Can you tell me whether you recognize this
21  document, Mr. Greenblatt?
22    A.  Yes.
23    Q.  Is this a letter that you received from
24  Mr. Robbins on or about July 12th, 2002?

53

1    A.  Yes.
2    Q.  Did you respond to this letter?
3    A.  Yes.  In the same manner that I responded
4  to the previous letters and said that they needed
5  to get Connolly's approval and that belly aching to
6  me without getting Connolly's approval wasn't going
7  to have any funds advanced.  And I do recall one
8  time, whether it was this time or some other time
9  that they had submitted invoice in excess of their
10  line.
11    Q.  Sir, in -- you do not recall how you may
12  have communicated this to CSMG, correct?
13    A.  I don't recall actually, no.
14    Q.  And you don't recall the substance of what
15  was said in such communications beyond what you've
16  stated?
17    A.  I recall the substance that if you want to
18  submit invoices for payment under the line that
19  they had to do it in accordance with the terms of
20  the note.  I got sick of telling them this.
21    Q.  Well, did you tell them that more than
22  once?
23    A.  Yes.
24    Q.  But you don't recall how you ever

54

1  communicated that to them?
2    A.  It is very likely that I would communicate
3  to them by telephone, but I don't recall the
4  communications.  It was five years ago.
5    Q.  Do you recall actually picking up the
6  phone and calling Don Robbins?
7    A.  Like I said, I don't recall.  It was five
8  years ago.
9    Q.  Sir, I'm only asking as you said it was
10  more than likely.  You have no specific
11  recollection of that occurring, though?
12    A.  I have no recollection of any of the
13  communications in particular.
14    Q.  Do you know if RTC had sufficient funds to
15  complete the project at Chastang, Alabama at this
16  point in time?
17    A.  Since it did complete it, it must have had
18  sufficient funds.
19    Q.  How do you know that RTC completed the
20  project at Chastang, Alabama?
21    A.  Because the day before its injected the --
22  went to inject gas into the pipeline, it operated
23  the plant and produced gas within spec, and in the
24  evening thereafter Waste Management opened valves

55

1  and let oxygen into the field.
2    Q.  How do you know that?
3    A.  There was testimony in the RTC case as to
4  that.
5    Q.  Testimony by whom?
6    A.  By -- I don't recall.  It was in the RT --
7  in an RTC hearing.
8    Q.  And is that testimony that you personally
9  observed?
10    A.  I don't recall whether I observed it or
11  read it in a transcript.
12    Q.  Okay.  And do you recall who at Waste
13  Management supposedly opened these valves?
14    A.  What particular person?
15    Q.  Yes.
16    A.  No.  As a matter of fact, I don't recall
17  the names of any Waste Management personnel, so
18  couldn't tell you.
19       (Whereupon, Greenblatt
20        Deposition Exhibit No. 9 was
21        marked for identification.)
22  BY MR. PHILLIPS:
23    Q.  The court reporter has handed you what's
24  been marked as Exhibit 9.  Have you seen this

14 (Pages 53 to 5

1  document before, sir?
2      A.  Yes.
3      Q.  Am I correct that this is a letter that
4  you received on or about July 24th, 2002 from
5  Mr. Robbins?
6      A.  Yes.
7      Q.  Is Mr. Robbins correct that the original
8  projected installation completion date was
9  July 23rd, 2002?
10     A.  I don't know.
11     Q.  Did you have any discussions with
12 Mr. Connolly regarding this correspondence or any
13 of the correspondence that we've reviewed so far
14 from Mr. Robbins regarding payment of expenses?
15     A.  Yes.
16     Q.  Was that conversation over the phone?
17     A.  I don't recall.
18     Q.  Did you have more than one conversation?
19     A.  Yes.
20     Q.  And what was the substance of that
21 conversation with Mr. Connolly -- or those
22 conversations with Mr. Connolly?
23     A.  The subject was the invoices, the rate of
24 invoices -- the rate at which the invoices were
                                                    57

1  coming in, and the amount of work that remained to
2  be done by the various parties.
3      Q.  Did you ever discuss with Mr. Connolly in
4  light of Mr. Robbins' request for funds whether
5  Mr. Connolly approved of the payment of those
6  funds?
7      A.  If Mr. Connolly approved any funds, we
8  paid them so, yes, I'm sure that we had to discuss
9  it.
10     Q.  Well, I'm -- perhaps I'm not being clear.
11         When you'd get one of these letters from
12 Don Robbins, you said that you had communicated to
13 Mr. Robbins the need for Mr. Connolly to approve of
14 all submissions under -- for advance under the line
15 of credit, correct?
16     A.  Yes.
17     Q.  As part of that response, did you ever
18 call up Mr. Connolly and say, John, do you approve
19 of this expense?
20     A.  No.  That's not the way things were
21 submitted.
22         Only things that were submitted from
23 Connolly with respect to CSMG were paid.  If they
24 were sent to me outside of CS -- outside of
                                                    58

1  Connolly I would send them over to Connolly, that's
2  all I would do.
3      Q.  How would -- how would Mr. Connolly
4  evidence his approval of an expenditure or an
5  advance?
6      A.  Mr. Connolly would give me either the
7  invoice or a list of invoices to be paid.
8      Q.  Would we see Mr. Connolly's initials or
9  signature on any of the invoices that were
10 approved?
11     A.  I don't recall the details.
12     Q.  Well, how would you know that Mr. Connolly
13 approved of an advance under the line of credit?
14     A.  I would get either as I said a list of
15 invoices or invoices from Mr. Connolly to pay with
16 respect to the line of credit.
17     Q.  Would you get the underlying documentation
18 of the expense from Mr. Connolly?
19     A.  I don't recall.
20     Q.  With respect to Exhibit 6, 7, 8, and 9, do
21 you recall any question as to whether CSMG had
22 actually submitted the invoices for payment to
23 Banco?
24     A.  What?
                                                    59

1      Q.  In this correspondence, Mr. --
2  Mr. Robbins is saying we've submitted certain
3  invoices to Banco for advances under the line of
4  credit, correct?
5      A.  I don't believe so.
6      Q.  Was there any question in your mind, for
7  example, sir, when you received the letter at
8  Exhibit 6, was there any question in your mind that
9  Banco had received the invoice referred to in that
10 correspondence?
11     A.  In Exhibit 6?
12     Q.  Yes.
13     A.  No.  We hadn't received the invoice.  He
14 didn't submit invoices to us.
15     Q.  Mr. Robbins never submitted an invoice
16 directly --
17     A.  To Banco, no.
18     Q.  -- to Banco?  That's -- perhaps I'm
19 confused by your prior testimony.
20         What you had told me I thought was that
21 Mr. --
22     A.  He submitted invoices but not to Banco.
23 He submitted invoices to the general contractor
24 which was RTC, and when RTC would approve them (

1  John Connolly would approve them and send them on
2  to us we would pay them.
3     Q.  When I asked you previously about Banco's
4  response to this correspondence, these letters from
5  Mr. Robbins --
6     A.  Right.
7     Q.  -- I believe, and correct me if I'm wrong,
8  that you told me that your response, you can't
9  recall whether it was a telephone conversation, any
10 form of correspondence, but you responded to
11 Mr. Robbins you've got to get John Connolly's
12 approval?
13    A.  Right.
14    Q.  Okay.  In saying that did you indicate
15 to --
16    A.  I have a letter --
17    Q.  Excuse me.  This is one of the occasions
18 that I referred to earlier at the beginning of the
19 deposition.
20    A.  Please, go on.  That was like a paragraph
21 type of hesitation, but go on.
22      MR. PHILLIPS:  Could you read it back?
23         (Record read as requested.)
24
       61

1  BY MR. PHILLIPS:
2     Q.  Did you ever indicate to Mr. Robbins that
3  you did not have the invoices that he was
4  requesting payment on?
5     A.  No.  What I said to Mr. Robbins was that
6  the invoices that he sent me a letter requesting
7  payment on he needed to get approved by John
8  Connolly.
9     Q.  Was Mr. Robbins and CSMG forwarding
10 invoices to Banco without first obtaining John
11 Connolly's approval?
12    A.  No.  They would forward the invoices to
13 John Connolly and then complain to me that I hadn't
14 funded invoices for which I hadn't received John
15 Connolly's approval for, and I told them they had
16 to go get John Connolly's approval, that calling me
17 about this wasn't going to do anything.
18      RTC is a general contractor, they have a
19 project they're building, they have subcontractors,
20 the subcontractor needs to be able to finish, they
21 need to be able to be sure that the subcontractor
22 will finish, and that's why they approve the
23 invoices.  The fact is the subcontractor did
24 finish, the plant operated.
       62

1     Q.  Did you call Mr. Robbins?
2     A.  I recall having a conversation with
3  Mr. Robbins, but I don't actually recall the call.
4     Q.  Okay.
5     A.  I told you that before.
6       (Whereupon, Greenblatt
7       Deposition Exhibit No. 10 was
8       marked for identification.)
9  BY MR. PHILLIPS:
10    Q.  Mr. Greenblatt, you've been handed by the
11 court reporter what has been marked as Exhibit 10.
12 Do you recognize this document, sir?
13    A.  No.
14    Q.  You do not recall receiving this letter
15 from Mr. Robbins on or about August 12th of 2002?
16    A.  I said that I didn't recognize it.
17    Q.  Okay.  Do you dispute that CSMG sent you
18 this letter?
19    A.  I don't recall.
20    Q.  Do you recall any instances where checks
21 issued by Banco that were sent out to vendors were
22 returned for non-sufficient funds?
23    A.  No.
24    Q.  Do you have any reason to believe that
       63

1  that didn't occur?
2     A.  I don't believe it occurred, but I don't
3  recall.
4       (Whereupon, Greenblatt
5       Deposition Exhibit No. 11 was
6       marked for identification.)
7  BY MR. PHILLIPS:
8     Q.  You've been handed by the court reporter,
9  Mr. Greenblatt, what has been marked as Exhibit 11
10 in this deposition.
11      Do you recognize this document?
12    A.  Yes.  This was a letter in which CSMG set
13 forth the basic problem that RTC had with it, is
14 that CSMG submitted in excess of $203,800 of
15 invoices --
16    Q.  Why was --
17    A.  Why would they do that --
18    Q.  Excuse me, you got to wait for the
19 remainder of the question --
20    A.  Excuse me, maybe you would like to let me
21 finish my answer, but since you don't, please o
22 ahead and ask your next question.
23      MR. PHILLIPS:  Would you read back the prior
24 question and response?
       6

16  (Pages 61 to 6

1      (Record read as requested.)
2      THE WITNESS: -- and said that they had more
3  additional costs which they had to incur to finish
4  and had no money to finish it.
5  BY MR. PHILLIPS:
6      Q.  My question for you, sir, was why would
7  RTC have a problem with that?
8      A.  Because RTC is the general contractor, and
9  RTC needs to see that one of its subcontractors can
10 finish a necessary portion with the funds that were
11 available to it, and that if the subcontractor
12 couldn't finish with respect to that, then RTC
13 would be concerned.
14     As for me, I would be concerned because I
15 needed to have an operating project in order to
16 make my collateral be secure, so I don't really
17 care what happens as long as the project is
18 finished because I'll be paid, and if the project
19 is not finished, then I have to go seize everything
20 and sell it.
21     Q.  Am I correct that under the note at
22 Exhibit 3 that CSMG was entitled to further loan
23 advances once the entire amount of the line of
24 credit had been advanced?
65

1      A.  No.
2      Q.  If you'd look at second to last page, the
3  paragraph we previously reviewed regarding line of
4  credit, second sentence.
5      A.  Okay.
6      Q.  What is the meaning of that sentence?
7      A.  I believe there's a typo.
8      Q.  You do not believe that this document
9  evidences the agreement of the parties?
10     A.  I believe that it does, but I believe that
11 there's a typo in there.
12     But even if there's no typo, it's only
13 entitled to further loan advances to the extent
14 that the lender wishes to do it, and we did do
15 further loan advances.
16     Q.  Okay.  That was my question, sir.
17     Was -- was Banco prepared to make further
18 loan advances?
19     A.  Banco did make further loan advances.
20 MR. PHILLIPS: Why don't we break for lunch.
21 MR. JORDAN: Okay.
22     (Lunch break.)
23
24
66

1      AFTERNOON SESSION
2  BY MR. PHILLIPS:
3      Q.  Mr. Greenblatt, I wanted to return for a
4  moment to Exhibit 10.
5      As I recall, you do not recall receiving
6  this letter, correct?
7      A.  That's correct.
8      Q.  Prior to the deposition, did you do any
9  review of the correspondence or other files of
10 Banco to determine what communications had been
11 received from CSMG or sent to CSMG?
12     A.  No.  I didn't see any.
13     Q.  Well, did you conduct any review of the
14 files for that purpose?
15     A.  No.
16     Q.  The last paragraph of this letter requests
17 a payment for certain items to be made directly to
18 Consortium Service Management Group, Inc.
19     Did Banco make any payments to CSMG
20 pursuant to that request?
21     A.  No.
22     Q.  Did Banco respond in any way to that
23 request?
24     A.  Banco paid the invoices according to the
67

1  terms of its loan.
2               (Whereupon, Greenblatt
3                Deposition Exhibit No. 12 was
4                marked for identification.)
5  BY MR. PHILLIPS:
6      Q.  You've been handed, sir, what has been
7  marked as Exhibit 12.  Do you recognize this
8  document?
9      A.  I believe this is a letter of default sent
10 to CSMG.
11     Q.  And is that a copy of your signature in
12 the signature block?
13     A.  Yes.
14     Q.  Do you recall sending this letter?
15     A.  I recall that I did send it.  I don't
16 recall sending it.
17     Q.  Do you know when you sent it?
18     A.  It appears on here that I sent it in
19 December 2002, but I don't recall.
20     Q.  Do you recall how you transmitted it?
21     A.  I would have sent it by fax and by
22 certified mail, but I don't recall.
23     Q.  Is that noted anywhere on the letter?
24     A.  No.
68

17 (Pages 65 to 68)

1    Q.  Would you personally have sent it by
2  facsimile?
3    A.  I don't recall.
4    Q.  Referring to the contents of the letter,
5  you refer to a failure to pay a judgment, I presume
6  there's a typo there, should be that was entered
7  against the company in the amount of $32,091 in
8  favor of Bagby & Russell Electric Company, do you
9  see that?
10    A.  Yes.
11    Q.  How did you become aware of that judgment?
12    A.  I don't recall -- wait a minute, I think I
13  do recall.  It may have been mentioned in an SEC
14  filing.
15    Q.  Which SEC filing?
16    A.  I don't recall which one.
17    Q.  Well, if you sent this on December 10th of
18  2002 or prepared this letter on December 10th of
19  2002, what would have been the last filing that you
20  would have had access to?
21    A.  I have no idea.  It may be that this was
22  2003 even though it's dated 2002, but -- so that
23  might be another typo here, but I don't recall.
24    Q.  Okay.  And you also state failure of the

                                                    69

1  principals as defined in the consolidated guaranty
2  and security agreement to maintain 51 percent
3  ownership in CSMG, do you see that?
4    A.  Yes.
5    Q.  When did you find out about the failure of
6  the principals?
7    A.  I don't recall.
8    Q.  Which principals does that refer to?
9    A.  The principals as defined in the security
10  agreement.
11    Q.  Okay.  Do you recall what the definition
12  was --
13    A.  No.
14    Q.  -- as you sit here?
15    A.  No.
16    Q.  The security agreement was one of the
17  documents that you reviewed prior to coming today,
18  correct?
19    A.  Yes.
20    Q.  At the time of the -- that the note was
21  executed, did the principals have a 51 percent
22  ownership interest in CSMG?
23    A.  I believe so, but I don't recall.
24    Q.  Is this -- strike that.

                                                    70

1    Besides the letter that we previously
2  reviewed from March 18th of 2002, was this the
3  first time that Banco notified CSMG that it was in
4  default of its obligations under the promissory
5  note?
6    A.  I don't recall.
7    Q.  Do you recall any other correspondence
8  besides this letter and the letter we previously
9  reviewed from March 18th, 2002 notifying CSMG that
10  was in default of its obligations under the
11  promissory note?
12    A.  I don't recall.
13    Q.  And prior to coming here today, you did
14  not perform any sort of review of the files of
15  Banco to determine whether any such correspondence
16  existed, correct?
17    A.  I was unable to find any files reflecting
18  such correspondence, correct.
19    Q.  You did conduct a review of the files of
20  Banco for the items identified on Exhibit A to
21  Exhibit 1 that's marked today, the notice of
22  deposition?
23    A.  I'm making sure you're finished.  Okay.
24  To the extent that they were available to me, yes.

                                                    71

1    Q.  Why wouldn't the files of Banco be
2  available to you as president of the company?
3    A.  Things could be lost.  Things could be
4  filed away and misfiled, I have no idea.  There's
5  any number of reasons why they could be not
6  available to me.
7    (Whereupon, Greenblatt
8    Deposition Exhibit No. 13 was
9    marked for identification.)
10  BY MR. PHILLIPS:
11    Q.  The court reporter has handed you what has
12  been marked as Exhibit 13, Mr. Greenblatt.
13    Could you take a moment to review that
14  document and tell me if you recognize it.
15    A.  No.  I don't recognize it.
16    Q.  You've never previously seen this
17  document?
18    A.  I don't recognize it.  I don't recall ever
19  seeing it before.
20    Q.  As of June 14th, 2001, was RTC in
21  bankruptcy?
22    A.  RTC had filed Chapter 11 in -- had a case
23  filed 1999, so yes.
24    Q.  Was Banco and yourself and Chip Lease,

                                                    72

18 (Pages 69 to 72)

1    MR. JORDAN: I didn't think it was that
2  determinative of the lawsuit. I'm trying to make
3  it a complete list.
4  BY MR. PHILLIPS:
5    Q. I'm just trying to find out the location
6  of Mr. Connolly.
7    A. Mr. Connolly is in suite 711 where he's
8  always been. I just don't know who owns the
9  company that he works for.
10    Q. Do you know what company he works for?
11    A. That's what I meant to say, I don't know
12  what company he works for.
13    Q. Okay. Do you know what company leases the
14  space known as suite 711?
15    A. No.
16    Q. When was the last time that you spoke with
17  Kevin Warner?
18    A. Friday or Thursday.
19    Q. Is Mr. Warner in the same location as
20  Mr. Connolly?
21    A. No.
22    Q. Do you know who employs Mr. Warner today?
23    A. No.
24    Q. What did you speak about with Mr. Warner

101

1  again.
2    Q. I don't believe I asked that question
3  previously, Mr. Greenblatt, I'm asking --
4    A. Again I'm not going to answer your
5  question.
6    Q. You're not going to answer whether you
7  recall sharing the contents of your July --
8    A. I'm not going to answer it, no.
9    MR. PHILLIPS: Will we be required to file a
10  motion with the Court?
11    THE WITNESS: Yes.
12    MR. JORDAN: You know what, the reality is it's
13  irrelevant.
14    MR. PHILLIPS: It is not irrelevant,
15  Mr. Jordan.
16    MR. JORDAN: How is it not irrelevant?
17    MR. PHILLIPS: Because it was obviously
18  released for the purpose of injuring and harming
19  CSMG.
20    MR. JORDAN: How could it injure or harm them,
21  they have --
22    THE WITNESS: Wait, you know, that's fine,
23  don't argue. If they want to file a motion, file a
24  motion. You should go at it.

103

1  on Thursday or Friday?
2    A. I believe we talked about -- oh, two
3  DVD's, the Bourne Identity and the other one, and I
4  thought that they weren't very good.
5    Q. How frequently do you speak with
6  Mr. Warner?
7    A. Constantly.
8    Q. Does he have an office located on the 7th
9  floor of 330 South Wells Street?
10    A. Yes.
11    Q. Is it suite 711?
12    A. No.
13    Q. Which suite is it?
14    A. 708.
15    Q. Did you share the contents of your
16  July 9th letter with either Mr. Connolly or
17  Mr. Warner prior to sending it to CSMG?
18    A. I don't recall that I did.
19    Q. You do recall sharing it with someone
20  other than your attorneys?
21    A. I didn't say that.
22    Q. I'm asking whether you do recall sharing
23  it with someone.
24    A. I'm not going to answer your question

102

1    MR. JORDAN: Please.
2    MR. PHILLIPS: Do you want to take a break?
3    THE WITNESS: No.
4      (Whereupon, Greenblatt
5      Deposition Exhibit No. 19 was
6      marked for identification.)
7  BY MR. PHILLIPS:
8    Q. You've been handed what has been marked as
9  Exhibit 19, Mr. Greenblatt.
10    Do you recognize this document?
11    A. Yes.
12    Q. What is it, sir?
13    A. It's my affidavit that I signed on
14  July 20th in this case.
15    Q. Referring you to Paragraph 10 of the
16  declaration, sir.
17    A. Yes.
18    Q. You tell the Court that CSMG failed to
19  make payments of principal or interest under the
20  note. On December 18th, 2002 Banco sent a notice
21  of default to CSMG.
22    A. Okay.
23    Q. Is that statement correct, sir?
24    A. I believe it refers to this letter here.

10

1    Q.   The letter that you told me probably was a
2  typo that it was sent --
3    A.   I didn't say probably.  I said what I
4  said, and to the extent whatever I said, you would
5  have to review what I said and read -- and it would
6  be what I said I said.
7         However, your characterization now is not
8  exactly what I said.  It is dated December 10th,
9  2002, and if that's incorrect and there was a typo
10  in there then, yes, there was a typo, however, that
11  refers to that letter.
12    Q.   Did you sent that letter that we've looked
13  at previously, Exhibit 12, on December 18th, 2002?
14    MR. JORDAN:   December 18th?
15    MR. PHILLIPS:   That's what he says in his
16  declaration.
17    THE WITNESS:   Well, then obviously, the --
18  there is a typo in something or other.
19         Thank you for pointing it out to me,
20  though, we're happy -- Greg, would you please amend
21  that typo with the Court so that the Court won't be
22  mistaken that I sent this on the 8th -- 18th
23  instead of the 10th?
24
                                                    105

1  BY MR. PHILLIPS:
2    Q.   How about in 2003 rather than 2002?
3    A.   An excellent point.  You should have --
4  you should tell the Court in a motion that there
5  was a typo in the original letter and in the
6  affidavit.
7    MR. JORDAN:   Okay.
8    THE WITNESS:   Thank you.
9    MR. JORDAN:   Let's move on.
10    THE WITNESS:   However, it may be the case that
11  it was sent on the 18th even though it's dated the
12  10th.  As I sit here today, I couldn't say.
13  BY MR. PHILLIPS:
14    Q.   Returning to Exhibit 12, sir, do you see a
15  facsimile notation on that?
16    A.   One that is from August 11th, 2004.
17    Q.   Which is the CSMG notation, correct?
18    A.   Yes.
19    Q.   And then there's one at the top of the
20  letter also in the right-hand corner for
21  August 10th, 2004, correct?
22    A.   Well, there is all sorts of August 10th,
23  August 11th, and August 13th, none of which are
24  identified by anybody.
                                                    106

1    Q.   Okay.  Is it possible that you didn't send
2  the letter until August of 2004?
3    A.   No.  It's possible that I sent the letter
4  again in August 2004, but I didn't send this
5  initial letter on August 2004.
6         This letter was sent in -- when it was
7  initially sent in December of the -- I believe
8  2003.
9    Q.   Turning back to Exhibit 19, sir,
10  Paragraph 12 of your declaration, you state a
11  subsequent notice of default for non-payment was
12  sent on February 3rd, 2005.
13         Do you know what letter that refers to?
14    A.   I don't recall as I sit here today, but we
15  sent numerous letters, yes.
16    Q.   Did you review the files of Banco prior
17  to --
18    A.   No.
19    Q.   -- prior to completing this declaration,
20  sir, with respect to correspondence between Banco
21  and CSMG?
22    A.   Yes.  Yes.
23    Q.   You just didn't review such files prior to
24  coming to this deposition?
                                                    107

1    A.   That's correct.
2    MR. PHILLIPS:   Greg, I have no idea what that
3  refers to.
4    MR. JORDAN:   The February 3rd, 2005?
5    MR. PHILLIPS:   Yes.
6    MR. JORDAN:   It is attached to the complaint.
7    MR. PHILLIPS:   Is it?
8    MR. JORDAN:   Yes.  With a fax transmittal that
9  I think if I recall indicates it was -- that the
10  date and the fax transmission date were set off,
11  but it's all attached to the complaint.
12         And just for the last record, I think your
13  client denies receiving the December 10th letter
14  but admits receiving the February '05 letter.
15    MR. PHILLIPS:   Off the offered.
16         (Discussion had off the record.)
17  BY MR. PHILLIPS:
18    Q.   Paragraph 14 of your declaration, you
19  state that on information and belief CSMG has moved
20  some of the collateral securing the note, its
21  current whereabouts are unknown.
22         What does that refer to, sir?
23    A.   That refers to the proceeds from the sale
24  of the stock of the Ukrainian engineering company
                                                    10

27 (Pages 105 to 10

# DEFENDANTS' EXHIBIT 2

JOHN CONNOLLY, OCTOBER 18, 2007

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3            EASTERN DIVISION
 4  BANCO PANAMERICANO, INC., a )
 5  South Dakota corporation,   )
 6       Plaintiff and          )
 7       Counterdefendant,      )
 8  -vs-              ) No. 07 C 00015
 9  CONSORTIUM SERVICE          )
10  MANAGEMENT GROUP, INC.,     )
11  a/k/a CONSORTIUM MANAGEMENT )
12  GROUP, INC., a Texas corp., )
13  and CSM GASTECH, LLC, a     )
14  Texas corp.,                )
15       Defendants and         )
16       Counterplaintiffs.     )
17       The deposition of JOHN CONNOLLY, called
18  for examination, taken pursuant to the Federal
19  Rules of Civil Procedure of the United States
20  District Courts pertaining to the taking of
21  depositions, taken before THERESA A. VORKAPIC, a
22  Notary Public within and for the County of Kane,
23  State of Illinois, and a Certified Shorthand
24  Reporter, CSR No. 84-2589, of said state, at Suite
```

**Page 2**

```
 1  4500, One North Wacker Drive, Chicago, Illinois,
 2  on the 18th day of October, A.D. 2007, at
 3  approximately 10:10 a.m.
 4  PRESENT:
 5       POLSINELLI SHALTON FLANIGAN & SUELTHAUS, PC,
 6       (180 North Stetson, Suite 4525,
 7       Chicago, Illinois 60601,
 8       312-873-3626), by:
 9       MR. GREGORY J. JORDAN,
10       gjordan@polsinelli.com,
11       appeared on behalf of Plaintiff and
12       Counterdefendant;
13       BENESCH FRIEDLANDER COPLAN & ARONOFF, LLP,
14       (2300 BP Tower,
15       200 Public Square,
16       Cleveland, Ohio 44114,
17       216-363-4500), by:
18       MR. MARK A. PHILLIPS,
19       mphillips@bfca.com,
20       appeared on behalf of Defendants
21       and Counterplaintiffs.
22
23  REPORTED BY: THERESA A. VORKAPIC,
24       C.S.R. Certificate No. 84-2589
```

**Page 3**

```
 1       MR. PHILLIPS: Would you swear the witness?
 2       (WHEREUPON, the witness was duly
 3       sworn.)
 4       JOHN CONNOLLY,
 5  called as a witness herein, having been first duly
 6  sworn, was examined and testified as follows:
 7            EXAMINATION
 8  BY MR. PHILLIPS:
 9       Q.  Good morning, Mr. Connolly.  My name as
10  you know is Mark Phillips.  I represent Consortium
11  Service Management Group and CSM Gastech in a
12  litigation that's been brought by Banco
13  Panamericano, Inc. and that's what litigation this
14  deposition is in connection with.
15       I know that you've been deposed before,
16  correct?
17       A.  Yes.
18       Q.  On a number of occasions.  I'll just go
19  through my standard ground rules, if you will.
20       If you at any time need to take a
21  break, just let me know.  The one thing that I
22  would ask is that if a question is pending, you
23  answer that question before the break occurs.
24  Verbal responses are required in terms of my
```

**Page 4**

```
 1  questions.  If you don't understand a question,
 2  let me know and I'll attempt to rephrase it or
 3  restate it, okay?
 4       A.  Okay.
 5       Q.  Thank you.  Are you represented by
 6  counsel today?
 7       A.  I am not.
 8       Q.  What is your business address, sir?
 9       A.  330 South Wells Street, Chicago,
10  Illinois, 60606.
11       Q.  What is the suite number that you're
12  at?
13       A.  711.
14       Q.  Are you employed today by Resource
15  Technology Corporation?
16       A.  Yes.
17       Q.  I'll be referred to that as RTC and
18  you'll understand when I refer to RTC what I'm
19  referring to, correct?
20       A.  Correct.
21       Q.  Are you the president of RTC?
22       A.  Yes.
23       Q.  Do you serve on the board of directors
24  of RTC?
```

JOHN CONNOLLY, OCTOBER 18, 2007

Page 85

1    Q.   Did you review the exhibits?
2    A.   Yeah.
3    Q.   Do you recall having any questions
4  about Exhibit F at the time that you signed this
5  agreement?
6    A.   I don't recall having any questions
7  about it.
8    Q.   Did you have any discussions with
9  Mr. Greenblatt regarding this agreement prior to
10 you executing it?
11   A.   Not that I can recall, no.
12   Q.   Do you recall Mr. Robbins ever visiting
13 the offices of RTC?
14   A.   Yes.
15   Q.   Do you recall when that was?
16   A.   No.
17   Q.   Who did Mr. Robbins meet with when he
18 visited the office of RTC?
19   A.   Myself, Kevin Werner, George Calvert,
20 maybe Johnny Johnson.  That's what I can recall.
21   Q.   Do you recall that Mr. Robbins executed
22 this agreement while in the offices of Resource
23 Technology Corporation?
24   A.   I do not.

Page 86

1    Q.   Do you have any reason to believe that
2  that isn't true?
3    A.   I don't know either way.  The only way
4  I would say it's not true is -- I would have --
5  then, the answer is yes and the reason I would say
6  is that may not be true is it's different dates.
7    Q.   That's the only reason?
8    A.   No, other than the fact I don't recall
9  it.  I don't recall it and plus Mr. Robbins signed
10 a day before I signed it.  He signed on 2-14-02
11 and I signed on 2-15-02.
12   Q.   Were you present when Mr. Robbins
13 signed a note on behalf of CSMG in favor of Banco
14 Panamericano?
15   A.   I don't believe so, but I don't recall.
16   Q.   Did you have any discussions with
17 Mr. Robbins regarding the terms of that note?
18   A.   No.
19   Q.   I'm handing you what has previously
20 been marked yesterday as Werner Exhibit 13.
21       (WHEREUPON, the document was
22       tendered to the witness.)
23 BY MR. PHILLIPS:
24   Q.   Have you ever seen that document

Page 87

1  before?
2    A.   Yes.
3    Q.   When did you first see that document?
4    A.   I don't recall.
5    Q.   What is that document, sir?
6    A.   This is a promissory note in the amount
7  of $203,800 dated 2-15-02, it says maturity 4-1-04
8  between borrowers CSMG Gas-Tech and lender Banco
9  Panamericano, Inc.
10   Q.   Without reference to the note itself,
11 do you have any understanding of the terms of the
12 loan between Banco Panamericano and CSMG?
13   A.   Yes.
14   Q.   What was that understanding?
15   A.   You want my understanding as of now?
16   Q.   As of now.
17   A.   Okay.  It was a loan.  And there had to
18 be some minimum payments made I saw on here on a
19 monthly basis and it had to be paid up by a date
20 certain sometime a couple of years after the loan
21 was executed.  I recall see an interest rate and
22 then a default rate.  That's all I can recall.
23   Q.   When was the last time you reviewed
24 this document?

Page 88

1    A.   This morning.
2    Q.   Did you review any other documents in
3  preparation for today's deposition?
4    A.   Yes.  I reviewed -- yes.  The answer is
5  yes.
6    Q.   What documents did you review in
7  preparation for today's deposition?
8    A.   The operating agreement, my terms may
9  be off but the complaint and counterclaim
10 document, and my deposition from 2005 in the Waste
11 Management RTC case.
12   Q.   Where did you obtain the complaint and
13 counterclaim in this lawsuit?
14   A.   Mr. Jordan's office.
15   Q.   Did you have discussions with
16 Mr. Jordan about today's deposition?
17   A.   Yes.
18   Q.   Did you discuss the substance of your
19 testimony with Mr. Jordan or Mr. Schmidt?
20   A.   No.
21   Q.   Did Mr. Jordan or Mr. Schmidt explain
22 what this lawsuit was about to you at the time
23 that you were in their offices?
24   A.   No.

22 (Pages 85 to 88)

JOHN CONNOLLY, OCTOBER 18, 2007

Page 89

1    Q.  You provided a copy of the complaint
2  and the counterclaim to Mr. Werner, did you not?
3    A.  I don't recall that.
4    Q.  Did you have any discussions with
5  Mr. Werner regarding the complaint and the
6  counterclaim in this lawsuit?
7    A.  I don't recall that.
8    Q.  Did you have any discussions with
9  Mr. Werner regarding his testimony yesterday in
10  this deposition?
11    A.  No.
12    Q.  Did you have any discussions with
13  Mr. Greenblatt at any time regarding this lawsuit?
14    A.  I'm sure I did.
15    Q.  Do you recall any such discussions?
16    A.  No.
17    Q.  Do you recall anything that
18  Mr. Greenblatt has told you about this lawsuit?
19    A.  I recall he told me that CSMG was in
20  default.
21    Q.  When did he tell you that?
22    A.  I don't recall.
23    Q.  Have you ever been asked to provide any
24  information to Banco Panamericano, Mr. Greenblatt

Page 90

1  or Mr. Jordan or any attorney representing Banco
2  Panamericano with respect to this lawsuit?
3    A.  Yes.
4    Q.  What information have you been asked to
5  provide?
6    A.  Just general, you know, facts about the
7  site itself and more of a facts about sequence of
8  events.
9    Q.  Who asked you to provide that
10  information?
11    A.  Mr. Jordan.
12    Q.  Do you recall what you told Mr. Jordan
13  about the sequence of events?
14    A.  Not with any specificity, no.
15    Q.  Did you talk to Mr. Jordan about this
16  note?
17    A.  I don't recall that at all.
18    Q.  Did you talk to Mr. Jordan about how
19  money was advanced on behalf of CSMG?
20    A.  No.
21    Q.  Did you talk to Mr. Greenblatt about
22  how money was advanced under this loan on behalf
23  of or to CSMG?
24    A.  I may have back then, but I don't

Page 91

1  recall any specificity.
2    Q.  If you would turn to Page 3 of Werner
3  Exhibit 13.  And the last paragraph on that page,
4  sir, entitled Line of Credit.
5        Do you see that?
6    A.  Right.
7    Q.  It says: "This note evidences a
8  straight line of credit.  Advances under this
9  note" -- I'm skipping a sentence there.
10  "Advances under this note may be requested either
11  orally or in writing by borrowers or as provided
12  in this paragraph.  Lender may but need not
13  require that all oral requests be confirmed in
14  writing.  All communications, instructions or
15  directions by telephone or otherwise to lender are
16  to be directed to lenders office shown above.  The
17  following person currently is authorized to
18  request advances and authorize payments under the
19  line of credit until lender receives from
20  borrowers at lender's address shown above written
21  notice of revocation of his or her authority,
22  Donald Robbins and John Connolly."
23        Your name is spelled wrong there,
24  correct, sir?

Page 92

1    A.  Correct.
2    Q.  Do you know why you were authorized to
3  request advances and authorize payments under this
4  line of credit?
5    A.  I disagree with your terminology.  I
6  believe I was authorized to certain authorize the
7  payments, but I don't know that -- the way this
8  reads, I don't know whether I was authorized to
9  request advances.
10    Q.  Do you know why you were given that
11  interpretation, you were named to authorize
12  payments with respect to this line of credit?
13    A.  Right.  The way I read this is request
14  advances, those are the first party, authorize
15  payment goes to the second party, it's in that
16  order, request and authorize.
17    Q.  But, sir, what I'm asking you is do you
18  know why you are identified as the person or a
19  person who could authorize payments under the line
20  of credit?
21    A.  Sure.
22    Q.  Why?
23    A.  RTC was in bankruptcy at the time.  I
24  had a fiduciary duty to make sure what went on on

23 (Pages 89 to 92)

JOHN CONNOLLY, OCTOBER 18, 2007

Page 93

1  that site as far as what was being put on that
2  site was being done properly because this work was
3  being done for the estate of RTC. I had a
4  fiduciary duty at the time as in effect the
5  trustee of the debtor in possession to the court.
6      Q.  Accepting for the moment that
7  explanation, how did your name even come up in the
8  context of this note if you know?
9      A.  I think it's asked and answered.  I
10 have a fiduciary duty.  The work being done is
11 being done for RTC the estate.  I have a fiduciary
12 duty to make certain that the equipment that goes
13 in on that site is done compliantly and in
14 accordance with the estate.  I really don't
15 appreciate your smirk right now so let's keep it
16 professional.
17     Q.  Sir, I am not smirking.  All I am
18 asking is because you told me, did you not, that
19 you weren't involved in the negotiation of this
20 note?
21     A.  I was not.
22     Q.  How did your name then come up in the
23 context of this note?
24     MR. JORDAN:  Asked and answered.  Objection.

Page 94

1  BY THE WITNESS:
2      A.  I'll just say I answered that twice.
3  I'll answer it again.  Because the work is being
4  done on the Chastang Landfill with a RTC contract,
5  RTC at that time was -- had an estate under
6  direction of the court.  I was the president of
7  RTC at the time and RTC was operating as a debtor
8  in possession.  I had a fiduciary responsibility
9  to ensure that the work that was being done on
10 that site was being done compliantly and in the
11 less interests of the estate.
12 BY MR. PHILLIPS:
13     Q.  With that understanding, did you tell
14 someone that you had to authorize payments under
15 this line of credit?
16     A.  Sure.
17     Q.  Who did you tell that to?
18     A.  Mr. Werner.
19     Q.  To your knowledge, was Mr. Werner
20 involved in the negotiation of the terms of this
21 note?
22     A.  I don't recall.  I don't think so.
23     Q.  Well, if you told Mr. Werner that, and
24 you don't believe that Mr. Werner was involved in

Page 95

1  the negotiation of the terms of this note, how
2  would you telling Mr. Werner that you had to
3  authorize payments result in the assertion --
4  insertion of this term in the note?
5      MR. JORDAN:  Objection to foundation.  You're
6  asking him -- the presumption in your question is
7  different than the question you asked before.  Go
8  ahead.
9  BY THE WITNESS:
10     A.  Can you repeat the question, please.
11         (WHEREUPON, the record was
12         read by the reporter.)
13 BY MR. PHILLIPS:
14     Q.  Do you understand the question?
15     A.  No.  If you could rephrase it, please,
16 I'd appreciate it.
17     Q.  Do you know how as a term of this note
18 your name was inserted as a person who had to
19 authorize payments under the line of credit?
20     MR. JORDAN:  Objection.  Asked and answered.
21 BY THE WITNESS:
22     A.  Again, the answer I have and I'm
23 staying by it is we were an estate under the
24 Bankruptcy Court and that's how me name had to be

Page 96

1  in here to authorize payments for equipment and
2  services going to this site.
3  BY MR. PHILLIPS:
4      Q.  Did you tell Mr. Robbins that you had
5  to authorize payments under the line of credit
6  with Banco Panamericano?
7      A.  I believe at some point he was aware of
8  that.  And I don't know if I told him that or not.
9  I can't recall that part, but he is certainly
10 aware of that.
11     Q.  To your knowledge, was he aware of that
12 before the date of this note?
13     A.  Oh, I don't know.
14         With that, I'm going to take a quick
15 break, thanks.  Is that okay?
16     MR. PHILLIPS:  It's fine.
17         (WHEREUPON, a recess was had.)
18 BY MR. PHILLIPS:
19     Q.  Prior to this morning, Mr. Connolly,
20 had you reviewed the terms of Werner Exhibit 13?
21     A.  I don't recall.
22     Q.  Did you ever tell Mr. Greenblatt that
23 you would need to authorize any payments under the
24 line of credit?

24 (Pages 93 to 96)

JOHN CONNOLLY, OCTOBER 18, 2007

Page 97

1    A.  No.
2    Q.  You never insisted that your name be
3  inserted in this note as the person who would
4  authorize payments under the line of credit?
5    A.  No, I did not.
6    Q.  Do you know how Mr. Greenblatt became
7  aware of Consortium Service Management Group?
8    A.  I don't recall.
9    Q.  Did you ever tell Mr. Greenblatt that
10  Consortium Service Management Group was going to
11  be providing equipment for the cleaning of
12  landfill gas at the Chastang Landfill or anything
13  similar to that?
14    A.  I may have, but I don't recall.
15    Q.  Do you recall ever being present at a
16  meeting between Mr. Robbins and Mr. Greenblatt?
17    A.  I do not recall.
18    Q.  Do you recall ever looking at a
19  security agreement between CSMG and Banco
20  Panamericano?
21    A.  I may have.  I guess the answer is I
22  don't recall.
23    Q.  Before introducing it as an exhibit,
24  I'll simply ask whether you've seen this document

Page 98

1  before?
2       (WHEREUPON, the document was
3       tendered to the witness.)
4  BY THE WITNESS:
5    A.  I don't believe I've ever seen this.
6  BY MR. PHILLIPS:
7    Q.  How did you come to an understanding
8  that under the note at Werner Exhibit 13 that you
9  were to be the person to authorize payments?
10    A.  That isn't my testimony.  I think
11  you've mischaracterized my testimony.
12    Q.  Tell me how I mischaracterized your
13  testimony.
14    A.  You know, my responsibility is to
15  ensure that the work is done correctly for the
16  benefit of the estate, okay.
17    Q.  Did you ever have the understanding
18  that you were to be the person to authorize
19  payments under the line of credit between CSMG and
20  Banco Panamericano?
21    A.  No, no.  My testimony is that I was the
22  individual that had to make sure that the work was
23  done correctly.
24    Q.  And I appreciate that.  What I'm asking

Page 99

1  you is did you ever understand that you were to
2  play a role in authorizing payments by Banco
3  Panamericano under this line of credit?
4    A.  No.
5    Q.  Did CSMG ever submit to you any
6  invoices from vendors?
7    A.  I recall some, yes.
8    Q.  With respect to those invoices that you
9  were requested to authorize Banco Panamericano to
10  make the payment with respect to those vendor
11  invoices?
12    A.  No, that's not my understanding.
13    Q.  That was never your understanding?
14    A.  No.
15    Q.  Did Mr. Greenblatt ever tell you that
16  before he would pay a vendor under the line of
17  credit that you first had to authorize the
18  payment?
19    MR. JORDAN:  Objection.  Calls for hearsay.
20  BY THE WITNESS:
21    A.  No.  No, I don't recall that at all.
22  BY MR. PHILLIPS:
23    Q.  Did Mr. Robbins ever tell you that it
24  was his understanding that you had to authorize

Page 100

1  payment of vendor invoices before such payment
2  would be made by Banco Panamericano?
3    A.  No.
4    MR. JORDAN:  That calls for hearsay.
5  Objection.
6  BY THE WITNESS:
7    A.  No.  I don't recall that at all.
8    MR. PHILLIPS:  Off the record.
9       (WHEREUPON, discussion was had
10       off the record)
11  BY MR. PHILLIPS:
12    Q.  Did you ever receive a phone call from
13  Mr. Robbins telling you that vendor payments were
14  not being made?
15    A.  I don't recall.
16    Q.  Did Mr. Robbins ever tell you that CSMG
17  was having difficulty completing the installation
18  of the carbon dioxide separator at the Chastang
19  Landfill because vendors were not being paid?
20    A.  I don't recall hearing that.
21    Q.  Did Mr. Robbins ever write to you or
22  copy you on any correspondence in which he said
23  that vendor payments were not being made in a
24  timely manner by Banco Panamericano?

25 (Pages 97 to 100)

JOHN CONNOLLY, OCTOBER 18, 2007

Page 101

1    A.   I recall something from him about the
2  timely manner, but, again, I don't know if he said
3  it was by Banco or who, but I recall the timing
4  part.
5    Q.   Did you ever respond to that?
6    A.   I don't recall.
7         (WHEREUPON, a certain document
8         was marked Connolly Deposition
9         Exhibit No. 7, for identification,
10         as of 10/18/07.)
11         (WHEREUPON, the document was
12         tendered to the witness.)
13  BY MR. PHILLIPS:
14    Q.   Mr. Connolly, you've been handed what
15  has been marked as Connolly Exhibit 7 and I would
16  ask that you go through the pages constituting
17  this exhibit and tell me, then, whether you recall
18  receiving at any time or reviewing at any time any
19  of the correspondence reflected in this exhibit?
20    A.   I do not recall seeing any of these.
21    Q.   Do you recall ever authorizing a
22  payment under the line of credit?
23    A.   No.
24    Q.   You never received an invoice that had

Page 102

1  been forwarded by CSMG for payment and sent that
2  on to Mr. Greenblatt for payment?
3    A.   No.
4    Q.   Did Mr. Greenblatt ever discuss with
5  you any of the matters raised in the
6  correspondence at Connolly Exhibit 7?
7    A.   Yes.
8    Q.   What did he discuss with you?
9    A.   I seem to recall a general discussion
10  that we had a deadline at the end of '02 to get
11  the gas flowing at that time. That's what I
12  recall.
13    Q.   You had a discussion with
14  Mr. Greenblatt?
15    A.   Right.
16    Q.   That you had a deadline to get the gas
17  flowing by the end of 2002, at the Chastang
18  Landfill?
19    A.   Yeah. That's my general recollection,
20  right.
21    Q.   In what context did you have that
22  discussion with Mr. Greenblatt?
23    A.   It would just have been verbal context.
24    Q.   Well, did you report to Mr. Greenblatt

Page 103

1  with respect to the progress of the Chastang
2  Landfill project?
3    A.   At times I did.
4    Q.   Why were you reporting to
5  Mr. Greenblatt regarding the progress of the
6  Chastang Landfill project?
7    A.   He was certainly our DIP lender at the
8  time and as such he was a senior secured creditor
9  as well and the DIP lender, I believe I had -- it
10  was appropriate to update him.
11    Q.   Did Mr. Greenblatt ever tell you that
12  Mr. Robbins was complaining about late payments?
13    A.   No.
14    Q.   Did Mr. Robbins -- excuse me. Did
15  Mr. Greenblatt ever tell you that Mr. Robbins
16  should be sending invoices to you and not to him?
17    A.   I don't recall that.
18    Q.   The first page, Connolly Exhibit 7, did
19  you ever see an invoice from BOH Brothers in the
20  amount of $54,800?
21    A.   I don't recall.
22    Q.   Second page, did you ever see an
23  invoice from Greer-Latham Engineering for work
24  performed at the Chastang Landfill?

Page 104

1    A.   I don't recall.
2    Q.   The last page of Connolly Exhibit 7,
3  you do not recall receiving a copy of this letter,
4  correct?
5    A.   Right. I don't recall that.
6    Q.   I'm handing you, sir, what has been
7  previously marked as Werner Exhibit No. 16. And I
8  would direct your attention solely to the second
9  page of the exhibit marked CSMGT 00363 in the
10  bottom righthand corner.
11         Have you ever seen this listing before?
12         (WHEREUPON, the document was
13         tendered to the witness.)
14  BY THE WITNESS:
15    A.   I don't recall.
16  BY MR. PHILLIPS:
17    Q.   Do you recall giving this document to
18  Mr. Werner?
19    A.   I don't recall that, no.
20    Q.   Did you ever receive any information
21  from Banco Panamericano regarding the payments
22  that had been made on behalf of or for the benefit
23  of CSMG with respect to the Chastang Landfill
24  project?

26 (Pages 101 to 104)

JOHN CONNOLLY, OCTOBER 18, 2007

Page 105

1    A.   I don't believe so, no.
2    Q.   Did you ever approve a payment in the
3 amount of $2500 to Clark Greer-Latham?
4    A.   I don't recall doing that, no.
5    Q.   I'm not going to go through this entire
6 list. Let me simplify it.
7         Do you recall approving or authorizing
8 any of these payments listed on the second page of
9 Werner Exhibit 16?
10   A.   I do not recall that.
11   Q.   You do not recall authorizing any of
12 these payments by Banco Panamericano?
13   A.   No.
14   Q.   Nor do you recall ever being told by
15 anyone that you had to authorize or sign off on a
16 payment prior to that payment being made by Banco
17 Panamericano?
18   A.   I don't recall that at all.
19   Q.   We've previously taken a look at the
20 operating agreement between RTC and CSMG with
21 respect to the Chastang Landfill, and I believe we
22 identified the date of that as February 14, 2002,
23 correct?
24   A.   I would say that's incorrect.

Page 106

1    Q.   That's because you signed it on
2 February 15, 2002, correct?
3    A.   That's correct.
4    Q.   As of February 15, 2002, as president
5 of RTC, what was your expectation as to when the
6 project at the Chastang Landfill would be
7 completed and gas would be available for delivery
8 and sale to Mobile Gas?
9    A.   Well, it was what we agreed to in the
10 contract in the operating agreement, and there was
11 a time line there and I don't recall it, but my
12 expectation was what we agreed to in the operating
13 agreement.
14   Q.   I'm going to go back to Werner Exhibit
15 No. 1.
16        Can you identify that time line in the
17 operating agreement?
18   A.   Yeah, Page 5, Item H, it says: "Deliver
19 a methane separation plant within 90 days of the
20 signing of this agreement and operation began
21 within 120 days of the signing of this agreement".
22   Q.   What was your understanding of the term
23 deliver?
24   A.   Generally it was to bring a plant on

Page 107

1 site, the components of a plant to the Chastang
2 Landfill site and have all of the necessary
3 components there.
4    Q.   Do you know whether that occurred or
5 not?
6    A.   I do.
7    Q.   Did it?
8    A.   Yes.
9    Q.   Do you know whether operation of the
10 methane separation plant began within 120 days of
11 the signing of the agreement?
12   A.   It did not. And I feel I need to
13 clarify that last answer.
14        The question you asked was did it
15 happen, but you didn't give me a time so I
16 answered that it did happen. I don't believe it
17 did happen within 90 days of this agreement to be
18 clear.
19   Q.   What component or components of the
20 methane separation plant were not delivered within
21 90 days of the signing of the agreement to the
22 Chastang Landfill site?
23   A.   I don't recall with any specificity
24 which components weren't delivered. My

Page 108

1 recollection is the entire, and it could have been
2 all of the plant, was not delivered within 90
3 days.
4    Q.   Have you ever seen the plant?
5    A.   Yes.
6    Q.   Do you have any recollection as to how
7 large the plant is?
8    A.   Yeah. Generally I do. I think the
9 footprint maybe a hundred foot square roughly,
10 very roughly. That type of size.
11   Q.   Do you know how many component parts
12 there were to the plant?
13   A.   I could give you a range. Major
14 components maybe four to eight type of a number.
15   Q.   When did you see the plant?
16   A.   I would say it was in late 2002.
17 Sometime in '02, perhaps early 2003.
18   Q.   You went to Chastang?
19   A.   No.
20   Q.   Well, how did you see the plant?
21   A.   Photography.
22   Q.   You saw photographs of the plant?
23   A.   And a video.
24   Q.   And a video of the plant?

27 (Pages 105 to 108)

# DEFENDANTS' EXHIBIT 3

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
 3

 4   BANCO PANAMERICANO, INC., a South   )
     Dakota Corp.,                       )
 5                                       )
              Plaintiff and              )
 6            Counterdefendant,          )
                                         )
 7            vs.                        ) No. 07 C 00015
                                         )
 8   CONSORTIUM SERVICE MANAGEMENT       )
     GROUP, INC., a/k/a CONSORTIUM       )
 9   MANAGEMENT GROUP, INC., a Texas     )
     Corp., and CSM GASTECH, LLC, a      )
10   Texas Corp.,                        )
                                         )
11            Defendants and            )
              Counterplaintiffs.        )
                                         )
12                                       )

13

14          The deposition of DONALD ROBBINS, taken in

15   the above-entitled cause before Barbara J. Polke,

16   C.S.R., Notary Public within and for the County of

17   Cook and State of Illinois, taken pursuant to the

18   Federal Rules of Civil Procedure for the United States

19   District Courts, at Suite 4525, 180 North Stetson,

20   Chicago, Illinois, on the 28th day of August, 2007, at

21   the hour of 9:53 a.m.

22

23                        COPY

24
```

1 provides those services?
2     A. Because we needed a larger firm and one
3 that's focused only in PCOAB work.
4     Q. What's PCOAB?
5     A. Public Company something new -- I don't
6 know. It's Sarbanes-Oxley regulations.
7     MR. PHILLIPS: Public Company Oversight
8 Accounting Board.
9     MR. JORDAN: Thank you, Mr. Phillips.
10 BY MR. JORDAN:
11     Q. And who provides those services at this
12 time?
13     A. Michael Pollack provides them.
14     Q. For the 10-QSB for the quarter ending
15 June 30, 2007, did Mr. Pollack provide those services
16 to CSMG?
17     A. He did.
18     Q. Okay. Why was it that Mr. Pollack did
19 not -- his name does not appear on that 10-QSB, at
20 least as far as I can tell?
21     A. I don't know. We've got lawyers and
22 accountants that do all that work.
23     Q. What, if any, contact did either
24 Mr. Allison, Mr. Creedon, or Mr. Skibicki have with

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

27

1 Banco, if you know?
2     A. I don't know.
3     Q. As far as you know, they didn't have any?
4     A. As far as I know, they didn't have any.
5     MR. JORDAN: Will you mark that for me, please.
6     (Whereupon Robbins Deposition Banco
7     Exhibit A was marked for
8     identification.)
9 BY MR. JORDAN:
10     Q. Will you review what the court reporter has
11 marked as Banco Exhibit A for identification and let
12 me know when you're finished.
13     Off the record.
14     (Discussion off the record.)
15 BY MR. JORDAN:
16     Q. Have you seen Banco Exhibit A for
17 identification before?
18     A. I have.
19     Q. All right. Now, Exhibit A is a four-page
20 document bearing the title "Promissory Note." What do
21 you understand Exhibit A to be?
22     A. It was the note for funding part of the
23 Chastang project.
24     Q. Okay. Now, turning to the fourth page,

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

1 there are some signatures on both. Page 41 of 84 PageID #:2485
2 me if you recognize the signatures?
3     A. It's my signature.
4     Q. For both entities?
5     A. For both.
6     MR. JORDAN: Off the record.
7     (Discussion off the record.)
8 BY MR. JORDAN:
9     Q. Have you ever spoken with someone named Leon
10 Greenblatt?
11     A. I have spoken with Leon Greenblatt.
12     Q. Who is Leon Greenblatt, as far as you know?
13     A. As far as I know, he is the president of
14 Banco Panamericano and the head of RTC.
15     Q. And did you negotiate with Leon Greenblatt
16 regarding the terms of Exhibit A?
17     A. I did, at the RTC office along with RTC
18 executives.
19     Q. Was this a face-to-face negotiation?
20     A. Face to face.
21     Q. Okay. Who was present?
22     A. John Connally; Johnny Johnson, in and out;
23 Kevin Warner printed up all of the documents in the
24 RTC office, made all of the changes to the documents

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

29

1 that we agreed to.
2     Q. Anyone else there other than you and
3 Mr. Greenblatt, presumably?
4     A. Some weight-lifter sitting in the back.
5     Q. I'm sorry?
6     A. I said some weight-lifter sitting in the
7 back that never said anything.
8     Q. Okay. This weight-lifter didn't participate
9 in the discussions at all?
10     A. Sat, like, there in the corner and watched
11 the whole time.
12     Q. Did you feel menaced by that person?
13     A. No. I don't feel menaced by any person.
14     Q. That's fine. I just wanted to figure it
15 out.
16     Now, what terms, in particular, were
17 negotiated with regard to Exhibit A?
18     A. The negotiation was to get the plant up and
19 running in Chastang. That was what it was for, and
20 the negotiations were that we would pay the payment
21 out of revenues from Chastang, and they were to pay
22 funds out as the invoices came in.
23     Q. Okay.
24     A. RTC was to pay the invoices.

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

8 of

1  Q.  Okay.  Now, since this was negotiated, what
2  I would like you to do is identify for me in Exhibit A
3  each of the terms of the promissory note that reflect
4  those negotiations.
   A.  Well, the amount was 203,000.
   Q.  That was the negotiated amount?
7  A.  That was the negotiated amount.
8  Q.  Was that the entire cost that CSMG was going
9  to have at the Chastang project?
10  A.  No.  That was the entire cost that we asked
11  them to pay.  Our entire cost was about $600,000.
12  Q.  Okay.  What was the source of the remaining
13  almost $400,000?
14  A.  Funds that we raised from various people.
15  Q.  Okay.  So the $203,000 was a negotiated
16  term, I guess 203,800.  Is that correct?
17  A.  Correct.
18  Q.  Okay.  What other term in this note is
19  reflective of your negotiations?
20  A.  Well, we paid 150,000 shares of Rule 144
21  stock.
22  Q.  And that would be in the paragraph entitled,
23  "Promise to Pay."  Is that correct?
24  A.  Correct.

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

---

1  Q.  Hold on.  Hold on.  It's not in the note.
2  MR. PHILLIPS:  Sir, --
3  THE WITNESS:  You didn't let me finish.
4  BY MR. JORDAN:
5  Q.  That's fine.  I'm saying what did Connally
6  say in the meeting?
7  A.  What Connally said is if I'm going to be
8  responsible for paying these payments out of revenues
9  out of revenues, I want to sign off on all of the
10  invoices, and that's why his name is on there.
11  Q.  Who was paying the monies out of revenues,
12  Connally or CSMG?
13  A.  Connolly's RTC was.
14  Q.  How was Connally paying the money out of
15  revenues?
16  A.  I have no idea.  That's what he said.  My
17  understanding was RTC was going to fund the monies
18  Q.  Does it say in the note RTC was going to
19  fund the monies?
20  A.  RTC did fund the monies, as far as I know.
21  Q.  For the payments?
22  A.  For what payment?
23  Q.  For the payments on the note.  Where does
24  say RTC was going to fund the money for payments o

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

---

31

1  Q.  What other terms that were negotiated are
2  included in this promissory note?
3  A.  5,000 a month starting in June, which is
4  when the plant was supposed to be up and operational.
5  Q.  Okay.  That would be June 2002?
6  A.  Correct.
7  Q.  And the loan was extended when?
8  A.  I don't understand that question.
9  Q.  When was the note made?  Was it on or about
10  February 15th --
11  A.  Correct.
12  Q.  What year is that?
13  A.  2002.
14  Q.  So it was only going to take a couple months
15  to get the plant up and running?
16  A.  Three months is what was anticipated.
17  Q.  Okay.  And when was construction completed?
18  A.  Construction was completed in January of
19  2003.
20  Q.  Okay.  And where in the note does it
21  indicate that the source of the funds would be
22  payments out of revenue?
23  A.  There's nothing in the note.  What Connally
24  said in the meeting --

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

---

33

1  the note?
2  A.  It doesn't say RTC.  We're talking about two
3  different things.
4  Q.  Okay.
5  A.  The payment of funds to CSMG was coming
6  through RTC.  That's what he was referring to.
7  Q.  Okay.  All right.  And I think you indicated
8  that one of the things that was negotiated was that
9  Banco was to pay out funds as invoices came in.  Is
10  that correct?
11  A.  That's correct.
12  Q.  Where does it say that in the note, that
13  Banco was going to pay out funds as invoices came
14  A.  I just saw it in here.
15  Q.  Is that in the "Line of Credit" paragraph?
16  A.  That's correct.
17  Q.  Where exactly does it say that Banco was
18  going to pay out funds as invoices came in?
19  A.  It's hard to read.  Just give me a minute
20  here.
21  MR. JORDAN:  Off the record.
22  (Discussion off the record.)
23  THE WITNESS:  I'm sorry.  What was your que
24  again?

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

BY MR. JORDAN:

Q. Where does it say, in that paragraph or anyplace else, that Banco was going to pay funds out as invoices came in?

A. It's my understanding Banco or RTC were going to pay the invoices when they came in. That's what we agreed to.

Q. But that's not reflected in the note. Correct?

A. I didn't see it in the note.

Q. Okay. Now, the "Line of Credit" paragraph has a sentence that states, "The following person currently is authorized to request advances and authorize payments under the line of credit until lender receives from borrowers, at lender's address shown above, written notice of revocation of his or her authority: Donald Robbins and John Connally." Do you see that?

A. I see that.

Q. Okay. Why is it that requests have to come in from both Donald Robbins and John Connally?

A. I suppose, because Connally said that if he had to be responsible for making the payments, he wanted to see them.

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

A. None that I am aware of.

Q. So it didn't have anything to do with you and John Connally having to authorize requests?

A. No. The request was sent in.

Q. By you?

A. I sent the request in. Whether Connally signed off on them or not, I don't know.

Q. Did you follow up with Connally to find out whether he, in fact, signed off on it?

A. I followed up with everybody often on why the bills weren't being paid.

Q. Did Connally say he did or he didn't follow up on them?

A. He didn't -- I don't recall one way or the other.

Q. Okay.

A. I'm assuming that they followed up on it.

Q. All right. So you don't know?

A. I don't know.

Q. Okay. Were there any other problems with the arrangement by which you and John Connally had to sign off on requests before they were funded?

A. Yes. I sent the documents in. You've got a

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

---

35

Q. Okay. And that was a negotiated term, that there had to be written approval by both John Connally and Donald Robbins?

A. That's correct.

Q. Okay. Now, did CSMG have any problems with that arrangement at any time?

A. I'm sorry. I didn't hear you.

Q. Did CSMG have any problems with that arrangement at any time?

A. We had problems from day one with that arrangement.

Q. What were the problems?

A. The first problem was that if we were going to get the plant up and running by June, we had to ship the equipment over to Chastang out of Houston, so we sent the invoice in to get it funded as soon as I got back, and I believe that was late February; didn't get funded until May.

Q. How much was that invoice?

A. Fifty-something thousand dollars. So it arrived on the site right at the 1st of June.

Q. Why is it that it wasn't funded, as far as you know?

A. I understood there was no money available.

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

number of letters, should have, that I wrote to Connally and Greenblatt where the bills didn't get paid.

At one point, one of the vendors was filing liens against the project over there.

At another point, we got sued and had a $35,000 -- only judgment this company has ever had, $35,000 judgment. We paid it off.

Q. And why was it that those particular obligations are obligations that Banco was supposed fund, as opposed to the other $400,000 that CSMG supposed to come up with?

A. All of these were prior to finding the 200,000.

We had sent Banco Panamericano about $208,000 worth of invoices by November, the end November of 2002, and, of those invoices, only abo $100,000 had actually been paid.

Q. Okay.

A. The rest of them were left hanging. Most those we had to go pick up ourselves.

Q. Did, in fact, Banco fund the entire amou of the line, as far as you know?

A. I don't know that Banco ever funded

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

1 anything.

2    Q.  Okay.

3    A.  Somebody paid -- somebody paid 203,400-some-

4 odd dollars. Whether it came from Banco or RTC, I

  have no idea.

6    Q.  Okay. Was there ever a time at which you

7 sent to Banco revocation of John Connolly's authority

8 under the "Line of Credit" paragraph?

9    A.  It wasn't my place to do that. I would not

10 have done that.

11    Q.  Why is that?

12    A.  It wasn't my place.

13    Q.  What do you mean by that?

14    A.  Greenblatt wanted John Connally to sign off

15 on everything.

16    Q.  Okay.

17    A.  It wasn't my place to complain about him not

18 signing or signing.

19     My guess is the guy was trying to get it in,

20 get the plant in. I don't know why he wouldn't sign

21 them.

22    Q.  Okay. Now, I believe you testified

23 previously that the landfill gas conversion plant in

24 Chastang was completed in was it December or January?

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

---

2    A.  By the time we finished it, installing it

3 and everything, I think it's 1,440,000.

4    MR. JORDAN: Why don't we mark these. Do you

5 want to replace these as Exhibit A or mark these as

6 Exhibit B? What's your pleasure, Mr. Phillips?

7    MR. PHILLIPS: Whatever you would like to do.

8    MR. JORDAN: Let's mark these as Exhibit B then.

9    (Whereupon Robbins Deposition Banco

10    Exhibit B was marked for

11    identification.)

12 BY MR. JORDAN:

13    Q.  I'm handing you what's marked as Exhibit B,

14 which I believe is -- if you could look at that and

15 tell me if that is just a better copy of Exhibit A?

16    A.  It appears to be a better copy of Exhibit A.

17    Q.  And your signature appears at the end of the

18 document on Page 4, is that correct, for both

19 entities?

20    A.  That's correct.

21    Q.  Okay. Now, Exhibit B indicates that, under

22 the paragraph "Payment," that 20 payments of $5,000

23 principal plus all accrued interest is due on the

24 first day of each month beginning June 1, 2002. Do

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

---

39

1    A.  It was ready to go in January 2003. We had

2 Ukrainians over tweaking the equipment and trying to

3 get it finished up, which took about another 30 days.

4    Q.  30 days completed in January, '03, or

5 completed in February, '03?

6    A.  The unit, we did the actual start-up of the

7 unit on March 23rd of 2003, March 18th, 19th, sometime

8 in that week after the 16th, 17th of March 2003.

9    Q.  Okay. Now, can you advise me as to what, if

10 any, equipment CSMG owned at the Chastang Landfill?

11    A.  What do we own?

12    Q.  In 2003, what did it own and has that -- and

13 I'll ask you if it changed. In 2003, what, if any,

14 equipment did CSMG own at Chastang?

15    A.  We owned the whole complex that was built

16 there on about an acre of land. It included

17 buildings, the $CO_2$ separator, two 56,000-pound

18 compressors, all of the equipment that still sits on

19 that site.

20    Q.  And what was the total -- as I understand

21 it, the $CO_2$ separator was purchased at a price of

22 $685,484. Is that correct?

   A.  That sounds about right.

24    Q.  Okay. What was the total purchase price for

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

---

4

1 you see that?

2    A.  I see that.

3    Q.  Did CSMG ever make any payments under th

4 promissory note?

5    A.  No, because we negotiated with them to mal

6 the payments from revenues from the processed gas.

7    Q.  Okay. Any other reason?

8    A.  I can't think of any other reason.

9    Q.  Okay. Was CSMG to use the monies advanc

10 under the promissory note for any other reason other

11 than for the business operations at the Chastang

12 Landfill, as far as you know?

13    A.  Reask that question, please.

14    Q.  Was CSMG allowed to use the monies advar

15 under Exhibit B, the promissory note, for any purpose

16 other than the business purposes at the Chastang

17 Landfill?

18    A.  Funds were sent directly to vendors from th

19 Chastang location. It would be impossible.

20    Q.  So you, as you sit here today, have no

21 knowledge as to how much Banco advanced under th

22 promissory note. Is that correct?

23    A.  I know what was advanced under the

24 promissory note.

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

1     What I don't know is who advanced it.
2     Q. Okay. How much was advanced under the
3 promissory note?
4     A. 203,400 and, I think, $34.
    Q. How do you calculate that specific number?
    A. It's calculated off of the accounting that
7 we got from RTC.
8     Q. Okay.
9     A. And off the invoices.
10     Q. Who at RTC provided the accounting?
11     A. Kevin Warner.
12     Q. When did he provide the accounting?
13     A. How did he provide it?
14     Q. No. When?
15     A. At the end of -- in early -- I think the
16 last we got from him was maybe January 2003.
17     Q. Okay. So you don't know whether Banco
18 advanced any monies after that date?
19     A. The number we have here -- I faxed all of
20 the invoices in. This number here completed the
21 funding. I didn't fax any more invoices in.
22     Any other payment in there was, most likely,
23 funds that RTC, it was their responsibility for things
24 they were doing on the side and had nothing to do with

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

---

43

us.
2     Q. Where did you fax the invoices to?
3     A. I faxed them to Kevin Warner. I put John
4 Connally's name on them and Leon Greenblatt's name on
5 them, I believe.
6     Q. Okay. Now, CSMG, in fact, tendered shares
7 to Banco under the note. Is that correct?
8     A. 150,000 shares, correct.
9     Q. All right. Do you know, as you sit here
10 today, whether Banco is still a shareholder of CSMG
11 stock?
12     A. I have no idea.
13     Q. You're the 30(b)(6) witness on behalf of
14 CSMG. Is that right?
15     A. What's a 30(b)(6)?
16     Q. 30(b)(6) is -- Rule 30(b)(6) states that a
17 party may, in the party's notice and the subpoena,
18 name as a deponent a public or private corporation, or
19 a partnership or association or governmental agency
20 and describe, with reasonable particularity, the
21 matters on which the examination is requested. In
that event the organization so named shall designate
one or more officers, directors, or managing agents or
24 other persons who consent to testify on its behalf and

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

---

2 on which the person will testify. A subpoena shall
3 advise a nonparty organization of its duty to make
4 such a designation. A person so designated shall
5 testify as to matters personally known or reasonably
6 available to the organization.
7     A. Okay.
8     Q. All right. So I would assume that who the
9 shareholders are would be reasonably known to the
10 organization.
11     MR. PHILLIPS: Excuse me. Objection.
12 Mr. Jordan, since you have provided a legal
13 description of 30(b)(6) --
14     MR. JORDAN: Make an objection. Don't make a
15 statement. Speaking objections are not allowed.
16 State the grounds for your objection and let's move
17 on.
18     MR. PHILLIPS: The grounds for objection are tha
19 he is a 30(b)(6) witness with respect to the matters
20 identified in the notice of deposition for 30(b)(6).
21     Whether or not -- and I'm objecting --
22     MR. JORDAN: Please don't raise your voice or
23 point.
24     MR. PHILLIPS: I'm not raising my voice, sir.

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

---

4

1     MR. JORDAN: Please don't point at me.
2     MR. PHILLIPS: Well, you pointed at me, sir.
3     MR. JORDAN: Anyway, finish your objection.
4     MR. PHILLIPS: My objection is that you are
5 trying to implicate that somehow he is required, und
6 the 30(b)(6) deposition notice, to know all of the
7 shareholders of CSMG. Produce the notice of
8 deposition.
9     MR. JORDAN: I am asking him to identify whet
10 Banco is or is not a shareholder of CSMG.
11     THE WITNESS: I cannot answer that question.
12 Here's the reason I can't answer the question: --
13     MR. JORDAN: Okay.
14     THE WITNESS: -- We are a public company. E
15 got Rule 144 stock. At some point, Banco registere
16 that stock. There's 21 million shares of our
17 company's stock in Cede Corp.
18 BY MR. JORDAN:
19     Q. In what?
20     A. C-e-d-e Corp., and that's once you put it
21 into the register or put it into a trading account for
22 any reason, whether you sold it, sell it, whatever, i
23 goes in this pool. So we have no idea, other than
24 insiders, who owns what.

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

12 c

1  Q.  Okay. Now, circling back just to get
2  clarity on this, you had talked about John Connally,
3  but his role in this entire transaction is a little
4  unclear to me.
   Who did John Connally represent, if you
   know?
7  A.  As far as I knew, John Connally represented
8  RTC, and as far as I knew, he represented Greenblatt.
9  Q.  Okay. And what led you to believe that John
10 Connally represented RTC?
11 A.  Card said he was president.
12 Q.  Did he have a similar card saying he had
13 some position with Banco?
14 A.  He didn't need to.
15 Q.  Did he or didn't he?
16 A.  He sat in the meeting.
17 Q.  Excuse me. Did he or didn't he have a card?
18 A.  He didn't have a card. Greenblatt, clearly,
19 was giving him orders.
20 Q.  He sat in a meeting?
21 A.  He did what Greenblatt told him to do. He
22 clearly worked for Greenblatt.
23 Q.  What did Greenblatt tell him to do?
24 A.  Told him to sign the documents.

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

47

1  Q.  What documents?
2  A.  The loan documents and the document for
3  putting the unit over at Chastang.
4  Q.  What document would that be?
5  A.  Operating agreement.
6  Q.  Did Mr. Greenblatt tell Mr. Connally to do
7  anything else, as far as you know?
8  A.  Those were -- I don't know of anything else.
9  Nothing while I was there.
10 Q.  What else would make John Connally a
11 representative of Banco, as far as you knew?
12 A.  When I talked to Connally, I talked to
13 Johnny Johnson and I talked with Kevin Warner about
14 why the invoices were not getting paid. What we were
15 told is that Greenblatt controlled the money.
16 Q.  Okay.
17 A.  And when Greenblatt gave the okay is when
18 they would pay it.
19 Q.  Okay. How did that statement make John
20 Connally an agent or representative of Banco?
21 MR. PHILLIPS:  Objection.
22 BY MR. JORDAN:
23 Q.  As far as you know?
24 MR. PHILLIPS:  Objection, calls for a legal

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

2  MR. JORDAN:  That's fine.
3  BY MR. JORDAN:
4  Q.  You can answer.
5  A.  My attorney has objected.
6  MR. PHILLIPS:  Well, you can answer to the extent
7  that you know, sir.
8  THE WITNESS:  Well, to the extent that I know, it
9  was very clear to me that this was all one
10 organization.
11 BY MR. JORDAN:
12 Q.  What do you base that on?
13 A.  I base it on my conversations with these
14 guys, and I base it on the way that Greenblatt ordered
15 folks around over there.
16 Q.  What conversation with these guys led you to
17 believe that?
18 A.  The conversations I had with them on why th
19 bills weren't being paid and the damages they were
20 doing to CSMG.
21 Q.  And when were these conversations?
22 A.  These were in everywhere from May of 2002
23 the end of -- May of 2002 through May of 2003.
24 Q.  Okay. And how many conversations would t

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

49

1  encompass?
2  A.  Just about weekly.
3  Q.  52 conversations?
4  A.  Close to it.
5  Q.  And of those close-to-52 conversations
6  starting in May of '02, who did you talk to?
7  A.  I talked to Kevin Warner. I talked to John
8  Connally. John usually gave my calls back to Kevin
9  when I'd call him, and I saw Johnny Johnson many, n
10 times in Mobile.
11 Q.  Okay. So when you had a conversation wit
12 Kevin Warner, was it -- in May of '02, just in May,
13 how many conversations did you have in May in which
14 you believe that Kevin Warner was acting as a
15 representative of Banco?
16 A.  I believe those guys were acting as a
17 representative of Banco on every occasion I talked
18 with them.
19 Q.  How many occasions did you talk to him in
20 May '02?
21 A.  I talked to Kevin daily.
22 Q.  Okay. And what was it, during those daily
23 conversations, that led you to believe that he was a
24 representative of Banco?

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

1  MR. PHILLIPS: Yes, you are.

2  MR. JORDAN: He is being evasive.

3  MR. PHILLIPS: No.

BY MR. JORDAN:

   Q. Is there anything that could refresh your recollection, sir?

7  A. I'm not --

8  MR. PHILLIPS: Excuse me. Objection. He has

9  asked and answered every one of your questions in this

10 line of questioning regarding conversations with

11 Mr. Connally and meetings with Mr. Connally,

12 Mr. Warner, Mr. Johnson. He has done so, sir, and the

13 fact that you didn't like the answers doesn't mean

14 that you can come back to it and try and change the

15 nature of the answer.

16 MR. JORDAN: After your speech, do you have an

17 objection?

18 MR. PHILLIPS: You were being argumentative with

19 the witness, sir.

20 MR. JORDAN: Oh, okay. All right. Thank you.

21 BY MR. JORDAN:

22 Q. Now, at least I didn't hear an answer to my

23 question, which is is there anything that could help

24 you recall? Is there anything that could help you

STEFANI REPORTING SERVICE
(312) 214-1100  (630) 279-7200

67

1  recall?

2  A. It's a ridiculous question. Is there

3  anything that can help you recall? I just told you I

4  can't recall. I didn't recall any more.

5  Q. But, see, that's kind of how the process

6  works. If you don't recall, and Mr. Phillips can feel

7  free to jump in here if he thinks I am wrong, if you

8  can't recall, then the questioner asks is there

9  anything that could help you recall, and then you

10 would say, yes, I think so, or, no, I don't think so,

11 yes or no.

12 A. I can't imagine anything that would make me

13 recall.

14 MR. JORDAN: That's fine, and I'm not being

15 difficult in that regard, at least in my view.

16      Please take a look at Exhibit C.

17      (Whereupon Robbins Deposition Banco

18      Exhibit C was marked for

19      identification.)

20 BY MR. JORDAN:

21 Q. I'm handing you what's been marked as

22 Exhibit C for identification. What I would like you

23 to do is review the document and tell me, after you're

24 finished reviewing it, whether you have seen it

STEFANI REPORTING SERVICE
(312) 214-1100  (630) 279-7200

1  before.

2  A. Okay.

3  Q. I am sorry. Did you say something?

4  A. Yes. It appears to be the security

5  agreement.

6  Q. So you have seen this before?

7  A. I believe I have.

8  Q. Now, it's a 29-page document, and on the

9  last page under the heading of "Borrowers," there

10 appear to be two signatures. I would like you to tell

11 me whether you recognize those signatures.

12 A. Those are my signatures.

13 Q. For both Consortium Management Group, In

14 and CSMG Gastech, LLC. Is that correct?

15 A. That's correct.

16 Q. Now, I believe you testified previously that

17 you had certain negotiations and that, as part of the

18 negotiations of the promissory note, there were

19 certain changes that were made.

20      Was this document, Exhibit C, negotiated a

21 the same time as Exhibit B, the promissory note?

22 A. The same afternoon.

23 Q. Okay. And can you tell me whether there

24 any term in this document entitled "Consolidated

STEFANI REPORTING SERVICE
(312) 214-1100  (630) 279-7200

1  Guaranty and Security Agreement," which I think w

2  both agree is the security agreement, is that a fair

3  statement? Can we just call this the security

4  agreement?

5  A. Yes.

6  Q. Is there any term in this security agreem

7  that indicates that CSMG's payments are going to c

8  out of revenue from the Chastang Landfill?

9  A. I have already told you there is nothing i

10 either document, but that that was agreed to later

11 Q. Okay. So that was, in fact, not negotiate

12 when you sat in Chicago. Is that correct?

13 A. That's correct.

14 Q. So was there an amendment to --

15 A. There was no amendment. It was a ver

16 agreement, and the agreement came about when

17 finally released the first funds to ship the equipme

18 in May of 2002.

19 Q. All right. Is there any term or language

20 the security agreement which you know of that s

21 that Banco will pay out funds as invoices come in

22 A. I -- I don't know.

23 Q. You don't know of any?

24 A. I don't know.

STEFANI REPORTING SERVICE
(312) 214-1100  (630) 279-7200

Q.   Do you want to take time to look or do you believe it's not in there?

A.   Maybe you could point it out to me and save us some time.

Q.   I don't know of anything in there that says that.

A.   The only thing that I know that references that is the note itself.

Q.   Okay.  That's fine.  Now, this May 2002 verbal agreement regarding paying out of revenues, who were the parties to the discussion about that change?

A.   I talked with Kevin Warner about it.

Kevin called me back later and said he had talked with Greenblatt, it was all going to be fine.

Q.   What would all be fine?  What to you mean by it will all be fine?

A.   Making the payment out of revenues.

Q.   You had sent several letters that year to Leon Greenblatt.  Is that right?

A.   Not in May I had not sent several letters to Greenblatt.

Q.   You subsequently sent several letters to --

A.   I sent several letters to Greenblatt.

Q.   Why did you send the letters to

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

---

71

Mr. Greenblatt?  Were those matters of some importance to you?

A.   I sent the letters to Greenblatt, to Kevin Warner, and to John Connally.

Q.   Okay.

A.   They were of some importance to me because we had moved that equipment that was supposed to have originally been in Corpus Christi to another Greenblatt location that didn't work out to Chastang, and we didn't have the funds to pay the people that Greenblatt had promised to fund.

Q.   Okay.

A.   And so they were of some importance to me.

Q.   Was this term, the fact that payments would be made out of revenues, was that of some importance to you?

A.   It has all importance to me.

Q.   It has what?

A.   It has a lot of importance to me.

Q.   Okay.  So do you have a copy of a letter or something else that you sent to either Kevin Warner or Leon Greenblatt confirming those terms?

A.   No, sir.

Q.   Are you aware that Banco claims they have a

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

---

perfected security interest in CSM's assets?

A.   I am aware they claim to.

Q.   Okay.  Do you dispute that claim?

A.   Absolutely.

Q.   What's your basis for disputing that claim?

A.   My basis for disputing the claim is that we believe that Banco, by their actions, owes us about $6 million.

Q.   All right.  So they owe you money.  Any other reason to dispute that they have a perfected --

A.   6 million is enough.

Q.   Okay.  We'll get to that.

Now, what I would like you to do, if you would look on the top of Exhibit C, it has -- it starts with Page 44 of 72 and ends with Page 72 of 72.  What I would like you to do is turn to Page 54 of 72.  Do you see Section 4.1?

A.   I do see it.

Q.   Okay.  And at the time that the document wa executed by you, did the document contain the langua set forth here in Section 4.1?

A.   Apparently so.

Q.   Okay.  Now, turn the page and look at Section 4.3 entitled "Collateral Release."  Now, do

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

---

7:

you know of any documents or other communication Banco in which they agreed to release any collateral for which they held the lien?

A.   I don't know of any.

Q.   I'm sorry?

A.   I don't know of any.

Q.   Okay.  Have you provided -- have you ever provided financial statements to Banco?

A.   No.

Q.   Okay.  Why is it you haven't provided financial statements to Banco?

A.   First, they were never asked for; and, second, they are public information.

MR. PHILLIPS:  Did you want to take a break a this point before you go to the next exhibit?

THE WITNESS:  Sure.

(Short break in proceedings.)

BY MR. JORDAN:

Q.   Just going back to a previous subject, wit regard to Mr. Warner, is there anyone else of whom are aware who has knowledge that Kevin Warner is agent or representative of Banco?

A.   You know, my conversations were directl with Kevin Warner.

STEFANI REPORTING SERVICE
(312) 214-1100    (630) 279-7200

---

Q. So you don't know of anybody else who --

A. I would have no reason to discuss such things. All these discussions came up in the normal course of business.

Q. Okay. How about Johnny Johnson? Do you know anyone else of whom you are aware who would know or believe that Johnny Johnson was an agent or representative Banco?

A. I know people that heard Johnny Johnson say what he said or Johnny Johnson told them that he worked for Greenblatt or whatever.

Q. Who would those people be?

A. John Creedon and Eddie Barnes.

Q. Anybody else?

A. Whoever was on the site working. I wasn't on the site installing the thing.

Q. Is there anyone else of whom you are aware who would know or you would believe would know that John Connally is an agent of Banco?

A. As I said, it all came up in the normal course of business discussions.

Q. So you don't know anybody else who would hold that view?

A. No. I have no reason to know.

A. I don't think so.

Q. Okay.

A. But I probably have e-mails that I sent out to people the day we got a notice of default two years late.

Q. Okay. Other than the fact that it was sent two years late, was there anything else of interest to you in that letter? I'm not sure what term you used. I think it was "interesting."

A. The fact that it was sent two years late and he tried to back-date it and make it look as if he had sent it in 2002.

Q. Okay. Anything else?

A. That's enough.

Q. Okay. That's fine. Do you know why it was, in answering the Complaint, that CSMG denied receiving that letter?

A. I'm sorry. What was the question?

Q. Do you know why CSMG denied receiving the letter?

A. To my knowledge, we never denied receiving the letter.

Q. Okay. That's fine.

A. Hang on. I don't think I've seen this

75

Q. And the only person you had conversation with with regard to the fact that payments would come out of revenue would be Kevin Warner. Is that correct?

A. That's correct.

MR. JORDAN: Will you mark that for me, please.

(Whereupon Robbins Deposition Banco Exhibit D was marked for identification.)

BY MR. JORDAN:

Q. Showing you what's been marked as Robbins Exhibit D for identification or as Banco Exhibit D for identification, can you tell me whether you've ever seen this document before?

A. I have seen the document. It's an interesting document.

Q. Okay. When did you first see the document?

A. Two years after it was dated.

Q. All right. In what context did you receive it?

A. Leon Greenblatt sent it to me.

Q. Okay. How did he send it to you?

A. I believe, by Express Mail.

Q. Do you have a receipt?

letter. I think the letter that I have is a different letter, sir.

Q. Okay.

A. I don't think I have ever seen this letter. The one that I got references my second notice of default, I believe.

Q. Okay.

A. And it was received two years after it was supposedly written.

MR. JORDAN: Okay. Will you mark that for me.

(Whereupon Robbins Deposition Banco Exhibit E was marked for identification.)

BY MR. JORDAN:

Q. Showing you what's been marked as Banco Exhibit E for identification, can you tell me if you have ever seen this before? Have you ever seen it before?

A. I'm not sure I've seen it before.

Q. Why do you say that?

A. Because I don't recall getting it.

Q. Okay.

A. I might have gotten it, but I just don't recall.

20

1    Q. Would it be helpful if I advised you that in
2  response to paragraph 25 of the Complaint, which
3  reads, "A subsequent notice of default for nonpayment
4  and because of dissolution of borrower Gastech was
5  sent to defendant by Banco on February 3, 2005, by
6  telecopier and by overnight delivery." It says, "See
7  Exhibit B."
8         And then the answer is, "Defendants admit
9  they received the notice of default dated
10 January 27th, 2005, sent by Banco, on February 3,
11 2005. Defendants admit that the notice of default was
12 sent by telecopier and overnight delivery. Defendants
13 deny any and all other allegations of paragraph 25."
14        Does that help you in recalling?
15    A. Was this in our --
16    Q. You know what, you really need to answer the
17 question you're supposed to answer. Do you know
18 whether you received it or not?
19    MR. PHILLIPS: Which question are you asking
20 right now? Are you asking the first one, does your
21 recitation of that help him recall whether he received
22 it?
23    MR. JORDAN: Sure.
24    MR. PHILLIPS: Does his recitation of what was

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

---

Banco.
2    Q. Okay. So the response is, no, you would not
3  have contacted Banco?
4    A. I would not have contacted Banco.
5    Q. And, as far as you recall, you did not
6  contact Banco?
7    A. That is correct.
8    MR. JORDAN: Okay. Would you mark this.
9         (Whereupon Robbins Deposition Banco
10        Exhibit F was marked for
11        identification.)
12 BY MR. JORDAN:
13    Q. Handing you what's been mark as Banco
14 Exhibit F for identification, let me know if you've
15 ever seen that before.
16    A. I've seen this. I wrote it.
17    Q. Okay. Now, in the first line of the
18 document, there is a reference of on August 24th, yo
19 received a certified letter dated December 10th, 200
20 Would that have been Exhibit D that you would have
21 received on October 24th, 2004?
22    A. Exhibit D or Exhibit E?
23    MR. PHILLIPS: Exhibit D.
24    THE WITNESS: I'm not sure, because this one,

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

---

79

1  said in the answer help you recall whether you
2  received it?
3    THE WITNESS: We received a notice, and the
4  notice that I recall we received was one that was
5  back-dated two years. I don't know. If I produced
6  this, then it's out of my office.
7  BY MR. JORDAN:
8    Q. Okay. So you don't remember receiving this?
9    A. I just don't recall it. That's correct.
10    Q. That's fine. I literally was trying to be
11 helpful, not difficult.
12    A. If I got it in 2005, by then, you know, the
13 firefight had already begun.
14    Q. Okay. What, if anything, did you do after
15 you received this, after you received whatever it was,
16 the notice of default that you remember receiving?
17    A. The first thing I would do with those is
18 send them to the auditor and send them to the lawyers.
19    Q. Okay.
20    A. And they would take them from there.
21    Q. Would you contact -- do you recall
22 contacting Banco or anyone related to Banco after
23 receiving the notice of default?
24    A. At that point, the lawyers were working with

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

---

8

1  you read my letter, it says, "the second notice."
2  This doesn't state it's the second notice. This is
3  not the letter I received.
4  BY MR. JORDAN:
5    Q. Okay. So Exhibit D is not the letter you
6  received. You received a different notice of default
7  Do you remember what it said?
8    A. Well, it would have been very similar, but
9  it said -- it started with this constitutes our second
10 notice of default.
11    Q. All right. Now, going to the second
12 paragraph, okay, now, we have talked before abo
13 fact that various people were, at least as you
14 understand it, representatives of Banco. Now, yo
15 in the second paragraph here that Mr. Greenblatt
16 controlled RTC, which is -- when you say "RTC," it
17 Resource Technology Corporation. Correct?
18    A. That's correct.
19    Q. Now, what's the basis for your statemer
20 that Mr. Greenblatt controlled RTC?
21    A. We just spent an hour on those questio
22 It's the same answers to the questions that you
23 while ago.
24    Q. Okay.

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

A. The same people making the same statements.

Q. Okay. So as far as you -- you don't see any difference between Banco and RTC?

A. I don't see any. As far as I'm concerned, it's absolutely controlled by Greenblatt, or was.

Q. So when Greenblatt was acting relating to operations, was he acting on behalf of -- in controlling RTC or controlling Banco?

A. I think Greenblatt always acted on behalf of Greenblatt, whatever the name underneath it was.

Q. I am just trying to get a sense of the difference, in your mind.

A. There is no difference in my mind.

Q. Okay. Now, did Leon Greenblatt ever indicate to you anything that would lead you to believe that he controlled RTC?

A. His actions indicated it.

Q. Would his actions -- how many times did you talk to Leon Greenblatt?

A. Oh, three or four, total. I had one meeting with him, went to lunch with him, and then talked to him a couple of other occasions.

Q. Okay. But none of those conversations -- since you said "actions," so I want to find out were

---

sitting on the site so he could show the Court that he had -- all the equipment was at the site.

So Greenblatt -- I told Kevin we're not going to do it until you guys get the field tuned. You know, you might as well go tune the field. We had to hold out. And so --

Q. Let me interject here to make sure I understand. You told Kevin Warner you were not going to bring this equipment onto site until the field was tuned?

A. Right. It was either the tuning of the field or the laying of the foundation. In that case, I think it may have been the laying of the foundation, and that was an RTC expense for that particular foundation, but this was in December of 2003.

So Greenblatt called me right away, and I said, well, I understand you need this for the Court.

Q. Was there anybody else on the line other than you and --

A. There was never anybody else on the line.

MR. PHILLIPS: Mr. Jordan, please allow him to finish, and then you can ask your follow-up questions.

MR. JORDAN: That's fine. All right. Go ahead.

---

83

any of those conversations -- let me start again.

During any of those conversations you just referenced, did Mr. Greenblatt say anything that led you to believe that he controlled RTC?

A. Yes.

Q. What did he say?

A. We were trying to get a unit --

Q. When was this, by the way?

A. In December of 2003.

Q. Okay.

A. Kevin Warner called me, and what he said was -- and I forgot what piece of equipment we were going to have shipped up there. He said we've got to this -- it was a large piece of equipment. It may have been the starters, but he said we've got to get the starters on the site, and, if I recall, the starters were sitting over at the Mobile airport. We had them flown in. What he said was Greenblatt needs it to stay in compliance with the bankruptcy.

Q. This is Warner saying this?

A. Yes. Greenblatt needs it to stay in compliance with the bankruptcy case or the bankruptcy, whatever you call it.

Q. Needs to stay in compliance?

---

85

THE WITNESS: So, you know, we had a conversa about it, and I said, hey, I understand you need it for the Court. Is there a problem with the Court?

I didn't get much of an answer, and about 30 minutes later Kevin called me and said, "You talk too much."

BY MR. JORDAN:

Q. What do you mean, "You talk too much"?

A. I shouldn't have said anything to Greenblatt about the Court, I guess, or needing it on the location for the Court.

We had a $100,000 piece of equipment, an thinking about it now, they wanted us to move that equipment and set it on the ground. RTC --

(Short interruption.)

BY MR. JORDAN:

Q. Okay. Go ahead.

A. RTC wanted us to take this electrical equipment and set it on the ground and leave it sitting on the ground without a foundation there.

We wouldn't do it. It made no sense. Rain ruin the equipment. So we did move it in, right awa got the foundation put in, and we did get it moved in

Q. Okay.

1   A.   There were many times that Kevin told me
2   that we have to do so-and-so in order to stay in
3   compliance with the Bankruptcy Court.  Greenblatt
4   wants it done.
5       Q.   Okay.  Did you ever send -- did you ever
6   make a note of this anyplace, any of these
7   conversations?
8       A.   No.
9       Q.   Did you ever relate these conversations to
10  anyone else?
11      A.   Yes.
12      Q.   I'm sorry?
13      A.   People who worked with me.
14      Q.   Such as?
15      A.   Such as Creedon.
16      Q.   And who else?
17      A.   Such as Bruce Jones.
18      Q.   Who is Bruce Jones?
19      A.   He is CFO for the company.
20      Q.   Is he still CFO for the company?
21      A.   He is still CFO for the company.
22      Q.   Okay.
23      A.   I may even have talked with Herman about it.
24      Q.   Herman who?

1   the Chastang Landfill methane gas sale under the
2   operating agreement with Resource Technology
3   Corporation," and it goes on.
4       It is not your -- is it your position that
5   the operating agreement includes a term that says that
6   the funding is to be repaid from revenues?
7       A.   No, and I have already answered that
8   question.  It was a gentleman's agreement, and there
9   is nothing in writing.
10      Q.   Okay.  All right.  Now, in the third
11  paragraph you indicate, "On December 10, 2002, Banco
12  Panamericano had not even completed funding of the
13  note." Do you see that?
14      A.   That is absolutely correct, sir.
15      Q.   Well, on December 9, 2002, Banco
16  Panamericano had funded just under 50 percent of the
17  note?
18      A.   That's correct.
19      Q.   So at least on September 14th, 2004, you
20  were aware that Banco Panamericano funded.  Is that
21  correct?
22      A.   Somebody funded.  If it was Banco or if it
23  was RTC, somebody funded.
24      Q.   So you don't know who funded?

87

1   A.   Herman Hohauser.
2       Q.   In his capacity as counsel?
3       A.   Correct.
4       MR. JORDAN:  Is that a privileged conversation,
5   Herman?
6       THE WITNESS:  It would be.
7   BY MR. JORDAN:
8       Q.   I guess you're the person to ask.  All
9   right.
10      So Bruce Jones, Creedon, and conversations
11  with your counsel.
12      A.   Yes.
13      Q.   Anyone else you would have related any of
14  these conversations to?
15      A.   Not that I recall.
16      Q.   Okay.  Any other conversation or action by
17  Greenblatt that indicated he controlled RTC?
18      A.   I think that was enough.  He convinced me
19  anyway.
20      Q.   Okay.  Now, going to the first paragraph of
21  the -- the first sentence of the second paragraph, it
22  says, "The Banco Panamericano note was for assistance
23  in funding part of CSMG's Chastang $CO_2$ separation plant
24  installation costs and to be repaid from revenues of

8

1   A.   I don't know who funded.
2       Q.   Okay.  And then, "On December 10, 2002,
3   Banco Panamericano paid $62,495.57 to Bagby & Ru
4   Electric Company for work covered under the Banco
5   Panamericano note obligations, and on December 12
6   2003, Banco Panamericano paid Diversified Employm
7   $40,169.22, which completed Banco Panamericano's
8   funding of the note."
9       A.   Actually, that's a misstatement, because
10  Banco didn't pay either one of them.  RTC paid them
11      Q.   How do you know that?
12      A.   Because they were RTC checks.
13      Q.   How do you know that?
14      A.   All the checks that went out, even the
15  bounced ones, were RTC checks.  To our knowledge
16  were all RTC checks.
17      Q.   Okay.  So you -- when, if ever, did you se
18  any of the checks?
19      A.   I think the spreadsheet that Kevin sent m
20  probably shows the check numbers.
21      Q.   Do you have -- it indicates, "Banco
22  spreadsheet attached," and I will tell you that
23  document CSMGT-00751 is produced by CSMG, but
24  CSMGT-00752 is not a spreadsheet.

1       Do you know what Banco spreadsheet is
2 referenced here?
3       A. I've still got the spreadsheet. I will be
4 happy to provide it.
      MR. PHILLIPS: We have provided it.
      MR. JORDAN: Do you know what document number it
7 is? It's unlikely you would know off the top of your
8 head, but --
9       MR. PHILLIPS: I do not believe I have it with
10 me, unfortunately. I can tell you that it is a
11 document attached to an e-mail from Kevin Warner to
12 Don Robbins dated January 23rd, 2003.
13       MR. JORDAN: January 23rd, 2003?
14       MR. PHILLIPS: January 23rd, 2003, and it was
15 part of the production. I could be off on the exact
16 date, but it was January 2003.
17 BY MR. JORDAN:
18       Q. Okay. So whether it's RTC or Banco
19 Panamericano, according to this, $203,800 was, in
20 fact, advanced by -- under the note. Is that correct?
21       A. That's correct, 203,800 or 203,434. I will
22 have to look at the exact amount; a couple hundred
23 either way.
24       Q. Now, you had referenced earlier the fact

---

1 December '02 Banco had -- or RTC actually funded the
2 note. Why would it be that Banco was responsible for
3 additional advances to Bagby & Russell or anyone else?
4       A. Banco referenced, in a letter dated 2002,
5 referenced a lien or a judgment against CSMG that
6 didn't exist at the time. So how could Banco
7 possibly, in 2002, have a judgment in their hand that
8 didn't happen until later?
9       The answer to your question is it probably
10 was not Banco's funding. We funded it. We paid for
11 it.
12       Q. Okay. See, now, I'm not hearing you
13 correctly. You may be doing a terrific job and I'm
14 not hearing that, because I thought what I asked you
15 was was Banco the party that caused the Bagby &
16 Russell lien and the Bagby & Russell judgment, and I
17 thought you had said yes, and now it sounds like you
18 are saying no.
19       A. Banco didn't help it any by not paying the
20 first Bagby & Russell funds that had to be paid.
21       Q. Okay.
22       A. So when this one popped up, Bagby & Russel
23 were not very happy with us.
24       Q. But, in fact, didn't they pay $62,495.57 to

---

1 that there was a judgment which you indicated was the
2 only judgment that had ever been entered against CSMG
3 and was related to this site and caused, I think, by
4 Banco. Do you recall that?
5       A. To my knowledge, that's correct.
6       Q. Now, can you read the last paragraph here
7 and tell me whether you still hold that view?
8       A. Well, I still hold that view.
9       Q. Okay. Now, since --
10       A. But --
11       Q. All right. You still hold that view. Let
12 me ask you a question.
13       You state here, "It is impossible that such
14 judgment existed on December 10, 2002, as the work
15 that is the subject of this judgment was not performed
16 by Bagby & Russell Electric Company until the spring
17 of 2003. The action was not filed against CSMG by
18 Bagby & Russell Electric Company until the fall of
19 2003. The judgment was not received by CSMG at the
20 end of March of 2004, paid by CSMG to Bagby & Russell
21 Electric Company in July of 2004, and the release of
22 judgment lien for $32,091.19 was filed by Bagby &
23 Russell Electric Company on August 31, 2004."
24       Now, given that, you acknowledge that in

---

1 Bagby & Russell on December 10, 2002?
2       A. If that's what I say, that's what they did.
3       MR. JORDAN: Okay. Off the record.
4       (Discussion off the record.)
5 BY MR. JORDAN:
6       Q. Now, do you recall making a statement in th
7 September 30, 2004, Form 10-QSB in connection with
8 notes to CSMG's financial statements for September 3
9 2004, that, "During the three months ending
10 September 30, 2004, the company has been notified t
11 one creditor that a note payable of approximately
12 $203,800, including accrued interest, is in default,
13 adding additional concern about the company's ability
14 to continue operations. The company is currently
15 working with the principal to either obtain a waiver,
16 refinancing, or modified payment arrangement, but it
17 is unclear if any agreement or settlement has been
18 reached." Do you recall that?
19       A. I am sorry. What year was that?
20       Q. That would have been for the three months
21 ending September 30, 2004.
22       A. That sounds correct.
23       Q. Okay. And I believe was it filed on or
24 about November 18th, 2004, do you know?

1   A. That would be correct.

2   Q. Okay. Now, CSMG included that statement in

3 its SEC filing because it was an accurate statement.

4 Is that correct?

    A. As far as I know, correct.

    Q. And there is no statement or comment in that

7 paragraph indicating any right of set-off, any other

8 claims against the creditor. Is that correct?

9   A. We had turned all that all over to our lawyers

10 by then, who were dealing with it.

11  Q. That's fine. Is there any statement in

12 there relating to any set-off or claim?

13  A. No. I think the set-offs all came later.

14  Q. Were you not aware on or about --

15  A. Let me see the file.

16  Q. -- November 18th --

17  A. Let me see the file.

18  Q. I don't have it.

19  A. You don't have a copy of it?

20  Q. No.

21  A. It would be in the "Litigation" area.

22  Q. So if, in fact, it was referenced, it would

23 be referenced in the "Litigation" area?

24  A. That's correct.

STEFANI REPORTING SERVICE
(312) 214-1100  (630) 279-7200

---

    Inc.?

2   A. Yes.

3   Q. Did they provide goods or services to CSMG

4 related to the Chastang Landfill?

5   A. They did.

6   Q. Have you ever heard of Hydraulic Crane

7 Specialists?

8   A. Yes.

9   Q. Did they provide goods or services to CSMG

10 related to the Chastang Landfill project?

11  A. They did.

12  Q. Have you ever heard of Thrifty Car Rental?

13  A. I have.

14  Q. Did they provide goods or services to CSMG

15 related to the Chastang Landfill project?

16  A. They did.

17  Q. Have you ever heard of The Cat Store?

18  A. I have.

19  Q. Have they ever provided -- did they provide

20 goods or services to CSMG related to the Chastang

21 Landfill project?

22  A. They did.

23  Q. Have you heard of Town Place Suites?

24  A. I have.

STEFANI REPORTING SERVICE
(312) 214-1100  (630) 279-7200

---

95

    Q. Can you tell me have you ever heard of

2 Clark, Geer, Latham?

3   A. Yes, I have.

4   Q. Do you know whether they provided goods or

5 services to CSMG relating to the Chastang Landfill?

6   A. They did.

7   Q. Do you know whether they were paid by

8 advances on the line?

9   A. I don't.

10  Q. Do you have any reason to dispute that they

11 were paid from advances on the line?

12  A. I can't answer that, because I know we paid

13 some of Clark, Latham's.

14  Q. Have you ever heard of Alamo Transformer

15 Supply?

16  A. Yes.

17  Q. Did they provide goods or services to CSMG

18 related to the Chastang Landfill project?

19  A. They did.

20  Q. Do you have any reason to dispute an

21 allegation that Alamo Transformer Supply was paid from

22 an advance on the Banco line?

23  A. I don't have the invoices in front of me.

24  Q. Okay. Have you ever heard of Silvertrans,

STEFANI REPORTING SERVICE
(312) 214-1100  (630) 279-7200

---

97

    Q. Did they provide goods or services to CSMG

2 related to the Chastang Landfill project?

3   A. They did.

4   Q. Have you heard of GE Capital Modular Space

5   A. I have.

6   Q. Did they provide goods or services to CSMG

7 related to the Chastang Landfill project?

8   A. They did.

9   Q. Have you heard of Diversified Employment

10  A. I have.

11  Q. Did they provide goods and services to CS

12 related to the Chastang Landfill project?

13  A. They did.

14  Q. Have you heard of J & C Diversified

15 Services?

16  A. I have.

17  Q. Did they provide goods or services to CSM

18 related to the Chastang Landfill project?

19  A. They did.

20  Q. Have you heard of Reliable Staffing?

21  A. I have.

22  Q. Did they provide good or services to CSM

23 related to the Chastang Landfill project?

24  A. They did.

STEFANI REPORTING SERVICE
(312) 214-1100  (630) 279-7200

1  Q.  Have you heard of Don Brothers Construction?
2  A.  I have.
3  Q.  Did they provide goods or services to CSMG
4  related to the Chastang Landfill project?
5  A.  They did.
6  Q.  And we have already discussed, is it
7  correct, that Bagby & Russell Electric provided goods
8  or services to CSMG related to the Chastang Landfill
9  project?
10  A.  Correct.
11  Q.  Of those companies that I have just
12  mentioned, do you have any reason to claim that they
13  were not paid from advances on the Banco line?
14  A.  You mean fully paid or just not paid?
15  Q.  Paid something.
16  A.  I have no reason to believe they weren't
17  paid something.
18  Q.  And of the companies that I mentioned just
19  now, any of them have debts or obligations owing by
20  CSMG as of today that were not paid?
21  A.  No.
22  Q.  Okay.  Now, as I understand it, CSMG claims
23  that Banco is barred, in whole or part, because of its
24  failure of performance.

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

2  A.  That's enough for me.
3  Q.  Okay.  So the answer is no, there's nothing
4  else?  Correct?
5  A.  Nothing that I can think of right now.
6  Q.  Would there be anything that could help
7  refresh your recollection?
8  A.  Not that I am aware of right now.
9  Q.  Now, we had talked before, and I believe
10  that the entire budget for the Chastang Landfill
11  project, CSMG's entire budget, was $600,000.  Is that
12  correct?
13  A.  No.  That's not correct.
14  Q.  What was its entire budget?
15  A.  Our entire budget was $1,440,000.
16  Q.  Okay.  And of that, Banco was to fund 200 --
17  just a skosh over $200,000.  Correct?
18  A.  That's correct.
19  Q.  Was it 203,800?  Is that right?
20  A.  203,800.
21  Q.  So of the remaining 1. -- just call it 1.2
22  or 3 million, all right, where was CSMG going to get
23  those monies?
24  A.  We got them from other sources.

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

101

---

99

1      In what way did Banco, not RTC, Banco, fail
2  to perform?
3  A.  Banco controlled RTC.  Banco controlled
4  everything, every nut, every bolt, every bit of gas,
5  and Banco's scheme was to sell tax credits on that
6  side.  I'm thoroughly convinced of that.
7  Q.  Other than their control over RTC, in what
8  way did Banco fail to perform?
9  A.  That was enough, wasn't it?  They destroyed
10  the project.
11  Q.  Okay.  I understand it may be enough for
12  you, okay.
13      I'm just asking whether anything other than
14  Banco's control over RTC would indicate a failure of
15  performance by Banco?
16  A.  Well, failure of performance besides control
17  over RTC?
18  Q.  Right.
19  A.  If, in fact, they were giving RTC the money
20  to pay the bills, then they were funding the money
21  very late, creating pretty serious problems.
   Q.  Okay.  So they failed to perform by funding
   late?
   A.  That's correct.

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

1  Q.  Okay.  Why was it that it was a problem th
2  this small portion of the entire project cost created
3  this default on the project?
4  A.  Because RTC had many other obligations o
5  that project that they failed to perform.
6  Q.  Okay.  RTC had obligations it failed to
7  perform?
8  A.  That's correct.
9  Q.  But Banco, as Banco, as lender, performed
10  Is that right?
11  A.  Not on the project, not as far as I'm
12  concerned.
13  Q.  How is it that Banco, as a lender, did not
14  perform?
15  A.  Banco, as a lender, sent the monies in ver
16  very late; but let's forget about Banco the lender.
17  Let's talk about Banco, the funder of RTC.
18  Q.  Let's not.
19  A.  Let's talk about it, because it's pertinent
20  to it.
21  Q.  You know what, with all due respect, it's
22  not pertinent to it at all.
23  A.  Then let's move on.
24  Q.  Now, Banco, as a lender, had to fund a

STEFANI REPORTING SERVICE
(312) 214-1100   (630) 279-7200

# DEFENDANTS' EXHIBIT 4

ResTecCorp@aol.com, 01:12 PM 1/14/03 -0500, Re: Distributions

X-Originating-IP: [64.12.136.161]
From: ResTecCorp@aol.com
Date: Tue, 14 Jan 2003 13:12:52 EST
Subject: Re: Distributions
To: csmg@sbcglobal.net
X-Mailer: AOL 5.0 for Mac sub 46

Dear Don,
Dates and payments enclosed.
Kevin

BancoChastang Exp.

*Werner* DEP. EX. NO. *16*
FOR ID., AS OF *CB 10-17-07*

CSMGT-00362

**Banco Panamericano**
**330 South Wells, Suite 710**
**Chicago, IL 60606**

| DATE | ACCOUNT | AMOUNT |
|------|---------|--------|
| 7/8/2002 | Clark, Geer, Latham | $2,500.00 |
| 11/2/2002 | Clark, Geer, Latham | $5,000.00 |
| 6/28/2002 | Thrifty Car Rental | $500.00 |
| 7/8/2002 | Thrifty Car Rental | $750.00 |
| 7/24/2002 | Thrifty Car Rental | $1,124.02 |
| 6/17/2002 | Hydraulic Crane Specialists | $5,000.00 |
| 7/7/2002 | Hydraulic Crane Specialists | $6,557.50 |
| 11/2/2002 | Boh Bros. Construction | $6,611.00 |
| 7/8/2002 | GE Capital Modular Space | $1,608.00 |
| 7/8/2002 | Diversified Employment | $2,296.26 |
| 12/12/2002 | Diversified Employment | $40,169.22 |
| 7/8/2002 | J & C Diversified Services | $2,500.00 |
| 7/29/2002 | Reliable Staffing | $1,394.04 |
| 8/14/2002 | Reliable Staffing | $2,202.48 |
| 8/14/2002 | Reliable Staffing | $2,741.55 |
| 10/25/2002 | Reliable Staffing | $28,343.97 |
| 12/10/2002 | Bagby & Russell Electric | $62,495.57 |
| 5/10/2002 | Alamo Transformer Supply | $8,600.00 |
| 10/28/2002 | Alamo Transformer Supply | $8,600.00 |
| 5/10/2002 | Silvertrans, Inc. | $17,835.00 |

|  |  |  |
|--|--|--|
|  |  | $206,828.61 |
|  | Clark, Greer, Latham | ($2,500.00) |
|  |  | $204,328.61 |

CSMGT-00363

# DEFENDANTS' EXHIBIT 5



# Leon A. Greenblatt

330 South Wells Street, Suite 718
Chicago, Illinois, USA 60606
Tel: (312) 341-4041
Fax: (312) 341-9596

CSMG GASTECH, A TEXAS Limited Liability Company
CONSORTIUM MANAGEMENT GROUP, INC, A Texas Corporation
500 No. Shoreline, Suite 701
Corpus Christi, Texas 78471

March 18, 2002

Dear Mr. Robbins:

This letter constitutes Notice of Default by Lender of your Note dated February 15, 2002. This default is due to the failure of Lender to receive 150,000 shares of borrower on or before the close of business on March 15, 2002.

Lender may exercise any or every remedy, right or power permitted to it law, either by suit in equity or by action at law or both to collect principal due, interest due, costs and attorney's fees. We urge you to cure this default. It is a bad way to start out.

Yours truly,

Leon A. Greenblatt

EXHIBIT
Greenblatt
#5
8-27-07

CSMGT-00432

03/18/2002  15:13    3123419596

**Banco Panamericano**
330 South Wells, Suite 718
Chicago, IL 60606
312-341-4040– Telephone
312-341-9596 - Fax

# facsimile transmittal

| | | | |
|---|---|---|---|
| **To:** | Don Robbins | **Fax:** | 361-884-0792 |
| **From:** | Leon Greenblatt | **Date:** | 03/18/2002 |
| **Re:** | | **Pages:** | 2 Pages (inc. this page) |
| **CC:** | | | |

Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Notes:

CSMGT-00433

# DEFENDANTS' EXHIBIT 6

# CONSORTIUM SERVICE MANAGEMENT GROUP, INC.



**DONALD S. ROBBINS**
President, C.E.O.
Corpus Christi, Texas



**GORDON W. ALLISON**
Executive Vice President
Oklahoma City, Oklahoma

March 19, 2002

Mr. Leon Greenblat
Banco Panamericano
300 South Wells St.
Suite 718
Chicago, IL 60606

VIA FAX: 312-341-9596

<u>1 Page</u>

RE: Stock Certificate due

Dear Mr. Greenblatt,

I am in receipt of your letter of March 18, 2002 regarding Notice of Default because the 150,000 share stock certificate has not been delivered.. I wish to apologize for the delay by the transfer agent on the certificate issue. Your stock certificate was ordered on February 25, 2002 as soon as I received the proper name for the certificate. As I mentioned in Chicago meeting it normally takes our transfer agent about 4 weeks to issue the stock certificates (the reason I did not want the certificate due in your office on March 1st). I spoke with the transfer agent today and I understand the certificate is will be issued today and being sent to my office. I will overnight the certificate to you when it arrives.

Best Regards,

Donald S. Robbins
President and CEO

CSMGT-00434

701 North Tower • 500 N. Shoreline • Corpus Christi, TX 78471 USA • (361) 887-7546 • fax (361) 884-0792 • e-mail csmg@swbell.n
252010 Kiev Ukraine 3 Janvarskogo Vosst. Str., Ste. 147 • tel/fax 380-44-290-4629
Maple Ridge Road • Oklahoma City, OK 73120 USA • phone/fax (405) 748-7424 • e-mail EEdsi@swbell.net

# DEFENDANTS' EXHIBIT 7



# DEFENDANTS' EXHIBIT 8

# CONSORTIUM SERVICE MANAGEMENT GROUP, INC.



**DONALD S. ROBBINS**
President, C.E.O.
Corpus Christi, Texas



**GORDON W. ALLISON**
Executive Vice President
Oklahoma City, Oklahoma

June 19, 2002

Mr. Leon Greenblat
Banco Panamericano
300 South Wells St.
Suite 718
Chicago, IL 60606

1 Page

VIA FAX: 312-341-9596

RE: BOH Brothers Payment

Dear Leon,

BOH Brothers has been calling and writing in regards to the foundation invoice due of $54,800 billed on April 2, 2002. I understand from a conversation today with John Creedon construction manager for CSMG and Mark Cacamis of BOH Brothers that BOH brothers intends to take action against us next week unless payment is received. I am concerned over the damaging effect this will have on CSMG and the project.

In addition BOH Brothers is supposed lay the rock at the site and install the last foundation for the transformer. They will not do this work unless they receive some payment.

Thank You,

Donald S. Robbins
President and CEO

EXHIBIT
Greenblatt
#6
8-27-07

CSMGT-004:

701 North Tower • 500 N. Shoreline • Corpus Christi, TX 78471 USA • (361) 887-7546 • fax (361) 884-0792 • e-mail csmg@swbell.
252010 Kiev Ukraine 3 Janvarskogo Vosst. Str., Ste. 147 • tel/fax 380-44-290-4629
12205 Maple Ridge Road • Oklahoma City, OK 73120 USA • phone/fax (405) 748-7424 • e-mail EEdsi@swbell.net
www.ctum.com

# DEFENDANTS' EXHIBIT 9

**CONSORTIUM SERVICE MANAGEMENT GROUP, INC.**
**500 NORTH SHORELINE, SUITE 701 NO.**
**CORPUS CHRISTI, TX 78471**
Telephone 361-887-7546 / FAX 361-884-0792

July 3, 2002

Mr. Leon Greenblatt
President
Banco Panamericano

Via Fax: 312-341-9596

Dear Mr. Greenblatt,

In good faith CSMG entered into the agreement with Banco Panamericano and yourself for financing of $ 208,300 of the installation costs of the CO-2 separator in Chastang Al with invoices to be paid upon receipt by Banco Panmericano. To date CSMG has submitted approximately $ 140,000 in invoices but less than $40,000 has been paid. Some invoices are more than 90 days old. We are having great difficulty securing services and equipment as a result of the unpaid invoices. BOH Brothers Construction or Greer – Latham Engineering will not finish their work until payment is received.

I am in Mobile now and the installation is moving along but we need additional equipment and services immediately that we have submitted invoices on. The latest invoices submitted for hotel, cranes, G E modular for construction office trailer, Greer Latham, J & C diversified engineering and CAT Rental have not been paid.

We are spending thousands of dollars per day for the Ukraine Specialists in Mobile but they are only here 30 days to complete the project. We need to give them full support of equipment and day laborers.

We beginning to lose time and efficiency and I am concerned over current and future damages to CSMG.

As you previously agreed, please pay the invoices immediately and provide us with notification so we can secure the necessary project services and equipment.

If you need to talk with me you can reach me on my Mobile # at 361-688-4354 or 251-345-9588 room 117.

Sincerely,

Donald S. Robbins
President and CEO

EXHIBIT
Greenbla
#7
8-27-0

CSMGT-00436

# DEFENDANTS' EXHIBIT 10

# CONSORTIUM SERVICE MANAGEMENT GROUP, INC

**DONALD S. ROBBINS**
President, C.E.O.
Corpus Christi, Texas

**GORDON W. ALLISON**
Executive Vice President
Oklahoma City, Oklahoma

FAXED 12:44

July 12, 2002

Mr. Leon Greenblat
Presidnet
Banco Panamericano
300 South Wells St.
Suite 718
Chicago, IL 60606

VIA FAX: 312-341-9596                    2 Pages

RE: Payments on Chastang Landfill project

Dear Mr. Geenblatt,

As you know Banco Panamericano has failed to complete its payments to venders on the loan to Consortium Service Management Group, Inc. on a timely basis, therefore we are in serious jeopardy with our partners, venders and manufacturers. I have notified you twice before on the seriousness of the problem, the damages to CSMG and damaging effect of our business relationships. Moreover RTC was supposed to install the piping from the blower to the CO-2 separation plant, the metering system and pipeline from the CO-2 separation complex to the pipeline. To my knowledge this work has not begun.

As CSMG has informed RTC and yourself we anticipated the installation to be completed in 30 days from the arrival of the Ukraine experts. We have a crew of high quality Ukraine specialists that arrived on June 23rd and whose I-94 visas expire on July 31, 2002. This crew is unable to complete their mounting because Banco Panamericano has not paid the crane company (most urgent). We need the crane on Monday the 15th in order to set the desorbers and absorbers. We believe the mounting part will be completed by July 31st.

These delays are very expensive as the ticker keeps ticking for hotel, food, visa changes, per diem, labor costs and factory representatives daily costs which runs thousands of dollars per day.

I sent you a letter on July 8th showing the most urgent payments(copy attached) to keep the project moving and I appreciate the partial payments sent. The remainder needs to be sent and the most urgent of those payments that needs to arrive by Monday morning the 15th are Hydraulic Crane Specialists, remainder of J & C Diversified and Greer, Latham Engineers.

Please take care of these payments today by overnight delivery to John Creedon at the Towne Place suites in Mobile AL. You have the address.

Sincerely,

Donald S. Robbins
President and CEO

EXHIBIT
Greenbla
#8
8-27-0

Snc C 101

701 North Tower • 500 N. Shoreline • Corpus Christi, TX 78471 USA • (361) 887-7546 • fax (361) 884-0792 • e-mail csmg@swbell.n
252010 Kiev Ukraine 3 Janvarskogo Vosst. Str., Ste. 147 • tel/fax 380-44-290-4629
12205 Maple Ridge Road • Oklahoma City, OK 73120 USA • phone/fax (405) 748-7424 • e-mail EEdsi@swbell.net
www.ctum.com

CSMGT-00437

# DEFENDANTS' EXHIBIT 11



**CONSORTIUM SERVICE MANAGEMENT GROUP, INC.**

July 24, 2002

~FAXED~

Mr. Leon Greenblat
President
Banco Panamericano
300 South Wells St.
Suite 718
Chicago, IL 60606

VIA FAX: 312-341-9596                                    1 Pages

RE: Payments on Chastang Landfill project


Dear Mr. Geenblatt,

   As I have expressed in prior correspondence, I am very concerned that the invoices being sent to Banco Panamericano are not being paid. To date we have submitted in excess of $181,000 in invoices with just over $50,000 actually paid. The payment delays that are for equipment, services and housing have resulted in project completion delays by at least 30 days. Our people have been on the Chastang site ready, willing and able to perform their duties with an original projected installation completion date of 7-23-02 but work has been impaired by the shortage of equipment and services when needed.

   The BOH Brothers invoice is almost 120 days old. We need BOH Brothers to finish the foundations for your compressors, our transformer and laying the finishing rock cover on the site. Moreover, BOH Brothers is filing liens against the Chastang project on August 2, 2002 and this will be very damaging to CSMG.   In addition due to the inability to secure equipment and services when needed and meet the original project projected completion date CSMG has been forced to extend the contract and housing for the Ukraine experts at an additional cost of just over $59,000.

   After foundations are poured there will be approximately 10 days for curing before compressors and transformer can be set. In addition we will need at least two and perhaps three weeks to tweak the system once mounting and installation is complete. Once the tweaking begins there is a good deal of work from RTC that must be done adjusting the landfill wells. As A result your contractual schedule for selling gas in the pipeline of September 1, 2002 will be very tight. By paying the invoices immediately and with RTC completing its work on the pipeline, metering system, closing wells for gas quality and compressor installation we should be able to meet the September 1, 2002 date.

   Please inform of your intent to complete the funding of our invoices.

Sincerely,

*Donald S. Robbins*

Donald S. Robbins
President and CEO

EXHIBIT
Greenblat
#9
8-27-07

---

***CSMG OFFICES:*** Corpus Christi, TX - Oklahoma City, OK – Kiev, Ukraine
Contact: Donald S. Robbins President and CEO   500 No. Shoreline, Suite 701 No., Corpus Christi, TX 78471
Telephone 361-887-7546  Telefax: 361-884-0792  E-Mail csmg@sbcglobal.net
WEB Site: www.ctum.com

# DEFENDANTS' EXHIBIT 12



# CONSORTIUM SERVICE MANAGEMENT GROUP, INC

**DONALD S. ROBBINS**
President, C.E.O.
Corpus Christi, Texas

**GORDON W. ALLISON**
Executive Vice President
Oklahoma City, Oklahoma

August 12, 2002
Mr. Leon Greenblat
President
Banco Panamericano
300 South Wells St.
Suite 718
Chicago, IL 60606

## FILE COPY

Certified Overnight Mail

7000  0520 0016 9464 8590

RE: Payments on Chastang Landfill project

Dear Mr. Greenblatt,

I have faxed 3 letters (copies attached) to you regarding my concerns of damages to CSMG caused by Banco Panamericano Inc.'s failure to pay the our submitted invoices as agreed. To date you nor Banco Panamericano Inc. have responded to any of the faxed letters or my telephone calls to you.

As of today the maximum loan amount of $203,800 of invoices have been submitted to Banco Panamericano Inc. and less than $60,000 has been paid . Moreover, some of the checks that Banco Panamericano Inc did send out to venders bounced for "non sufficient funds".

Today Boh Bros. Construction called and informed me they were going to take immediate legal action against CSMG including claims of fraudulent dealings unless the invoice was paid.

In good faith CSMG entered into the loan agreement with Banco Panamericano Inc.. I good faith and as part of the agreement CSMG issued 150,000 shares of CSMG rule  common stock to Banco Panamericano Inc. as part of the loan interest. In good faith and at the insistence of  Banco Panamericano Inc. such stock had to be delivered to Banco Panamericano Inc. prior to Banco Panamericano Inc. making any invoice payments under the loan agreement. In good faith CSMG expected its invoices to be paid by  Banco Panamericano Inc.as agreed. In good faith CSMG delivered the $CO_2$ separation equipment, ordered the necessary mounting and installation services, cleared the location, poured foundations, brought the Ukraine specialists over and have almost completed the $CO_2$ separation equipment mounting. In good faith CSMG hired the Employment placement firms and other venders who are calling daily for payments that Banco Panamericano Inc is obligated to pay. In good faith CSMG expected Banco Panamericano Inc. to honor its agreement especially in light of  your and  Banco Panamericano Inc. insistence on receiving your rule 144 common stock  prior to the start of Banco Panamericano Inc.  making payments.

Of the invoices submitted to Banco Panamericano Inc. and in order to keep the installation and mounting from being stopped CSMG has paid directly  $3,148 of the hotel bill, $ 10,863 to J & C diversified,  $10,000 to employment placement firms and today $54, 800 to Boh Brothers Construction. All of these invoices were faxed to to Banco Panamericano Inc. but were  not  paid.

Banco Panamericano, Inc. is in breach of its lending agreement and contract with CSMG and has not acted in good faith.  CSMG may and will take all necessary legal remedies against yourself and Banco Panamericano, Inc. including recovery of all damages unless this breach is cured.  This is a bad way to do business.

For Invoices that CSMG paid of $3,148.00 to Towneplace Suites,  $10,863.00 to J&C Diversified, $10,000.00 to Diversified Employment Service and $54,800.00 to  Boh Bros. Construction, make checks out directly to Consortium Service Management Group, Inc., 500 no. Shoreline,  Suite 701 no. Corpus Christi, TX 78471.  All other invoices submitted you have the mailing address.

Sincerely

*Donald S. Robbins*

Donald S. Robbins
President an CEO

EXHIBIT
Greenblatt
#10
8-21-07

CSMGT-00439

701 North Tower • 500 N. Shoreline • Corpus Christi, TX 78471 USA • (361) 887-7546 • fax (361) 884-0792 • e-mail csmg@sw.bell.n
252010 Kiev Ukraine 3 Janvarskogo Vosst Str., Ste. 147 •  tel/fax 380-44-290-4629
12205 Maple Ridge Road • Oklahoma City, OK 73120 USA • phone/fax (405) 748-7424 • e-mail EEdsi@swbell.net
www.ctum.com

# DEFENDANTS' EXHIBIT 13



# CONSORTIUM SERVICE MANAGEMENT GROUP, INC.

**DONALD S. ROBBINS**
President, C.E.O.
Corpus Christi, Texas

**GORDON W. ALLISON**
Executive Vice President
Oklahoma City, Oklahoma

October 28, 2002
Mr. Leon Greenblat
President
Banco Panamericano
300 South Wells St.
Suite 718
Chicago, IL 60606

VIA FAX: 312341-9596

RE: Completion of Chastang Landfill project

Dear Mr. Greenblatt,

    I have been informed the Chastang project must be completed and flowing gas by 12-22-02. To date CSMG has submitted in excess of $ 203,800 in invoices to be paid under the loan agreement with Banco Panamericano "Banco". Banco has paid $93,329.82 leaving a balance of funding due of $110,470.18. CSMG has under protest paid many of the invoices submitted to Banco for payment. These include: Boh Brothers $65,400, Towne Place Suites $ 17,000, Diversified Employment $10,000, Cat Rental Store $ 6,500, J&C Diversified $17,025 and misc. supplies over $12,000 which are some of the largest payments.
    At this time CSMG it will be very difficult to cover the remainder of the costs of installation without the remainder of the Banco loan being funded.
    In order to have adequate time to adjust and tweak the equipment the installation should be completed no later than the first week of December 02, therefore foundations should be completed by 11-5-02 and structures no later than 11-15-02. CSMG will need the loan funding of $110,470.18 in the next 7 days or Banco can make payments on outstanding balances directly to Boh Brothers, Latham Greer, Bagby and Russell, Diversified employment, Alamo transformer, The Cat store and GE rental over the next 7 days.
    Please let me know how you intend to handle the funding by 10-31-02 as I will be traveling and difficult to reach between 11-1-02 and 11-12-02.

Sincerely,

Donald S. Robbins
President and CEO

Cc: John Connolly
     President RTC

EXHIBIT
Greenblatt
#11
8-27-07

CSMGT-00440

701 North Tower • 500 N. Shoreline • Corpus Christi, TX 78471 USA • (361)887-7546 • fax (361)884-0792 • e-mail csmg@sbcglobal.
252010 Kiev Ukraine 3 Janvarskogo Vosst. Str., Ste. 147 • tel/fax 380-44-290-4629
12205 Maple Ridge Road • Oklahoma City, OK 73120 USA • phone (405)748-7424 • fax (405)748-7475 • e-mail EEdsi@swbell.ne
6212 Berlee Dr., Alexandria, VA 22312-612 USA • (703)354-6883 • fax (703)642-7210 • e-mail hhouauser@ctum.com
www.ctum.com

# DEFENDANTS' EXHIBIT 14

FROM :

Aug 10 04 04:23p

# Banco Panamericano, Inc.
330 South Wells Street, Suite 718
Chicago, Illinois, USA 60606
Tel (312) 341-4041
Fax (312) 341-9596

CSMG GASTECH, A TEXAS Limited Liability Company
CONSORTIUM SERVICES MANAGEMENT GROUP, INC, A Texas
Corporation
500 No. Shoreline, Suite 701
Corpus Christi, Texas 78471

December 10, 2002

Dear Mr. Robbins:

This letter constitutes additional Notice of Default by
Lender of your Note dated February 15, 2002. This default is
due to the failure of Lender to receive interest and principal
payments when due, failure to pay principal and interest upon
maturity, failure to pay a judgment was entered against the
Company in the amount of $52,091 in favor of Bagby & Russell
Electric Company, failure of the Principals as defined in the
Consolidated Guaranty and Security Agreement to maintain 51%
ownership in CSMG. While Lender has indulged CSMG until now,
Lender insists that CSMG perform its obligation under this and
other sections of the Note and Security Agreement immediately
or make arrangements agreeable to Lender in its sole
discretion.

Lender may exercise any or every remedy, right or power
permitted to it law, either by suit in equity or by action at
law or both to collect principal due, interest due, costs and
attorney's fees. We urge you to cure this default or make
arrangements satisfactory to Lender in its sole discretion.

Yours truly,

Leon A. Greenblatt
President

EXHIBIT
Greenblatt
#12
8-27-07

CSMG                    Aug 11 04 01:33P

CSMGT-00442

# DEFENDANTS' EXHIBIT 15

# BANCO PANAMERICANO, INC.
330 South Wells, Suite 718
Chicago, Illinois 60606
(312) 342-9596 Fax

January 26, 2005

<u>VIA TELECOPIER (361) 884-0792 AND BY OVERNIGHT MAIL</u>
Mr. Donald Robbins
Consortium Management Group, Inc., also known as
Consortium Service Management Group, Inc.
CSMG Gastech, LLC
500 Shoreline Drive, Suite 700
Corpus Christie, Texas 78471

Case: 1:07-cv-00015    Document 73-14    Filed 12/21/2007    Page 3

Re: *Promissory Note in the amount of $203,800*
*Maturity Date: April, 2004*
*Notice of Default*

Dear Mr. Robbins:

Consortium Management Group, Inc., also known as Consortium Service management Group, Inc. and CSG Gastech, LLC (collectively CSMG) are indebted to Banco Panamericano, Inc. ("Banco") as evidenced by a $203,800 promissory note dated February 15, 2002 (the "Banco Indebtedness").

CSMG failed to make payments due on the first day of each month, beginning June 1, 2002. In addition, CSMG failed to make monthly payments of all accrued unpaid interest due. Finally, CSMG failed to pay all remaining principal together with all accrued interest due and payable on the Maturity Date of June 1, 2004, and has failed to pay accumulated late charges. Banco will declare default due to non-payment on the Banco Indebtedness, and increase the interest rate by 36.5 percentage points, if payment in the amount of $288,703.60 is not received within five days.

Banco also declares a default on the Banco Indebtedness under the terms of the Promissory Note because CSMG Gastech, LLC was involuntarily dissolved by the Texas Secretary of State on February 14, 2003.

Sincerely yours,

Leon A. Greenblatt, III
President, Banco PanAmericano, Inc.

**Exhibit E**

# DEFENDANTS' EXHIBIT 16

## Orla Collier

| From: | Orla Collier |
|---|---|
| Sent: | Tuesday, September 16, 2008 12:53 PM |
| To: | 'Louis D. Bernstein' |
| Subject: | RE: Banco v. CSMG - Case No. 07-CV-15 |

Are you agreeing the spreadsheet is not evidence and should not be considered as evidence by the court?

*Chip Collier*
Telephone 614) 223-9340
Facsimile (614) 223-9330

---

**From:** Louis D. Bernstein [mailto:L.Bernstein@muchshelist.com]
**Sent:** Tuesday, September 16, 2008 12:05 PM
**To:** Orla Collier
**Cc:** James T. Zeas; Jonathan D. Sherman
**Subject:** RE: Banco v. CSMG - Case No. 07-CV-15

We will correct the error with the exhibits and will shortly be sending them to you.
An attorney in my office prepared the spreadhsheet, which was prepared for the court's convenience, so we will obviously not be presenting him for deposition.

Louis D. Bernstein
Much Shelist
Much Shelist Denenberg Ament and Rubenstein, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606
Phone 312.521.2654
Fax 312.521.2554
LBernstein@muchshelist.com
www.muchshelist.com

**Associated with International ALLIANCE of Law Firms**

Please consider the environment before printing this email.

The information contained in this email communication is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

**Circular 230 notice**
To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (I) avoiding penalties under the Internal Revenue code or (II) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Janice A. Martindale [mailto:jmartindale@BFCA.COM] **On Behalf Of** Orla Collier
**Sent:** Tuesday, September 16, 2008 10:57 AM
**To:** Louis D. Bernstein
**Subject:** Banco v. CSMG - Case No. 07-CV-15

Lou, your filing yesterday was incorrect. Not all exhibits were electronically filed. We do not have Exhibits 22, 23, 24, 25, 26, 27 and 28.

9/16/2008

It appears that the exhibits were filed in five groups less than 50 pages. The fifth group of filings did not include Exhibits 22-28 but repeated Exhibits 14-21.

Please forward electronically Exhibits 22-28.

Also, please identify that person (or persons) who prepared the spreadsheet attached as Exhibit B. We may want to depose this person.

Thanks.

Chip

*Orla E. Collier*
Benesch Friedlander Coplan & Aronoff LLP
41 S. High Street, Suite 2600
Columbus, Ohio 43215
✉ ocollier@bfca.com
☎ (614) 223-9300 Main
☎ (614) 223-9340 Direct
🖷 (614) 223-9330 Fax
*Assistant: Janice Martindale (614) 223-9314*

To ensure compliance with requirements imposed by the IRS, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Confidentiality Note: This message is intended for use only by the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify Janice Martindale at (614) 223-9314 immediately by telephone. Thank you.

9/16/2008